# EXHIBIT A-1

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM   INDEX NO. 153601/201

NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 04/08/201

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

STATE OF QATAR,

*Plaintiff,*

*-against-*

FIRST ABU DHABI BANK PJSC,
SAMBA FINANCIAL GROUP SJSC,
AND JOHN DOE DEFENDANTS 1–20

*Defendants.*

Index No. _____

**SUMMONS**

---

TO THE ABOVE-NAMED DEFENDANTS:

(See attached List of Defendants with Addresses)

YOU ARE HEREBY SUMMONED to serve upon plaintiff's attorneys an answer

to the complaint in this action within 20 days after the service of this summons, exclusive

of the day of service, or within 30 days after service is complete if this summons is not

personally delivered to you within the State of New York.  In case of your failure to

answer, judgment will be taken against you by default for the relief demanded in the

complaint.

Plaintiff designates New York County as the place of trial.  The basis of venue is

CPLR § 301 and § 302(a)(2).

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

Dated: New York, New York
April 8, 2019

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

By: _Daniel J Kramer/KF_

Daniel J. Kramer
Theodore V. Wells, Jr.
Andrew J. Ehrlich
Geoffrey R. Chepiga
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
dkramer@paulweiss.com
twells@paulweiss.com
aehrlich@paulweiss.com
gchepiga@paulweiss.com

Jonathan L. Hochman
Karen M. Steel
SCHINDLER, COHEN & HOCHMAN LLP
100 Wall Street, 15th Floor
New York, NY 10005
(212) 277-6300
jhochman@schlaw.com
ksteel@schlaw.com

*Attorneys for Plaintiff State of Qatar*

2

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/201

RECEIVED NYSCEF: 04/08/201

## DEFENDANTS SERVICE LIST

First Abu Dhabi Bank PJSC
FAB Building, Khalifa Business Park, Al Qurm District, Abu Dhabi, UAE

Samba Financial Group
King Abdul Aziz Rd, Riyadh 12629, Saudi Arabia

3

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM    INDEX NO. 153601/2019

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 04/08/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

STATE OF QATAR,

*Plaintiff*,

-*against*-

FIRST ABU DHABI BANK PJSC, SAMBA
FINANCIAL GROUP SJSC, AND JOHN DOE
DEFENDANTS 1–20

*Defendants*.

Index No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

Page

NATURE OF THE ACTION .................................................................................................. 1

THE PARTIES...................................................................................................................... 3

  A.  PLAINTIFF....................................................................................................... 3

  B.  DEFENDANTS ................................................................................................. 4

JURISDICTION AND VENUE ............................................................................................ 5

BACKGROUND ................................................................................................................... 6

  A.  THE ILLEGAL BLOCKADE OF QATAR ..................................................... 6

  B.  THE BANQUE HAVILLAND PLAN TO WAGE FINANCIAL WARFARE ON QATAR..................................................................................................... 7

      1.  Banque Havilland's Plan to Wage Financial Warfare .............................. 8

          (a)  Attacking the Currency ................................................ 9

          (b)  Attacking Qatari Bonds ............................................... 10

          (c)  Attacking Qatar Through the Media ........................... 11

          (d)  The Intended Outcome of the Banque Havilland Scheme ............................ 12

  C.  DEFENDANTS ATTACK THE RIYAL AND TRY TO BREAK THE PEG ............... 13

      1.  Defendants Weaponized Bloomberg and Reuters in Their Attack.......................... 13

      2.  The Currency Attack Continues Through the Fall of 2017 ..................................... 18

      3.  Defendants' Quotes on Bloomberg and Reuters Were Fraudulent.......................... 19

      4.  Defendants' False Quotes Abated When the Banque Havilland Presentation Was Exposed................................................................................................ 21

      5.  Defendants' Currency Manipulation Caused Harm to Qatar and Investors in New York County and Elsewhere ...................................................................... 22

  D.  DEFENDANTS' MANIPULATION OF QATARI BONDS AND CREDIT DEFAULT SWAPS .............................................................................. 24

  E.  ADDITIONAL MANIPULATIVE CONDUCT .............................................. 27

      1.  Use of the Media to Amplify Harm to Qatar .......................................... 27

      2.  Efforts to Cause Runs on Qatari Banks .................................................. 28

  F.  QATAR HAS SUFFERED SUBSTANTIAL HARM AS A RESULT OF DEFENDANTS' SCHEME............................................................................. 28

CLAIMS FOR RELIEF ....................................................................................................... 30

FIRST CLAIM FOR RELIEF ............................................................................................. 30

SECOND CLAIM FOR RELIEF ........................................................................................ 33

THIRD CLAIM FOR RELIEF ............................................................................................ 34

i

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM          INDEX NO. 153601/2019

NYSCEF DOC. NO. 1                                                RECEIVED NYSCEF: 04/08/2019

PRAYER FOR RELIEF .......................................................................................................... 35

JURY TRIAL DEMANDED ................................................................................................... 36

Plaintiff State of Qatar ("Qatar"), by and through its attorneys, brings this action against First Abu Dhabi Bank PJSC ("FAB"), Samba Financial Group SJSC ("Samba Bank"), and John Doe Defendants 1–20 (the "John Doe Defendants"), and alleges as follows with knowledge as to its conduct and on information and belief as to the conduct of others:

## NATURE OF THE ACTION

1.  In this lawsuit, Qatar seeks relief from brazen schemes to manipulate the markets for Qatari currency, bonds, and other financial instruments.

2.  The schemes arise out of an illicit blockade of Qatar by the Kingdom of Saudi Arabia ("Saudi Arabia"), the United Arab Emirates ("UAE"), and the Kingdom of Bahrain ("Bahrain"), which seeks to isolate Qatar by land, air, and sea. As the United Nations High Commission on Refugees has determined, the blockade is unlawful and violates international humanitarian law. Undeterred by this finding, the blockading countries seek to continue and deepen the unlawful isolation of Qatar. Indeed, Saudi Arabia has announced its intention to relocate a nuclear waste site to its border with Qatar and to dig a canal along the border, literally turning Qatar into an island.

3.  Not satisfied with Qatar's physical isolation, financial institutions and individuals in league with the blockading countries launched a campaign of financial warfare against Qatar. Defendants and others engaged in an array of unlawful, manipulative, and fraudulent conduct — including fictitious quoting (or "spoofing") and crossing transactions (or "wash sales") — both in New York County and elsewhere, in an attempt to devalue Qatar's currency (the "Riyal" or "QAR") and cause significant financial harm to Qatar.

4.  Elements of Defendants' schemes are set out in an extraordinary PowerPoint presentation created by Banque Havilland (the "Banque Havilland Presentation" or the "Presentation"), a Luxembourg bank with deep ties to the UAE ruling family. The Banque

Havilland Presentation outlined a strategy for manipulating Qatar's financial instruments, which Defendants FAB, Samba, and the John Doe Defendants executed in New York and elsewhere.

5.    The plan included, among other things, a scheme to devalue Qatar's currency, the Riyal, and "break the peg" — the fixed exchange rate at which the Riyal has traded to the U.S. Dollar for more than a decade. Consistent with the Banque Havilland Presentation, Defendants and others tried to artificially devalue the Riyal by submitting thousands of fictitious and depreciated bid/ask quotes to foreign currency platforms that Thomson Reuters and Bloomberg, L.P. hosted in New York County, and to manipulate key composite foreign exchange rates that Reuters and Bloomberg compiled and published in New York County. Defendant FAB and others made these fictitious quotes a few weeks after the illegal blockade began, during the Eid al-Fitr holidays — one of the holiest periods of the Muslim calendar — when markets in the region traditionally have very little activity and their false quotes were more likely to be included in Bloomberg and Reuters indices.

6.    But the quotes were phony, as FAB, Samba Bank, and others repeatedly refused to transact with counterparties at the prices they were quoting in public.

7.    The fictitious quotes had Defendants' desired manipulative effect: they altered the Bloomberg and Reuters composite rates to show a devalued price of the Riyal. In response, Qatar liquidated investments, including nearly $3 billion in U.S. Treasury bills and notes held by Qatar in accounts in New York County, incurred losses, and drew down foreign currency reserves, using more than $40 billion to support its currency. This furthered an object of Defendants' conspiracy, which, as described by the Banque Havilland Presentation, was to deplete Qatar's financial reserves so that it would be unable to complete its preparations to host

2

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

the 2022 FIFA World Cup games, and would be forced to share the games with Saudi Arabia or the UAE.

8.  Defendants intended their quotes to signal weakness in the Riyal and, by submitting frequent, coordinated quotes, Defendants' actions had a direct effect on investors in New York County and elsewhere. Not only did the offshore exchange rates Bloomberg and Reuters compiled show that the value of the Riyal had declined significantly, but U.S. Dollar-denominated Qatari bond prices also fell, and the rates on credit default swaps ("CDS"), which rise in value as bond prices fall, more than doubled.

9.  Defendants' conduct has been manipulative, deceptive, fraudulent, and unlawful. Manipulative conduct is still ongoing, and the full extent of Defendants' schemes is not yet known.

10. Through this action, Qatar seeks to hold FAB, Samba Bank, and the unknown John Doe Defendants who conspired with them liable for the billions of dollars in damages that they have caused to Qatar, plus punitive damages and statutory interest.

## THE PARTIES

### A.  PLAINTIFF

11. Qatar is a foreign sovereign nation. It operates through its agencies and instrumentalities, including the Qatar Central Bank ("QCB"), Ministry of Finance ("MoF"), and the Qatar Investment Authority ("QIA"). The QIA operates a subsidiary in New York County, the Qatar Investment Authority Advisor (USA), Inc.

12. By decree, Qatar's currency—the Riyal—is pegged at an exchange rate of 3.64 Riyal to the U.S. Dollar (the "Peg"). This exchange rate has been stable for more than a decade. It provides consistency and reliability to foreign investors and is the bedrock of Qatar's monetary

policy. At all relevant times, the QCB has stood behind the Peg, and has been willing and able to exchange Riyals at the pegged rate.

13. Qatar issues billions of dollars in government bonds that are denominated in U.S. Dollars and trade in the United States, including in New York County. More Qatari sovereign bonds are believed to be held in the United States than in any other country in the world. Large U.S. insurance companies located in New York County, among others, publicly report their holdings of Qatari sovereign bonds.

14. As a result of Defendants' manipulative conduct, Qatar suffered significant harm when it was forced to liquidate billions of dollars of investments held in New York County and elsewhere in order to provide liquidity to Qatari banks to maintain the Peg.

## B. DEFENDANTS

15. FAB, formerly known as National Bank of Abu Dhabi, is a financial institution based in the UAE with branches across the world, including in the United States. FAB has ties to the UAE government, and its largest shareholders include the Abu Dhabi Investment Council and the Mubadala Investment Company, which are sovereign wealth funds. Mubadala Investment Company's parent, the Mubadala Development Company, is partnering with the owners of Banque Havilland in a joint venture, to create the Anglo-Gulf Trade Bank ("AGTB"), one of the world's largest privately owned trade-finance banks.

16. Samba Bank is a financial institution based in Saudi Arabia with branches across the globe. Samba Bank has ties to the Saudi government. Its largest shareholders include the government of Saudi Arabia and its sovereign wealth funds.

17. John Doe Defendants 1–20 are individuals or entities whose identities are currently unknown. The John Doe Defendants participated in, conspired with others, or aided and abetted others in performing the unlawful acts alleged herein.

4

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/201!
RECEIVED NYSCEF: 04/08/201!

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to CPLR 301 and 302(a)(2).

19.     Defendants specifically directed their fraudulent conduct at New York County, including, among other ways, by submitting fraudulent quotes through their accounts with Bloomberg and Reuters to foreign exchange platforms and data centers located in New York County.  Defendants directed their fraudulent conduct at New York County:  (i) in order to manipulate indices compiled and published in New York County, which are relied upon by investors in New York County and elsewhere; (ii) in order to influence financial markets in New York County, where substantial Qatari assets are held by large New York-based institutional investors; (iii) in order to influence Qatar itself, which through its agencies and instrumentalities has offices in New York County and held significant assets in New York County; (iv) with the effect of damaging Qatari assets in New York County; and (v) with the effect of damaging the many other significant investors in Qatari securities who are located in New York County.  As a result of Defendants' fraudulent conduct, Qatar and others suffered harm in New York County. Among other things, Qatar was forced to liquidate billions of dollars in investments held in accounts, including in New York County, and use those proceeds to support the Peg and stabilize Qatar's currency.

20.     The John Doe Defendants participated in the scheme, either by submitting fraudulent quotes themselves, conspiring to commit fraud, or aiding and abetting the commission of fraud directed at New York County.

21.     Venue is proper in this County pursuant to CPLR 503(a).

5

## BACKGROUND

### A.    THE ILLEGAL BLOCKADE OF QATAR

22.    On June 5, 2017, Saudi Arabia, the UAE, and Bahrain cut diplomatic ties with Qatar. These countries closed all land, sea, and air transportation links with Qatar; ordered their citizens to leave Qatar; declared a ban on all travel to and from Qatar; and instructed all Qatari residents and visitors to leave their territories within 14 days.

23.    Qatari citizens who resided in blockading countries were forced to leave those countries, abandoning their families, businesses, and property.

24.    The UAE General Prosecutor announced that anyone from the UAE that "showed any sympathy" for Qatar or its citizens on social media would be imprisoned for 3-15 years and fined over $100,000.

25.    The United Nations High Commission on Refugees has declared that the blockade of Qatar violates international humanitarian law.

26.    The illegal restrictions on the movement of people and goods had an immediate, detrimental impact on the human rights of the citizens of Qatar and the blockading countries. The blockade has destabilized Qatar's economy, impeding the flow of trade and money and increasing the costs of transportation and goods.

27.    To further the aims of the blockading countries, financial institutions and individuals in league with the blockading countries, including FAB, Samba Bank, and the John Doe Defendants, launched a campaign of financial warfare against Qatar in New York County and elsewhere, seeking to cripple Qatar by harming its financial instruments and its foreign investors.

28.    The illegal blockade continues to this day.

6

**B.   THE BANQUE HAVILLAND PLAN TO WAGE FINANCIAL WARFARE ON QATAR**

29.     Although the full scope of Defendants' scheme is not yet known, a remarkable PowerPoint presentation — the Banque Havilland Presentation — was published by *The Intercept* on November 9, 2017 (attached hereto as Exhibit A) and subsequently garnered world-wide news coverage.  The Banque Havilland Presentation provides a glimpse into the secretive efforts by Defendants and others to wage financial warfare on Qatar.

30.     As reported by the press, the Banque Havilland Presentation was prepared by an analyst at Banque Havilland named Vladimir Bolelyy, and was later discovered in the email inbox of the UAE Ambassador to the United States and disseminated throughout global media.

31.     Banque Havilland, S.A. is a private bank owned and controlled by the Rowland family.  Banque Havilland is a successor to failed Kaupthing Bank, several executives of which have been convicted of fraud and sentenced to prison.

32.     Banque Havilland has deep, historic ties to the UAE and its ruling family, as well as business relationships in Saudi Arabia and Bahrain.  These connections to the blockading countries supplied the motive, means, and opportunity for Banque Havilland to develop the strategy to wage unlawful financial warfare against Qatar, which Defendants carried out.

33.     The Rowland family has long had business ties to the UAE and enjoys a close relationship with the Crown Prince of Abu Dhabi, Sheikh Mohammed bin Zayed Al Nahyan (also known as "MBZ").  Indeed, the Rowland family recently announced a multi-billion dollar partnership with one of the UAE's sovereign wealth funds, Mubadala Development Company, to create one of the world's largest, privately owned trade-finance banks, AGTB.  AGTB, which is expected to have $200 billion or more in assets, is supported by funds from members of the Rowland family, who have personally committed more than $100 million, and MBZ.  The

7

Rowland family also has connections with financial institutions in Saudi Arabia and Bahrain and with senior officials in those countries.

34. Further underscoring the deep connections between the UAE, the Rowlands, and Banque Havilland, the analyst who prepared the Presentation — Vladimir Bolelyy — left Banque Havilland in 2017 to work for AGTB.

35. Newspapers reported that the Banque Havilland Presentation was found in November 2017 in the email inbox of the UAE Ambassador to the United States, Yousef Al-Otaiba. The Presentation was labelled as "Qatar Opportunity" and stored in the same electronic folder as an "update" on AGTB, again underscoring the connections between Banque Havilland and the UAE regime. Both documents were filed under a heading: "Rowland Banque Havilland."

### 1. Banque Havilland's Plan to Wage Financial Warfare

36. The Banque Havilland Presentation describes a multi-prong scheme for numerous co-conspirators to destabilize Qatar's economy. Defendants FAB, Samba Bank, and others put elements of the Banque Havilland Presentation into effect.

37. The Banque Havilland Presentation has three principal components: (1) devalue the Qatari Riyal and break the Peg; (2) drive down the prices of Qatari bonds, which would make it more difficult for Qatar to raise capital, and allow the conspirators to make money through the purchase of CDS, which would increase in value as the bonds plunged; and (3) use the media, particularly in New York County and other major financial centers, to launch a public relations assault on Qatar's reputation for financial stability. Defendants pursued each of these strategies separately, and in conjunction with each other, in their unlawful manipulative scheme to attack Qatar.

8

(a)    **Attacking the Currency**

38.    For more than fifteen years, Qatar has pegged the value of the Riyal to the U.S. Dollar at a rate of 3.64 Riyals to the U.S. Dollar.

39.    The Peg provides stability and reliability and facilitates foreign — particularly U.S. — investment. Maintaining the stability of the Peg is a bedrock of Qatar's monetary policy.

40.    Qatar has always stood by the Peg, and the QCB has exchanged the Riyal at the rate of 3.64 Riyals to the U.S. Dollar. Prior to Defendants' manipulation, there had been no material or sustained fluctuation in the Riyal-to-U.S. Dollar exchange rate for almost a decade.

41.    Because the Riyal is a pegged currency, it is not typically a heavily traded currency in international markets.

42.    As set forth in the Banque Havilland Presentation, a key part of the conspiracy was to break the Peg. If the conspirators managed to break the Peg and devalue Qatar's currency, Qatar would suffer severe economic consequences. Qatari assets would be depreciated, and foreign investors would question their investments in Qatar. Because the economic consequences of breaking the Peg would be so severe, the Banque Havilland Presentation anticipates that, if the Peg were under attack, Qatar would be forced to liquidate investments, including in New York County, and would draw down its cash reserves to support the Peg.

43.    In fact, attacking the Peg is so central to the plan presented in the Presentation that it was prominently featured in its Mission Statement. The Presentation instructs the conspirators that they must work together to manipulate Qatar's currency and financial instruments, noting that "*sanctions do not work unless adhered to by all parties*"; the "*currency peg pressure is only effective when it is exercised by all parties*"; and that "*maintaining the peg requires extensive use of central bank foreign exchange reserves*."

9

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

44.     Even if the conspirators could not break the Peg, they knew they could inflict billions of dollars of damages on Qatar by forcing Qatar to deplete its reserves and liquidate other investments to defend the Peg, which is indeed what happened. The actions of FAB, Samba Bank and others formed part of the strategy to force Qatar to defend its currency.

(b)     **Attacking Qatari Bonds**

45.     The Presentation also calls for an attack on Qatari sovereign bonds.

46.     The Presentation's Mission Statement sets forth the conspirators' aim to manipulate Qatari sovereign bonds and related CDS to drive down the value of Qatar's bonds, putting additional pressure on the country's economy, and making it more difficult for Qatar to raise money going forward. It concludes with the conspirators' goal: "*Control the yield curve, decide the future.*" In other words, by increasing the cost of Qatar's bonds and damaging its ability to raise money ("*control the yield curve*"), the conspirators sought to inflict harm on Qatar and its financial prospects ("*decide the future*").

47.     Stage 1 of the Presentation calls for the conspirators to "*Establish Execution Strategy.*" The Presentation proposes the creation of an anonymous offshore investment that would hold Qatari bonds, in order to "*create a sizeable, strong, and standalone entity which can be . . . a smaller counterpart to central bank reserve holdings*" for which "*confidentiality [was] maintained.*"

48.     This "standalone entity" would also be used to buy CDS derivative of Qatari bonds, which would increase in value as the value of the underlying bonds declined. Specifically, the Presentation calls on the co-conspirators to "*assess [the] global market conditions for the Qatari Riyal and CDS to establish an execution strategy,*" including "*determining [the] available liquidity, supply, and pricing*" and "*identifying the appropriate instruments such as currency forwards, currency options, and bond CDS.*"

10

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

49.     Stage 1 of the Presentation also outlines action by co-conspirators across different geographic regions.  Specifically, Stage 1 of the Presentation calls for "ensuring" the existence of "*trade lines*" in "*different time zones*" and the inclusion of "*second-tier banks*" to allow the co-conspirators "*maximum flexibility*" to coordinate their manipulation of Qatar's financial instruments.  The Presentation proposes "*mak[ing] targeted use of investment banks' friendship with Qatar to affect loyalty and add confusion to the marketplace*."

50.     In Stage 2, co-conspirators would "*Gear Up to Control the Yield Curve*."  This would be accomplished by engaging in manipulative trading, such as "*crossing transactions*," i.e., wash sales, "*whereby . . . affiliated part[ies] sell[] the same bond holdings back to the original seller and thereby create[] additional downward pressure [on bond prices]*."  These "*crossing transactions*" would artificially increase transaction volume, drive down prices, "*add to confusion in the marketplace*," and attract the attention of investors — all with the goal of sowing panic and prompting further sell-offs of Qatari financial instruments.  According to the Presentation, this activity would introduce downward pressure on Qatar's currency, while also increasing the value of the CDS owned by the co-conspirators.

51.     Stage 2 calls for the co-conspirators to increase purchases of CDS on Qatari sovereign bonds.  The Presentation instructs co-conspirators to seek out "*Qatar-friendly banks who may prove more willing to enter into these trade*s" and to "*increase long CDS positions slowly with large banks, just enough to move the price sufficiently to make it newsworthy*."

(c)     **Attacking Qatar Through the Media**

52.     In Stage 3 of the Presentation, the co-conspirators would focus on the "*PR Machine & Position Increase.*"  The Presentation explains that co-conspirators would increase their positions in CDS and put further downward pressure on Qatari bond prices as well as the Peg by "*fir[ing] up the PR machine to remind people that there is a problem with Qatar*."  Co-

11

**FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM**      INDEX NO. 153601/2019
NYSCEF DOC. NO. 1                                          RECEIVED NYSCEF: 04/08/2019

conspirators planned to coordinate public statements about Qatar's supposedly unstable economy in order to "*refresh the PR message to add more fuel to the fire.*"

53.      Finally, the Presentation calls for the co-conspirators to generate news articles and issue "*bold statements from neighboring countries*" that "*focus on the prospect of restricted access to [the] US Dollar and now-doubtful stability of the country.*"  The Presentation predicts that Qatar would stand behind the Peg and would have to spend significant amounts of its reserves to stabilize its currency.

### (d)      **The Intended Outcome of the Banque Havilland Scheme**

54.      According to the Presentation, Qatar's U.S. Dollar reserves would be depleted and its financial prospects would be so compromised that, among other things, Qatar might be unable to host the world's most prestigious soccer tournament — the FIFA World Cup — which Qatar is slated to host in 2022.  The Presentation notes that if the co-conspirators forced Qatar to "*spend[] its reserves on protecting the currency and domestic credit markets,*" the country would have less money to fund infrastructure spending necessary to build the 2022 World Cup stadiums and other facilities.  The Presentation anticipates that the manipulation of Qatar's economy would exacerbate the "*already increased*" construction costs for the 2022 World Cup caused by the blockade, especially since Saudi Arabia and the UAE had been the "*primary suppliers of materials*" to Qatar.

55.      If Qatar did not have the financial ability to host the 2022 World Cup, that would leave an opening for the blockading countries to make a bid to host the games as a regional event, instead of solely in Qatar.  That would bring attention, tourism, and money to the blockading countries.  Indeed, the UAE has publicly announced that it would be willing to co-host World Cup games.

12

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/201!

RECEIVED NYSCEF: 04/08/201!

56.     The Presentation also notes the co-conspirators' intent to "*appeal to FIFA . . . to [use] football as a tool to stabilize the region,*" concluding that "*if Qatar rejects the Proposal, [Qatar] will be seen [as] unwilling to work with their [Gulf Cooperation Council] partners.*"

## C.     DEFENDANTS ATTACK THE RIYAL AND TRY TO BREAK THE PEG

57.     The Banque Havilland Presentation described a multi-pronged scheme to destroy Qatar's economy.  Defendants used the Bloomberg and Reuters foreign exchange platforms — all based in New York County —to put elements of the scheme into action.

### 1.     Defendants Weaponized Bloomberg and Reuters in Their Attack

58.     In carrying out their scheme, Defendants used New York County financial data providers as unwitting tools.

59.     Bloomberg, which is headquartered in and registered to do business in New York County, and Reuters, which has its principal place of business in New York County, are market-leading New York-based data providers that distribute financial information around the world. Bloomberg and Reuters broadcast quotes that are submitted directly by contributors.  Bloomberg and Reuters also use contributors' quotes to calculate proprietary exchange rates for currency pairs including the Riyal-to-U.S. Dollar exchange rate used for trading offshore (i.e., not directly with the QCB, which provides the Peg exchange rate), via their data platforms.

60.     The proprietary currency exchange rates compiled by Bloomberg and Reuters are important international rates.  The Bloomberg and Reuters exchange rates are closely followed by market participants and relied on as benchmarks by banks and other institutions in New York County and around the world.  The values listed by the exchanges are perceived as the product of market forces and indicative of the financial health of the currency issuers.

61.     The Bloomberg and Reuters exchange rates for the Riyal are relied on and broadcast around the world, but they originate in New York County.  Bloomberg's Global FX

13

business, which manages the Bloomberg foreign exchange platform, is located in New York County, and the electronic servers holding the data Bloomberg distributes around the world are located in New York County. Similarly, Reuters' foreign exchange servers are located in New York County. By submitting false quotes for the Riyal-to-U.S. Dollar exchange rates to Bloomberg and Reuters, Defendants transmitted artificial exchange rates into New York County, through electronic servers located in New York County, and caused Bloomberg and Reuters to transmit, publish, and disseminate artificial Riyal-U.S. Dollar exchange rates from New York County.

62.     Bloomberg calculates two composite exchange rates for the Riyal-U.S. Dollar exchange rate, the Bloomberg Composite Rate ("CMP") and the Bloomberg Generic Price ("BGN"). Bloomberg uses a proprietary algorithm to calculate both exchange rates, but it publicly discloses that its algorithms consider quotes only from "privileged" contributors. Bloomberg determines which contributors are "privileged" based on the "quality and consistency of [their] data, as well as consensus with the market." For the BGN, "each contributor is assigned a quality score based on numerous factors including update frequency and spike frequency." Bloomberg's public explanation makes clear that Bloomberg's proprietary algorithm determines "privileged" contributors based on which contributors: (1) quote more frequently, (2) have stable quotes (i.e., no spikes), and (3) have quotes that are generally in line with those of other contributors.

63.     The illegal blockade started on June 5, 2017. Market evidence shows that Defendants' manipulation of the FX indices began in earnest a few weeks later.

64.     Beginning on or about Friday, June 23, 2017, FAB and others submitted thousands of sham offers to buy and sell the Riyal in significantly increased volumes of quotes,

14

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

and at substantially devalued rates to the Bloomberg and Reuters foreign exchange platforms in New York County.

65.    The choice of Friday, June 23 was significant. Markets in the region are always closed on Fridays, and currency markets are typically not active on Fridays. Moreover, Friday, June 23 was the weekend leading into the Eid al-Fitr holidays, one of the holiest periods in the Muslim calendar, when regional banks are closed for several days and currency trading activity is historically vastly reduced. This was akin to beginning the manipulation on Christmas Eve.

66.    The volume of quoting of the Riyal during the 2017 Eid al-Fitr holidays was a striking departure from regular market activity, particularly during Eid al-Fitr.

67.    During the Eid al-Fitr holidays the year before, in 2016, FAB did not submit a single quote to the foreign exchange platform hosted by Bloomberg. And, again, during the 2018 Eid al-Fitr holidays, FAB did not submit a single quote for the Riyal to the foreign exchange platform hosted by Bloomberg. By contrast, during Eid al-Fitr in 2017, FAB submitted hundreds of quotes for the Riyal every day during the holidays, all at rates substantially depreciated from the Peg.

68.    Before June 2017, FAB submitted quotes for the Riyal only sporadically to the Bloomberg foreign exchange platform in New York, and these quotes were at or very close to the Peg of 3.64. On June 23, 2017, in contrast, FAB submitted quotes for the Riyal every minute, at depreciated rates as low as 3.72 to 3.82 Riyals to the U.S. Dollar.

69.    Defendants also put pressure on the Riyal's Peg to the U.S. Dollar by submitting fictitious quotes in the market for Riyal currency forwards and non-deliverable forwards ("NDF").

15

70.     During the Eid al-Fitr holidays, FAB quoted in the Riyal currency forwards market in increasing volume and at depreciated rates. FAB continued to submit thousands of depreciated quotes per day to the Bloomberg currency forwards platform through November 2017.

71.     Defendants submitted those quotes to take advantage of quiet holiday markets in order to more easily manipulate the foreign exchange indices that are compiled by Bloomberg and Reuters in New York County and relied on by Qatar and investors around the world. Defendants intended to game the system that Bloomberg and Reuters set up, outlined above, that "privileged" frequent and consistent quoters.

72.     And, for a time, the scheme worked. FAB, Samba Bank, and others quoted the Riyal at such frequency and at such consistently depreciated rates that they were "privileged" contributors on Bloomberg.

73.     The frantic burst of fake quoting activity caused Bloomberg's Riyal-U.S. Dollar exchange rates to drop sharply. Bloomberg began compiling the quotes from this new, "established" consensus market of banks, and the so-called "offshore" Riyal rates depreciated dramatically. Of course, an "offshore" market at fluctuating rates makes no sense for a currency like the Riyal, which is pegged at a specific U.S. Dollar exchange rate, guaranteed by the country's central bank, and its significant reserves — unless the market believes the Peg may not be honored, which was indeed the conspirators' aim.

74.     On the first day of the weekend leading into Eid al-Fitr, June 23, 2017, Bloomberg's BGN "offshore" rate for the Riyal depreciated sharply from 3.75 to 3.79. Similarly, on the second day of the Eid al-Fitr holidays, June 24, 2017, the CMP "offshore" rate for the Riyal depreciated from 3.79 to 3.81.

16

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

75.     Defendants' manipulation of these Bloomberg rates broadly affected markets, including in New York County, because the Bloomberg CMP and BGN rates are relied on by banks, investors, and other financial institutions in New York County and elsewhere.

76.     Defendants' coordinated and manipulative activity reinforced a false narrative that Qatar's currency was increasingly volatile and its economy was too unstable for investment.

77.     As Defendants intended, and consistent with the Presentation, this quoting activity was picked up by major international media, which wrote numerous articles about the sudden drop in Riyal-to-U.S. Dollar exchange rates.  For example, on June 28, 2017, Reuters published an article titled "*The Qatari Riyal FX Market in Chaos*," and on July 6, 2017, *Bloomberg* published an article with a headline asking, "*What is a Qatari Riyal Worth*?"

78.     Defendants' manipulative scheme caused significant harm to Qatar, as well as to investors and global financial markets.

79.     Qatar and its agents at all relevant times tracked markets for the Riyal, including the Bloomberg and Reuters exchange rates, and closely monitored the market distortions that occurred and were widely reported in the international media.

80.     Unaware that the Bloomberg and Reuters exchange rates for the Riyal had been manipulated, and believing that Defendants' quotes and the manipulated Bloomberg and Reuters exchange rates reflected the legitimate offshore market activity for the Riyal,  Qatar took swift action in response.  In order to stabilize the currency markets, and as set forth below, Qatar liquidated investments, depleted foreign exchange reserves, and used more than $40 billion to support its currency and maintain the Peg.

81.     Throughout Defendants' manipulation, Qatar stood behind the Peg, and the QCB was willing and able to transact at 3.64.

17

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

## 2. The Currency Attack Continues Through the Fall of 2017

82. Defendants' manipulative conduct and fictitious quoting continued throughout the summer and fall of 2017 and continued to have a destabilizing effect on the Bloomberg and Reuters "offshore" exchange rates for the Riyal-U.S. Dollar.

83. Samba Bank submitted quotes to the Riyal-U.S. Dollar Bloomberg foreign exchange platform in increased volumes and at substantially depreciated rates in July 2017. Samba Bank increased its volume of quotes to the Riyal-U.S. Dollar Bloomberg platform as the year progressed, at rates substantially devaluing the Riyal. Samba Bank quoted a rate as depreciated as 3.95 Riyals to the U.S. Dollar on Bloomberg on November 20, 2017.

84. Defendants' activity in the Riyal currency forwards market also closely mimicked its manipulative activity in the Riyal-U.S. Dollar foreign exchange markets. For example, Samba Bank submitted thousands of depreciated quotes per day to the Bloomberg currency forwards platform in July 2017, and continued to quote at high volumes and depreciated prices through November 2017.

85. FAB likewise increased the numbers of quotes it was submitting in October and November 2017, often submitting quotes to Bloomberg and Reuters every minute, and at rates as low as 3.93.

86. Due to Defendants' manipulative conduct, the exchange rates Bloomberg and Reuters calculated continued to sharply depreciate the Riyal relative to the U.S. Dollar, and hit an all-time low in November 2017 of 3.94 Riyals to the U.S. Dollar.

18

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019



Source: Bloomberg
Note: Based on end-of-day quote data from Bloomberg Generic Price ("BGN") composite. Mid quote is calculated as the average of the end-of-day Ask and Bid quotes. Excludes cases in which the Bid quote is greater than or equal to the Ask quote and cases in which the Ask or Bid quotes are missing.

87. This conduct continued to have a significant impact on Qatar.

88. Still unaware that the Bloomberg and Reuters exchange rates for the Riyal had been manipulated, and with the Defendants' quotes and the manipulated Bloomberg and Reuters exchange rates apparently reflecting legitimate market activity, Qatar continued to liquidate investments, deplete foreign exchange reserves, and use billions of dollars to support its currency and maintain the Peg.

### 3.  Defendants' Quotes on Bloomberg and Reuters Were Fraudulent

89. Defendants' conduct was classic "spoofing." Not only were the quotes Defendants submitted to the Bloomberg and Reuters foreign exchanges unusual, they were also bogus, as Defendants were unwilling to transact at the bid/ask prices they quoted to potential counterparties. When traders from other institutions contacted FAB, Samba Bank, and others to transact at the quoted rates, they were told that the rates were "indicative only" or other similar excuses for why no actual trading could occur.

19

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 1                                          RECEIVED NYSCEF: 04/08/2019

90.     While FAB, Samba Bank, and others were submitting thousands of quotes to the Bloomberg Riyal-U.S. Dollar foreign exchange platform at depreciated rates, Bloomberg chat messages reveal that they declined to stand behind the rates they quoted. For example:

a.    On July 9, 2017, when a bank from a blockading country was quoting rates on Bloomberg as high as 3.76, a trader from that bank was approached via "chat" message about trading Riyals at the bank's quoted rates. The trader responded that the bank had "*no interest at the mom[ent] in QAR.*" The very next day, a trader from the same bank was approached again about transacting at the bank's quoted rates. The trader responded that the quotes published on Bloomberg were "*not dealing price[s].*"

b.    Similarly, on November 1, 2017, a day when FAB's end-of-day quote submitted to Bloomberg was 3.850 Riyals to the U.S. Dollar — well below the Peg — a trader at FAB was approached, via "chat" message on the Bloomberg platform, with a request to complete a transaction at FAB's quoted rates. The trader responded that the quoted rates were "*indicative levels*" and that he was "*SQR*" (i.e., "square" or unwilling to complete the transaction).

c.    Again, on November 22, a FAB trader was approached, via "chat" message on the Bloomberg platform, with a request to complete a transaction at FAB's quoted rates. The trader responded that he had "*nothing to suggest.*" despite the fact that FAB traders had submitted over a thousand quotes to Bloomberg that day, with an end-of-day ask quote at the depreciated rate of 3.890 Riyals to the U.S. Dollar.

20

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

d. On November 29, 2017, a trader at FAB was approached, via "chat" message on the Bloomberg platform, with a request to complete a transaction at FAB's quoted rates. The trader responded: "*I'm SQR at the moment*" (i.e., "*square*" or unwilling to complete the transaction).

e. Also on November 29, 2017, a trader at Samba Bank was approached, via "chat" message on the Bloomberg platform, with a request to complete a transaction at Samba Bank's quoted rates. In response, the Samba Bank trader wrote that he had "*no interest for QAR[] at the mom[ent]*." However, Samba Bank submitted hundreds of quotes that day, and ended the day with an ask quote of 3.730 Riyals to the U.S. Dollar.

91.     Despite refusing to trade Riyals, FAB, Samba Bank, and others continued to submit quotes to Bloomberg and Reuters at rates as depreciated as 3.97 into November 2017.

### 4.     Defendants' False Quotes Abated When the Banque Havilland Presentation Was Exposed

92.     Defendants' false quotes on Bloomberg and Reuters abated towards the end of November 2017, when two events occurred, and the contours of the scheme were revealed to the public: First, Defendants' scheme, as memorialized in the Banque Havilland Presentation, was revealed to the world in *The Intercept*. Second, soon thereafter, the QCB announced that it was beginning an investigation into the market manipulation and had retained U.S. legal counsel to conduct its investigation.

93.     FAB ceased quoting in the Bloomberg QAR/USD spot market as of November 29, 2017, despite submitting over 1,000 intraday quotes in the QAR/USD spot market on Bloomberg on prior days. FAB did not submit any more quotes to Bloomberg at all for the rest of 2017, and for all of 2018 quoted on only one day — and at the pegged rate.

21

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 04/08/2019

94.    Samba Bank sharply dropped its rates and returned to quoting around the pegged

rate. After quoting a rate as high as 3.95 on November 20, 2017, Samba Bank's quoted rates fell

precipitously, and its quoted rates were back to near the pegged rate in December 2017.

95.    Although the illegal blockade continues to this day, and other manipulative

conduct is ongoing, Bloomberg and Reuters foreign exchange rates have consistently stayed at or

near the pegged rate since December 2017.

### 5.    Defendants' Currency Manipulation Caused Harm to Qatar and Investors in New York County and Elsewhere

96.    Defendants' scheme to submit false quotes and manipulate the Bloomberg and

Reuters foreign exchange rates for the Riyal caused extensive harm to Qatar and businesses and

individuals who invested in Qatar.

97.    Many investors located in New York County invest in Qatar.

98.    A significant component of that investment is through shares in the Qatari

companies included in the MSCI Emerging Markets Fund ("MSCI EM"), which is an exchange-

traded fund that is headquartered in New York County and allows retail investors and others to

invest in a basket of emerging market economies. The MSCI EM tracks the performance of

firms with a combined market capitalization of approximately $4.9 trillion and is often mimicked

or followed by other investors.

99.    To invest in Qatari companies, investors in funds like the MSCI EM or any other

investors must purchase shares in such companies using Riyals.

100.   Investors in the MSCI EM and other similar funds must therefore convert U.S.

Dollars to Riyals before they buy shares or after they sell them. Banks and other financial

institutions in New York County and throughout the world rely on the Bloomberg and Reuters

"offshore" rates to exchange currency for the purpose of investing in Qatari companies.

22

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

101.    U.S. investors who purchased Qatari stocks, bonds, or other instruments in the period before the manipulation would have purchased those financial instruments at an exchange rate of 3.64 Riyals to the U.S. Dollar. In contrast, if those same investors sold the instruments after the manipulation began, they would have received a depreciated rate — as low as 3.94 Riyals to the U.S. Dollar.

102.    The difference in the Riyal exchange rates before and after Defendants' manipulative conduct caused investors in New York County and elsewhere to suffer significant harm on their investments in Qatar. In fact, complaints were made about this kind of exchange-rate loss by investors, including investors located in New York County.

103.    The problem grew so severe in the fall of 2017 that MSCI EM considered incorporating the unofficial "offshore" rates for the Riyal, compiled by Bloomberg, into its valuations of the Qatari stocks in the MSCI EM, instead of the official pegged rate of 3.64.

104.    On November 21, 2017 — a day when Defendants were submitting thousands of depreciated quotes to Bloomberg at approximately 3.90 Riyals to the U.S. Dollar — Bloomberg reported that MSCI EM was considering switching its index rate to the new "offshore" rates instead of the official pegged rate of 3.64. Had MSCI EM switched to using the offshore Bloomberg composite rate to value Qatari securities in the MSCI EM, investors' holdings would have been even further devalued.

105.    Defendants knew that their manipulative conduct would result in Qatar and investors in New York County and elsewhere redeeming their investments at depreciated rates, and intended exactly such a result.

23

### D.   DEFENDANTS' MANIPULATION OF QATARI BONDS AND CREDIT DEFAULT SWAPS

106.   Defendants also attacked Qatar's sovereign bonds. Their goal was to try to depress the value (and accordingly increase the yield) of Qatari bonds, drive away the many investors in New York County who held Qatari bonds (and could purchase more), and convince the world that Qatar was not suitable for investment, while inflating the market in CDS in relation to Qatari bonds.

107.   Qatari bonds are traded over the counter in the United States, and several large financial institutions based in New York County are among the largest holders of Qatari bonds. At least three financial institutions headquartered in New York County held investments collectively worth more than $300 million in Qatari sovereign bonds as of the end of 2017. Each of the three was an active purchaser and seller of Qatari sovereign bonds in 2017.

108.   The Banque Havilland Presentation called for co-conspirators to manipulate the price of Qatari bonds by engaging in sham transactions, including wash sales, designed to drive down the price of the bonds. As the Presentation described, conspirators would "*sell the same bond holdings back to the original seller and thereby create additional downward pressure*" on bond prices. Conspirators would also seek out "Qatar friendly banks" with which they could trade. They would also purchase CDS positions on the bonds, which would increase in value as the prices for the bonds fell.

109.   Defendants also used similar manipulative tactics in the bond market as they used in the Riyal-U.S. Dollar foreign exchange platforms — distorting the market with the submission of fictitious, depreciated quotes, and causing depreciation in the price of Qatari bonds.

110.   FAB and others attacked the Qatari bonds in several ways, including:

24

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

a. *First*, by attacking the Riyal–U.S. Dollar exchange rates in order to decrease the value of all Qatari bonds, as participants in the market would be led falsely to believe that the market regarded Qatar with reduced confidence.

b. *Second*, by posting excessive and depreciated (or, in the case of CDS, inflated) quotes via the Bloomberg and Reuters platforms (and via other means of market communication currently unknown to Qatar).  For example, with respect to the Qatari U.S. Dollar–denominated bond maturing June 2, 2046, and paying a coupon rate of 4.625%, FAB began quoting depreciated bond prices immediately following the blockade announcement, but then quickly brought its bond quotes back up to pre-blockade levels.  FAB then sharply depreciated its quoted bond prices again during the Eid al-Fitr holidays and again in October and November.  FAB's quoting followed a similar pattern in the Qatari U.S. Dollar–denominated bond maturing June 2, 2021 and paying a coupon rate of 2.375%, the Qatari U.S. Dollar–denominated bond maturing June 2, 2026 and paying a coupon rate of 3.25%, and the Qatari U.S. Dollar–denominated bond maturing June 15, 2030 and paying a coupon rate of 9.750%.

c. *Third*, by carrying out "crossing transactions" as discussed in the Banque Havilland Presentation (i.e., engaging in transactions whereby the asset is transferred and/or re-transferred at a depreciated notional price, but without any true exchange of value taking place) and publicizing such

25

"crossing transactions" to the market so as to create the perception that

holders of Qatari bonds were actively selling at depreciated prices.

d. *Fourth*, by purchasing CDS, as described in the Banque Havilland

Presentation, so that as the value of Qatari bonds fell, the value of the CDS

held by the Defendants would rise.

111.     Just as the conspirators had planned, and as predicted by the Banque Havilland

Presentation, the drop in bond prices caused an enormous corresponding increase in the prices of

CDS. CDS spreads rose from 59.025 bps on June 2, 2017 to their highest level ever on July 7,

2017, at 124.32 bps shortly after the close of the Eid al-Fitr holidays. Those who invested in

CDS — as the Banque Havilland Presentation called for the conspirators to do — profited.

112.     The press covered the depreciation of the Qatari bond prices as evidence that the

blockade — rather than Defendants' intentional market manipulation — made Qatari bonds a

credit risk.

113.     For example, in the days immediately following the Eid al-Fitr manipulation,

*Bloomberg News* reported that Qatar's bond prices had fallen 3% on average since the blockade

was announced, and that CDS had surged to their highest level in more than a year on June 29,

2017.

114.     Defendants' manipulative scheme in the bond market caused significant harm to

Qatar, as well as to investors in New York County elsewhere.

115.     Qatar and its agents at all relevant times tracked markets for Qatari bonds, and

monitored the market distortions that occurred on Friday, June 23, 2017 and were widely

reported in the international media.

26

116.     Defendants' manipulative conduct in the bond market contributed to the perceived depreciation of the Riyal and put further pressure on Qatar to support the Peg.  Unaware that the distortions in the bond market had been caused by Defendants' manipulative conduct, and believing Defendants' bond quotes reflected legitimate market activity, in response to the manipulation across markets, Qatar liquidated investments, including investments held in New York County, depleted foreign exchange reserves, and used billions of dollars to support its currency and maintain the Peg.

**E.      ADDITIONAL MANIPULATIVE CONDUCT**

117.     Consistent with the Banque Havilland Presentation, Defendants and others took additional steps to amplify the manipulation and harm Qatar.

**1.      Use of the Media to Amplify Harm to Qatar**

118.     The blockading countries and others coordinated a public relations campaign against Qatar.  As set forth in the Banque Havilland Presentation, the blockading countries hoped press attention — especially in New York County and other financial centers — would amplify the effects of Defendants' manipulative conduct and increase the economic pressure on Qatar.

119.     The Embassy of Saudi Arabia, the Embassy of the UAE, and the Executive Affairs Authority of Abu Dhabi engaged The Harbour Group, a United States public affairs company, to conduct an extensive media campaign against Qatar, targeting numerous United States publications including the *Wall Street Journal*, *Bloomberg*, *Reuters*, and the *New York Times*, which are located in New York County.

120.     The UAE also hired SCL Social Limited, parent of Cambridge Analytica, to engage in a social media campaign targeting Qatar.

121.     As the blockading countries had planned, regional and international media outlets began reporting on the volatility in the financial markets manufactured by Defendants as

27

legitimate, intensifying concerns about Qatar's financial instruments and inflicting damage on

Qatar's financial reputation. For example:

> (a) On June 28, 2017, *Reuters* published an article titled "The Qatari Riyal FX
> Market in Chaos."
>
> (b) On June 30, 2017, *Reuters* ran another article describing chaos in the
> foreign exchange markets market titled "Several UK Banks Stop Selling
> Qatari Riyals."
>
> (c) That same day, the *Middle East Eye*, a regional periodical, published an
> article titled "Qatari Currency Facing Crisis."
>
> (d) On July 6, 2017, *Bloomberg* published an article with a headline asking,
> "What is a Qatari Riyal Worth?"

122. Similar press coverage continued throughout the summer and fall of 2017.

## 2. **Efforts to Cause Runs on Qatari Banks**

123. Around the time of the 2017 Eid al-Fitr holidays, persons and entities from the

blockading countries abruptly withdrew more than $8 billion from Qatari banks.

124. This withdrawal was planned to create a run on Qatari banks, manufacture a

liquidity crisis in Qatar, and deplete U.S. Dollar reserves from Qatari banks. It was intended to

coincide with Defendants' other manipulative conduct, and reinforced the false narrative that

Qatar's finances were in crisis. Defendants' goal was to create panic among foreign investors,

and exacerbate the downward pressure on the Riyal.

## F. **QATAR HAS SUFFERED SUBSTANTIAL HARM AS A RESULT OF DEFENDANTS' SCHEME**

125. Defendants' manipulative scheme has caused extensive damage to Qatar.

28

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

126.    Qatar and its agents at all relevant times tracked markets for the Riyal and Qatari sovereign bonds, and closely monitored the market distortions that occurred and that were widely reported in the international media.

127.    Qatar was not aware that the Bloomberg and Reuters exchange rates for the Riyal had been manipulated, and relied on the fact that Defendants' bogus quotes and the manipulated Bloomberg and Reuters exchange rates reflected legitimate activity in the offshore foreign exchange markets.

128.    Qatar was not aware that the bond quotes submitted to Bloomberg had been manipulated, and relied on the fact that Defendants' fictitious quotes in the Bloomberg bond markets reflected bona fide transactions in the Qatari U.S. Dollar–denominated bonds.

129.    In response to these market distortions, and in order to support the Peg, Qatar sustained billions of dollars in damages by (i) liquidating investments, including nearly $3 billion in U.S. Treasury bills and notes held in accounts located in New York County as well as other U.S. Dollar–denominated securities earning a high rate of return, in order to provide proceeds to banks in Qatar, and (ii) diverting financial reserves held in New York County and elsewhere to banks in Qatar. This is exactly what the Banque Havilland Presentation predicted Qatar would do, when it wrote that "*maintaining the peg requires extensive use of central bank foreign exchange reserves.*"

130.    In total, Qatar used more than $40 billion to support its currency.

29

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Fraud)
### (Against All Defendants)

131.    Qatar incorporates by reference and realleges the preceding allegations as though fully set forth herein.

132.    Defendants made material misrepresentations to Qatar, to Bloomberg, to Reuters, and to investors, including the following misrepresentations, among others:

  a.  that the Riyal quotes they submitted to the foreign exchange platforms hosted by Bloomberg and Reuters in New York County reflected the actual value of the Riyal;

  b.  that the Riyal quotes they submitted to the foreign exchange market platforms hosted by Bloomberg and Reuters in New York County indicated a willingness to enter into arm's-length transactions for the Riyal at the quoted prices; and

  c.  that the quotes they submitted to the foreign exchange market platforms hosted by Bloomberg and Reuters in New York County for Qatari government bonds reflected the actual value of the referenced government bonds.

133.    In addition to making these representations regarding the value of the Riyal and/or the value of Qatari government bonds, each of the Defendants failed to disclose to Qatar, and to Bloomberg, Reuters, and investors, additional facts necessary to make its representations not materially misleading. Specifically, each of the Defendants failed to disclose that it was manipulating its Riyal-U.S. Dollar quotes and, therefore, manipulating the Riyal composite rates

30

calculated by Bloomberg and Reuters; that it was manipulating its Qatari government bond quotes; and that its quotes did not accurately reflect the actual value of the Riyal or Qatari government bonds.

134.    Each of the Defendants knew that its misrepresentations were materially false and misleading when made. In Bloomberg chats between Defendants and counterparties who sought to trade Riyals with Defendants at the depreciated prices Defendants were quoting, Defendants refused to trade and stated that the quoted prices for Riyals were "*wrong*" or "*indicative*." Nevertheless, Defendants continued to submit thousands of Riyal quotes at depreciated rates at which they were unwilling to transact.

135.    Each of the Defendants' misrepresentations were made intentionally or with reckless disregard for the truth. As set forth in the Banque Havilland Presentation, each of the Defendants knew that Qatar had maintained the value of the Riyal at a pegged rate of 3.64 Riyals to the U.S. Dollar for more than a decade. Nonetheless, each of the Defendants submitted quotes for the Riyal at depreciated values compared to the pegged rate in order to carry out Defendants' scheme to manipulate the markets for Qatari financial instruments around the world, including in New York County.

136.    Each of the Defendants knew that Qatar, as well as Bloomberg, Reuters, and investors, through MSCI EM and otherwise, were likely to receive and rely on its misrepresentations. By making these misrepresentations, each of the Defendants intended for Qatar, as well as Bloomberg, Reuters, MSCI EM, and investors, to rely on the misrepresentations and to believe them to be accurate representations of market value.

a.    Specifically, each of the Defendants submitted false quotes to Bloomberg and Reuters with the intent that Qatar and others would rely on the quotes

31

Case 1:19-cv-05567-AJN Document 2 Filed 06/14/19 Page 39 of 134

as accurate representations of the purportedly depreciating value of the Riyal, and that, as part of the scheme, Bloomberg and Reuters would rely on the false quotes when calculating composite or index rates reflecting the market value of the Riyal. Each of the Defendants knew that its false quotes would be used in the calculation of the composite or index rates, and each of the Defendants flooded Bloomberg's and Reuters' New York County platforms with false quotes with the intent to manipulate the published composite and index rates. Defendants' intent to cause damage was underscored by their sustained attempts over time to become a "privileged" contributor to the Bloomberg and Reuters composite rate indices to create a critical mass of "privileged" contributors who could more easily depreciate composite rates for Riyal-U.S. Dollar. Each of the Defendants intended for Qatar and others such as MSCI EM to rely on, and take action in response to, the depreciated rates for the Riyal and the manipulated Bloomberg and Reuters foreign exchange rates. As described in the Banque Havilland Presentation, each of the Defendants intended for Qatar to "*spend its reserves on protecting the currency and domestic credit markets*" and to spend significant sums to maintain the Peg.

b. Each of the Defendants employed a similar scheme with respect to Qatari government bonds, and submitted false quotes to Bloomberg and Reuters with the intent that Qatar and others would rely on the quotes as accurate indicators of the depreciating value of Qatari government bonds.

32

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

137.   Qatar reasonably and justifiably relied to its detriment on Defendants' material misrepresentations and omissions by, among other things, depleting reserves, liquidating investments, and taking other steps to protect the Riyal and to maintain the Peg.

138.   Each of the Defendants' material misrepresentations and omissions directly and proximately caused extensive damages in that Qatar depleted reserves, liquidated investments, including investments held in New York County, and used more than $40 billion to support the Riyal and maintain the Peg.

139.   Each of the Defendants continues or imminently threatens future manipulative, fraudulent, and unlawful conduct aimed at attacking Qatar and its finances.

140.   Each of the Defendants' fraudulent acts were willful and wanton, entitling Qatar to punitive damages.

### SECOND CLAIM FOR RELIEF

#### (Conspiracy to Commit Fraud)
#### (Against All Defendants)

141.   Qatar incorporates by reference and realleges the preceding allegations as though fully set forth herein.

142.   As described in the preceding allegations, Defendants perpetrated a fraud on Qatar through, among other things, false and manipulated quotes for the Riyal and Qatari government bonds.

143.   Defendants formed a conspiracy or corrupt agreement to commit fraud by manipulating their Riyal-to-U.S. Dollar quotes and, therefore, manipulating the Riyal composite rates calculated by Bloomberg and Reuters; manipulating their Qatari government bond quotes; and engaging in a course of material misrepresentations and omissions to conceal their fraudulent acts.

33

144.   As described in the preceding allegations, Defendants intentionally and knowingly committed acts in furtherance of the conspiracy by manipulating their quotes for the Riyal and Qatari government bonds, by making misrepresentations and/or omissions regarding those quotes, and by engaging in a course of material misrepresentations and omissions to conceal their fraudulent acts, and to continue or imminently threaten future manipulation.

145.   Qatar reasonably and justifiably relied to its detriment on Defendants' material misrepresentations and omissions.

146.   Each of the Defendants' material misrepresentations and omissions directly and proximately caused damages in that Qatar depleted reserves, liquidated investments, including investments held in New York County, and used more than \$40 billion to support the Riyal and maintain the Peg.

147.   Because Defendants engaged in the conspiracy to commit fraud stated in this Complaint willfully and wantonly, Qatar is entitled to punitive damages.

### THIRD CLAIM FOR RELIEF

#### (Aiding and Abetting Fraud)
#### (Against All Defendants)

148.   Qatar incorporates by reference and realleges the preceding allegations as though fully set forth herein.

149.   Each of the Defendants acted in concert to advance a fraudulent scheme to harm Qatar.

150.   Each of the Defendants was aware of the misrepresentations and omissions made by the other Defendants in furtherance of the conspiracy. Each of the Defendants also was aware that the misrepresentations and omissions made by the other Defendants in furtherance of the conspiracy were false and/or misleading at the time that they were made.

34

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

151.   Each of the Defendants provided substantial assistance to other conspirators in making the fraudulent misrepresentations and omissions.  Each of the Defendants submitted, or otherwise assisted with the submission of, false quotes to Bloomberg and Reuters in New York County, without any intent to trade at the quoted rates, for the purpose of depreciating foreign exchange rates published by Bloomberg and Reuters in New York County, and with the intent to assist other Defendants in carrying out their fraudulent activities.

152.   The substantial assistance of each Defendant proximately caused the harm suffered by Qatar.  The participation of each Defendant, as alleged herein, substantially assisted the conspirators in carrying out the fraudulent scheme.  It was foreseeable to Defendants that Qatar would be harmed by the carrying out of their fraudulent scheme.  Further, Defendants continue their manipulation or imminently threaten future manipulation.

153.   Each of the Defendants' substantial assistance has caused damages in that Qatar depleted reserves, liquidated investments, including investments held in New York County, and used more than $40 billion to support the Riyal and maintain the Peg.

154.   Each of the Defendants' acts were willful and wanton, entitling Qatar to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Qatar prays for relief as follows:

(a)    That the Court enter judgment awarding Qatar damages against Defendants for all economic, monetary, actual, consequential, and compensatory damages Plaintiff suffered as a result of Defendants' conduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

35

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

(b)   That the Court enter a permanent injunction ordering Defendants to cease
manipulation of the Riyal, Qatari government bonds, Riyal forwards, and other
Qatari financial instruments;

(c)   That the Court award Qatar its costs of suit, including reasonable attorney' fees
and expenses;

(d)   That the Court award Qatar punitive damages; and

(e)   That the Court award such other and further relief as the Court may deem just and
proper.

## JURY TRIAL DEMANDED

Qatar hereby demands a trial by jury on all issues triable by jury.

36

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

Dated: New York, New York
April 8, 2019

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

By: /s/ Daniel J. Kramer

Daniel J. Kramer
Theodore V. Wells, Jr.
Andrew J. Ehrlich
Geoffrey R. Chepiga
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
dkramer@paulweiss.com
twells@paulweiss.com
aehrlich@paulweiss.com
gchepiga@paulweiss.com

Jonathan Hochman
Karen Steel
SCHINDLER, COHEN & HOCHMAN LLP
100 Wall Street, 15th Floor
New York, NY 10005
(212) 277-6300
jhochman@schlaw.com
ksteel@schlaw.com

*Attorneys for Plaintiff State of Qatar*

37

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

# Exhibit A

# The Intercept_

# LEAKED DOCUMENTS EXPOSE STUNNING PLAN TO WAGE FINANCIAL WAR ON QATAR — AND STEAL THE WORLD CUP

Ryan Grim, Ben Walsh

November 9 2017, 7:21 a.m.



Photo: Max Faulkner/The Fort Worth Star-Telegram/AP

LEIA EM PORTUGUÊS →

A plan for the United Arab Emirates to wage financial war against its Gulf rival Qatar was found in the task folder of an email account

belonging to UAE Ambassador to the United States Yousef al-Otaiba and subsequently obtained by The Intercept.

The economic warfare involved an attack on Qatar's currency using bond and derivatives manipulation. The plan, laid out in a slide deck provided to The Intercept through the group Global Leaks, was aimed at tanking Qatar's economy, according to documents drawn up by a bank outlining the strategy.

The outline, prepared by Banque Havilland, a private Luxembourg-based bank owned by the family of controversial British financier David Rowland, laid out a scheme to drive down the value of Qatar's bonds and increase the cost of insuring them, with the ultimate goal of creating a currency crisis that would drain the country's cash reserves.



A screenshot of Ambassador Yousef al-Otaiba's Outlook Tasks. Photo: Global Leaks

Rowland has long had close relationships with UAE leadership, particularly with Abu Dhabi Crown Prince Mohammed bin Zayed,

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM   INDEX NO. 153601/2019
NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 04/08/2019

5/1/2018    Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

known as MBZ. The bank is currently in the process of creating a new financial institution in cooperation with the UAE's sovereign wealth fund, Mubadala, according to contracts and correspondence obtained by The Intercept outlining the terms of the deal. That project is separate from the Qatar operation, but it reflects the close relationship between the bank and the UAE.

The Qatar debt project would be grandiose in its ambitions. "Control the yield curve, decide the future," reads the planning document, referring to a standard financial-industry graph showing a country's borrowing costs for debt that is due at different dates. The height and shape of the yield curve is thought to be a reflection of how healthy an economy is and influences what financing options are available to a country.

Targeting a nation's economy using financial manipulation would be a dramatic break from traditional norms of diplomacy and even warfare.

The plan the document presents is far-fetched and appeared to have been put together by someone with little or no experience trading in credit and currency markets, two industry veterans who reviewed the plan for The Intercept said. Both were granted anonymity because speaking to the press could jeopardize their employment. "I can't believe they put this on paper," one of the credit veterans added. "They are talking about colluding to manipulate markets."

There is no conclusive evidence the plan has been initiated, nor that it will ever be launched — and the current pressure Qatar's currency is under as a result of an ongoing blockade imposed by the UAE means those direct, overt steps may be more effective economic sabotage than anything the slides outline. Additionally, the publication of this story means the secrecy the plan says it requires no longer exists.

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 2          Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup          RECEIVED NYSCEF: 04/08/2019

The Intercept reached Edmund Rowland, David's son and CEO of the U.K. branch of Banque Havilland, at a mobile phone number listed in internal company documents obtained by The Intercept and asked about the status of the plan to short Qatar on behalf of the UAE, referencing the document. "We've never done anything," Rowland said. Asked for more details, Rowland responded, "I can't make any comment," and hung up.

After the call with Rowland, Herbert Kozlov, a lawyer with the firm Reed Smith, reached out to The Intercept and said on behalf of the bank that it had not traded in Qatari bonds or credit default swaps, the financial products the plan proposed to use. "Banque Havilland does not trade in bonds, securities, CDS, or any other instruments of Qatar and it has no plans to do so," Kozlov said, reading a statement. As for the plan to take down Qatar, he said, "The bank is a prestigious private banking group and will not be drawn into or make comments on what are political storylines."

The metadata of the slide deck obtained by The Intercept indicates Vladimir Bolelyy, an analyst with Banque Havilland, as the creator. A call by The Intercept to Bolelyy's receptionist was rebuffed. "He's been told by Herb Kozlov not to contact this company," said the receptionist, referring to The Intercept. The Intercept had not previously told Kozlov that Bolelyy was listed as the author of the document.

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM    INDEX NO. 153601/201
NYSCEF 7/2018NO. 2    Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup RECEIVED NYSCEF: 04/08/201

## MISSION STATEMENT

*SANCTIONS DO NOT WORK UNLESS ADHERED TO BY ALL PARTIES*

*CURRENCY PEG PRESSURE IS ONLY EFFECTIVE WHEN IT IS EXERCISED BY ALL PARTIES*

*WHAT MATTERS IS WESTERN PERCEPTION — THE MORE THE WRONGDOING IS CONDEMNED, THE MORE EFFECTIVE SANCTIONS WILL BE*

*MAINTAINING THE PEG REQUIRES EXTENSIVE USE OF CENTRAL BANK FOREIGN EXCHANGE RESERVES*

*CONTROL THE YIELD CURVE, DECIDE THE FUTURE*

Strictly Private and Confidential                                    Page 2

The mission statement of the plan for a UAE economic war on Qatar. Photo: Global Leaks

The new project comes amid — and, if implemented, would escalate — a regional crisis that reached new heights in June, when the UAE and Saudi Arabia led a bloc of Gulf nations in blockading and cutting off diplomatic relations with Qatar. U.S. Secretary of State Rex Tillerson recently faulted the blockading countries for intransigence, but President Donald Trump has largely taken the opposite approach, emboldening Saudi Arabia and the Emirates at the expense of Qatar, which is home to one of the largest overseas U.S. military bases in the world. Tillerson traveled to the region on October 20 in the latest effort to defuse the crisis.

According to a report in the American Conservative, Tillerson previously told people close to him that he believed Trump had undermined him at the behest of Otaiba, the UAE ambassador, working

through Trump's son-in-law and White House adviser Jared Kushner, to whom Otaiba is close.

Both Kushner and Trump have reason to take sides with Otaiba in the dispute. The president has a Trump-branded golf course in Dubai and bragged at a press conference before his inauguration about a deal he was offered by a billionaire Emirati real estate developer.

The president's attempts to get his hands on Qatari money have been less successful. In 2010, Trump traveled to Qatar with his daughter Ivanka Trump in an attempt to secure two different sources of investment funding. He was unceremoniously rebuffed by both.

More recently, Kushner sought a $500 million bailout from a Qatari royal as part of a plan to redevelop his badly underwater flagship investment in a New York office tower. The money for such bailouts often comes from the Gulf. As The Intercept first reported, the Qatari royal agreed to help bail out the Kushners, contingent on their ability to raise the rest of the funding they needed from other sources. The remainder of the funding, however, fell through, and the Qatari royal pulled out of the deal.

After the deal fell apart, Kushner helped orchestrate an unyielding response to the Saudi- and UAE-led economic blockade of Qatar, which Trump took credit for sparking with a hardline approach at a summit in Riyadh. Former top White House adviser Steve Bannon also credited Trump with stoking the blockade at a recent event in Washington. "I don't think it's just by happenstance that two weeks after that summit, that you saw the blockade by the United Arab Emirates, Bahrain, Egypt, and the Kingdom of Saudi Arabia on Qatar," Bannon said at a think tank. "And I've said from day one, even with the situation in the Pacific, with northwest Korea, I think the single most important situation in the world, that's happening right now, is the situation in Qatar."

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM                    INDEX NO. 153601/201

NYSCEF DOC. NO. 2          Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup          RECEIVED NYSCEF: 04/08/201

In late June, Trump waded further into the conflict with remarks aimed at Qatar during a private fundraiser, according to audio obtained by The Intercept. "We're having a dispute with Qatar — we're supposed to say Qatar," Trump said, mocking the pronunciation of the country's name by varying the syllabic emphasis. "It's Qatar, they prefer. I prefer that they don't fund terrorism."

Regional tensions ratcheted up another few notches over the weekend, as Saudi Arabia's Crown Prince Mohammed bin Salman, a close ally of both Otaiba and MBZ, arrested dozens of princes and other top officials in a swift consolidation of power and followed it up with a threat to wage war against Iran.



U.S. dollars to Qatari riyals currency chart. Photo:XE.com

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM INDEX NO. 153601/2019
NYSCEF DOC. NO. 2 Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup RECEIVED NYSCEF: 04/08/2019

The economic blockade has already directly impacted Qatar's economy, decimating trade, travel, and finance flows in and out of the country. Qatar's sovereign wealth fund recently brought $20 billion back to the country to prop up the country's banking system, and the country's currency is already showing signs of financial stress.

The cost of insuring Qatari debt has risen some 70 percent since May, the stock market is down 24 percent this year, and yields are rising ahead of a bond offering to be made by the end of the year. Ahead of that debt sale, the country abruptly changed how it calculates how much foreign currency reserves it has, a key metric investors use to assess how risky it is to buy a country's debt. The move doubled Qatar's foreign currency reserves and came as a complete surprise to international officials, who normally discuss and review foreign reserve accounting before they are publicly announced. Instead, in this case, Qatar simply released a six-word statement changing its accounting. Despite the unexpected move, the Wall Street Journal noted that "Qatari bond yields are still relatively low for an emerging-market country, reflecting the country's vast oil reserves and attendant wealth."

Banque Havilland is best known for its role in a previous incarnation in the bankruptcy of Iceland, from which it sprung as a new bank out of the Luxembourg branch of the Icelandic bank Kaupthing, and for a willingness to work with controversial clients, such as Nigerian tycoon Kola Aluko.

David Rowland launched Banque Havilland with the help of his friend Prince Andrew. Rowland has been an active ally of the conservative British Tory Party and is said to be close to David Cameron, the former British prime minister. Rowland was said to have paid £20,000 — about $23,000 — for a portrait of Cameron at a Conservative Party fundraiser

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM   INDEX NO. 153601/20]
NYSCEF DOC. NO. 2       Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup   RECEIVED NYSCEF: 04/08/20]

and was briefly named treasurer of the Tories in 2010, before withdrawing amid controversy.

The bank is named after the Rowland's family home on the tax-haven island of Guernsey, Havilland Hall. Though Edmund Rowland runs the bank, internal documents show his father David remains involved. Documents marked "secret and confidential" outlining the plan for the financial attack against Qatar were being circulated between Banque Havilland and the Emirati embassy in Washington as recently as late September.

## PROPOSED STRUCTURE

### STAGE 1 – Establish Execution Strategy

➢ TO PRESERVE INTEGRITY OF EXISTING QATARI BOND HOLDINGS, AN IN-SITU TRANSFER WILL BE ARRANGED INTO A PROTECTED CELL COMPANY:
  ➢ Create a sizeable, strong, and standalone entity which can be viewed as a smaller counterpart to central bank reserve holdings
  ➢ Confidentiality is maintained
  ➢ Separate ownership remains intact
  ➢ Qatari bond holdings serve as collateral
  ➢ Individual holdings can be instantly accessible
➢ ASSESS GLOBAL MARKET CONDITIONS FOR THE QATARI RIYAL AND CDS TO ESTABLISH EXECUTION STRATEGY WHICH WOULD INCLUDE:
  ➢ Determining available liquidity, supply, and pricing
  ➢ Identifying appropriate instruments such as currency forwards, currency options, and bond CDS
  ➢ Ensuring trade lines are placed in different time zones and include second-tier banks to allow maximum flexibility
  ➢ Make targeted use of investment banks' friendship with Qatar to affect loyalty and add confusion to the marketplace

Strictly Private and Confidential                              Page 3

A screenshot from phase one of the plan. Photo: Global Leaks

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 2
Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

A private financial institution like Banque Havilland would be very familiar with the first step of the plan as laid out in the outline: creating a new offshore investment fund constructed to obscure its links to the UAE. The fund would hold Qatari bonds already owned by the UAE, as well as additional debt the fund could buy. The fund would also buy credit default swaps, which would rise in value as Qatari debt sank.

The plan then calls for precipitating a run on the debt through a series of sham transactions to drive down the price of Qatar's bonds – a manipulation technique known as "painting the tape," where players swap instruments back and forth to create the false appearance of a high volume of trades. The hope is to get other traders who aren't in on the plan to see the high volume on the "tape" – the market ticker – and think that, since volume is high in a period of political turmoil, something important must be happening, prompting them to sell. The sales, if the technique goes to plan, would drive the price of the bonds down, creating more panic and more selling. According to the plan, the UAE, having bought credit default swaps against the debt, would see the value of that insurance rise as Qatari debt tanked.

The document outlining the scheme puts the bond trading proposal in print: "Establish a crossing transaction arrangement whereby another affiliated party sells the same bond holdings back to the original seller and thereby creates additional downward pressure."

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM    INDEX NO. 153601/201
NYSCEF DOC. NO. 2          Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup    NYSCEF: 04/08/201

## PROPOSED STRUCTURE (CONT'D)

### STAGE 2 – Gear Up to Control the Yield Curve

➢ PURCHASE MEDIUM- AND LONG-TERM QATAR PAPER:

  ➢ This would allow to control the yield curve (and thus bond prices) and should favourably affect CDS pricing at a later stage

  ➢ Establish a crossing transaction arrangement whereby another affiliated party sells the same bond holdings back to the original seller and thereby creates additional downward pressure

A screenshot from phase two of the plan. Photo: Global Leaks

The hope is to spark a run by bond investors who think everybody else is selling, so they better get out quickly.

Falling debt prices and rising costs of the default swaps would signal a fresh crisis to the markets, putting pressure on Qatar's currency. The Qatari riyal is pegged to the U.S. dollar, so as its offshore value falls, the country would be forced to spend billions of dollars from its reserves to push it up.

In other words, the UAE plans to short Qatar, then drive it into the ground by manipulating international financial markets, all while gaining diplomatic leverage against its rival.

Speculating about a country's currency and economic future is far from unprecedented in the high-flying world of finance, but the difference in this case is that the plan is not designed for a vulture fund bent on a profit, but a sovereign state looking to undermine a neighboring nation.

The plan is not an obvious winner from a profit perspective, which further suggests its goals to be political rather than financial. As the document notes, at the end of the operation — if it's successful — it

will be difficult for the UAE to unload its Qatari bonds because the attack would have largely weakened Qatar financially.

And that's if the plan even works. "It is very difficult to manipulate a sovereign [country's] yield curve," Frank Partnoy, a finance and law professor at the University of San Diego who formerly structured derivatives at Morgan Stanley, told The Intercept. "This belongs in a James Bond movie but probably wouldn't work very well in practice."

> **PURCHASE CDS ON QATAR:**
>   > Start with Qatar-friendly banks who may prove more willing to enter into these trades
>   > Increase long CDS positons slowly with large banks, just enough to move the price sufficiently to make it newsworthy
>   > Market depth may be limited and poor pricing on exit expected

A screenshot of the plan dealing with the purchase of credit default swaps on Qatari debt. The CDS instruments rise in value as the bonds fall, allowing the UAE to profit from the collapse of Qatar's currency. Photo:Global Leaks

Rather than outline specifics, the document speaks in a vague, somewhat harebrained tone: It doesn't contain any analysis of Qatari bond, derivative, or currency markets or an estimate of the total economic firepower the UAE can put behind the plan, nor does it address how much of Qatar's $68 billion in outstanding debt the UAE and it allies already own; how to respond when, as is likely to happen relatively quickly in these lightly traded markets, the Qataris see strange trades and apply pressure to markets in the opposite direction by buying their bonds, stabilizing their currency, and selling credit default swaps; or whether a successful attack on a pegged currency in the region will whip back and lead to pressure on the UAE dirham, the Saudi riyal, and the pegged currencies of their allies.

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 2          Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup          RECEIVED NYSCEF: 04/08/2019

The plan, instead, lays out a conceptual scheme in several phases, the first of which takes a close look at Qatari currency and credit markets to figure out "available liquidity, supply, and pricing."

If all goes according to plan, the next move would be to force Qatar to blow through its cash to prop up its currency. "Maintaining the peg requires extensive use of central bank foreign exchange reserves," reads the outline's mission statement. The idea would be that as the Qatari bond market tanks, so will the country's currency. And as holders of Qatar's currency sell it off and exchange it for dollars, the country's dollar reserves plummet.

The basic premise of the plan — that Qatar is spending billions of dollars to offset the pain inflicted by the blockade and that the country's currency is vulnerable — is largely correct. Just before the blockade against Qatar was enacted, the sheikdom held at least $35 billion in currency reserves. After the embargo, Qatar's reserves plummeted as it spent to prop up its currency and keep its economy afloat. The country now holds just under $24 billion in reserves, though a recent accounting maneuver roughly doubled that number.

Because the country is incredibly rich, Qatar's official reserves understate how much money it has to defend its currency. The government can call on the vast liquid wealth of Qatar-based corporations, its $335 billion sovereign wealth fund, and its citizens to stabilize the currency or support the economy. For instance, the recent repatriation of $20 billion of the sovereign wealth fund's cash from international accounts back to onshore banks effectively bailed out Qatar's financial system, and some government funds are already selling assets.

Qatar may be spending tens of billions of dollars to fight the economic effects of the blockade, but it has hundreds of billions of dollars more.

ILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM                                    INDEX NO. 153601/2019
SCEF 7/2018 NO. 2          Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup  NYSCEF: 04/08/2019

And, on the record, Qatar insists that it has sufficient reserves to keep its currency pegged to the dollar.

As a result, the plan would be anything but a sure bet, financially speaking.

Keeping the outline light on details makes sense, said Partnoy, the University of San Diego professor, in the context of the way banks generally operate. "Bankers are always trying to sell complicated products that will make them fee income," he said. "This is an effort to try to sell something that might be a terrible idea."

---

## PROPOSED STRUCTURE *(CONT'D)*

### STAGE 3 – PR Machine & Position Increase

➤ **FIRE UP THE PR MACHINE TO REMIND PEOPLE THERE IS A PROBLEM WITH QATAR:**

  ➤ Reinforce the existing narrative, suggesting the state is feeling some pain from lack of engagement with neighbours and use their own narrative against them

  ➤ Qatar will counter with their own PR but will exhaust the message quickly, especially as market prices will show their weakened position

➤ **INCREASE POSITIONS:**

  ➤ Simultaneously hit all second-tier bank CDS lines and increase existing positions with larger banks

  ➤ Buying additional CDS leads to falling bond prices, rising rates, and escalation in CDS premia

➤ **REFRESH THE PR MESSAGE TO ADD MORE FUEL TO THE FIRE:**

  ➤ Focus on the prospect of restricted access to US Dollar and now-doubtful stability of the country

  ➤ The currency peg will not break, although credit markets will not be looking healthy

  ➤ Some bold statements from neighbouring countries may prove useful

  ➤ And… continue to increase positions

➤ **CLOSE THE POSITIONS WITH THE QATAR FRIENDLY BANKS FIRST, FOLLOWED BY OTHER LARGER BANKS AND SECOND-TIERS**

Strictly Private and Confidential                                                              Page 5

---

The public relations machine ramps up in phase three of the plan. Photo: Global Leaks

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM    INDEX NO. 153601/2019
NYSCEF DOC. NO. 2    5/7/2018    Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup    RECEIVED NYSCEF: 04/08/2019

The third stage of the plan would be to ramp up the "PR machine" in order to slam Qatar internationally, pointing to its weakening financial situation. "Focus on the prospect of restricted access to US Dollar and now-doubtful stability of the country," the plan reads. "And … continue to increase positions." In other words, keep the market cornered and feed fears about falling prices with manufactured bad news.

The public relations effort also calls on other countries for help — presumably UAE allies, like Egypt and Saudi Arabia, which have in recent months teamed up with the Emirates to blockade Qatar. "Some bold statements from neighbouring countries may prove useful," the plan says.

Jacob Frenkel, a former Securities and Exchange Commission enforcement lawyer and federal criminal prosecutor who has served as an expert witness in market manipulation cases, said the proposal raises serious red flags. Because the plan would likely involve trades in U.S. markets and would use U.S. servers and dollars, American regulators and prosecutors would have jurisdiction over it.

Frenkel, now a partner at the law firm Dickinson Wright, said that agreements about timing and pricing of trades are common in manipulation schemes. "The use of entities created for the purpose of engaging in transactions to create the perception of an independent market interest is a characteristic found in market manipulative activities," he said. That alone is a "red flag that would be of interest to a regulator. And anybody in law enforcement would acknowledge what I'm saying."

The documents were provided to The Intercept by an opaque group that calls itself Global Leaks. Over the summer, Global Leaks began distributing emails from Otaiba's inbox to media outlets, including The Intercept. Little is known about the organization, but the Global Leaks

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 2          Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup    RECEIVED NYSCEF: 04/08/2019

operatives use a .ru email account, which suggests they are either Russian or attempting to give that impression. Global Leaks claims it is not connected to the Russian government or any other government.

Global Leaks said it received the documents from sources connected to Banque Havilland, a claim The Intercept investigated and found had merit, though other possibilities — such as a hacking operation — can't definitively be ruled out.

After obtaining the documents, Global Leaks operatives said they asked a source who maintains access to Otaiba's inbox to search for documents related to Rowland or Banque Havilland. That source found the slide deck outlining the scheme in Otaiba's Outlook tasks — a folder designed to serve as a "to-do" list — and provided it to Global Leaks.

Otaiba's use of a Hotmail account for sensitive diplomatic business was itself questionable when it was reported compromised earlier this year — that he continues to do so months later is even more puzzling. Otaiba has not responded to emails from The Intercept, including one requesting comment for this article, but a Washington, D.C. journalist who corresponds with him recently shared an email sent by Otaiba from the same compromised account. Emails to Otaiba's Hotmail account were not responded to but did not bounce back.

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM INDEX NO. 153601/20

NYSCEF DOC. NO. 2    Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup   RECEIVED NYSCEF: 04/08/20

## FIFA OPTION

> **QATAR HAS COMMITTED TO $200BN OF SPENDING FOR ITS HOSTING OF 2022 WORLD CUP**

> **THE GCC CAN PETITION FIFA TO GRANT THE TOURNAMENT TO THE REGION AS A WHOLE**
>> Precedent in the form of Korea/Japan World Cup in 2002
>> European Championship in 2020 to be hosted across the continent in multiple countries

> **AN APPEAL TO FIFA WILL BE TO DISPLAY FOOTBALL AS A TOOL TO STABILISE THE REGION**

> **IF QATAR REJECTS THE PROPOSAL, THEY WILL BE SEEN UNWILLING TO WORK WITH THEIR GCC PARTNERS**

> **NEGATIVE PUBLICITY CAN RESURFACE AROUND THE ORIGINAL AWARD OF THE TOURNAMENT, BRIBERY ALLEGATIONS, CONDITIONS OF CONSTRUCTION PERSONNEL AND OTHER ISSUES**

> **THE MOVE DRAWS PUBLIC ATTENTION TO QATAR'S DUBIOUS ABILITY TO HOST THE WORLD CUP ON THEIR OWN**
>> Primary suppliers of materials were Saudi Arabia and the UAE – costs have already increased
>> Importing talent from abroad has become more difficult given the no-fly zones – ability of fans to travel to the region has already diminished
>> If Qatar now spends its reserves on protecting the currency and domestic credit markets, there is less dry powder to fund the infrastructure spending

Strictly Private and Confidential                                                            Page 6

A screenshot from the public relations stage of the plan. Photo: Global Leaks

While the scheme itself would be an ambitious undertaking, the goal is ultimately petty: It's about soccer.

One of the plan's stated aims is forcing Qatar to share soccer's 2022 World Cup, according to the outline. The strategy laid out in the document calls for using a public relations campaign to point the international soccer body FIFA to Qatar's dwindling cash reserves, making a case that the small Persian Gulf monarchy can't afford to build the necessary infrastructure.

The blockade is already raising prices for infrastructure supplies and recruiting top officials to work in Qatar has been difficult, the slides point out. The outline concludes with the hope that the economic war will make it harder for Qatar to continue building stadiums and other

ILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM                    INDEX NO. 153601/2019
'SCBA7728a18NO. 2        Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup NYSCEF: 04/08/2019

assets needed to host the games: "If Qatar now spends its reserves on protecting the currency and domestic credit markets, there is less dry powder to fund the infrastructure spending."

The UAE, according to the document, hopes to make a push for the Gulf Cooperation Council — a group of Arab monarchies that includes Qatar — to host the premiere global sports event across the member nations, rather than in Qatar alone.

On October 20, several weeks after The Intercept first obtained the document outlining the plan, a well-funded Twitter campaign launched with the goal of taking the World Cup from Qatar, complete with a slickly produced video.



 **Kick Qatar Out**
@KickQatarOut

Don't be a spectator to Qatar's human rights abuses. It's more than a game. Stop the abuse.

4:14 PM - Oct 23, 2017

928    823 people are talking about this

"An appeal to FIFA will be to display football as a tool to stabilise the region," the document reads. "The GCC can petition FIFA to grant the tournament to the region as a whole." If Qatar rejects the idea, the plan

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

contends, "they will be seen unwilling to work with their GCC partners" — one of which would have just launched a surreptitious financial attack against the country.

Top photo: Yousef al-Otaiba, UAE ambassador to the United States, talks during a news conference on Thursday, Feb. 2, 2012, in Grapevine, Texas.

We depend on the support of readers like you to help keep our nonprofit newsroom strong and independent. **Join Us** →

## RELATED

**The Sordid Double Life of Washington's Most Powerful Ambas**

**At Neocon Think Tank, Steve Bannon Bashes Qatar and Praise**

**Hacked Emails Show Top UAE Diplomat Coordinating With Pro**

**Saudi Arabia's Government Purge — And How Washington Co**

ILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
YSCEF DOC. NO. 2

INDEX NO. 153601/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

RECEIVED NYSCEF: 04/08/2019

## ADDITIONAL CREDITS:



Research: Sheelagh McNeill.

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 3

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

STATE OF QATAR,

*Plaintiff,*

-against-

FIRST ABU DHABI BANK PJSC, SAMBA
FINANCIAL GROUP SJSC, AND JOHN DOE
DEFENDANTS 1–20

*Defendants.*

---

Index No. 153601/2019

**AFFIDAVIT OF SERVICE
PURSUANT TO N.Y.
BUSINESS CORPORATION
LAW § 307**

State of New York )
                ) ss.:
County of New York )

        GEOFFREY R. CHEPIGA, ESQ., having been duly sworn, hereby states

as follows:

        1.    I am an attorney at law duly licensed to practice in the state of New York

and a partner at Paul, Weiss, Rifkind, Wharton & Garrison LLP, attorneys for plaintiff

State of Qatar in the above-captioned action.  I am over 18 years of age and not a party to

this action.  I submit this affidavit to demonstrate compliance with the requirements for

service of process on Defendant First Abu Dhabi Bank PJSC ("FAB") pursuant to N.Y.

Business Corporation Law § 307.

        2.    The State of Qatar commenced the above-captioned lawsuit on April 8,

2019, by filing a Summons and Complaint, a copy of which is attached as Exhibit 1.

        3.    On April 9, 2019, pursuant to N.Y. Bus. Corp. Law § 307(b), I arranged

for a copy of the Summons and Complaint to be personally served on an agent duly

authorized to accept service of process for and on behalf of the New York State Secretary

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 3                                          RECEIVED NYSCEF: 05/06/2019

of State, at the office of the New York State Secretary of State in the City of Albany,
New York, along with the $40 fee. *See* Affidavit of Service by Mary M. Bonville,
attached hereto as Exhibit 2.

　　4.　　On April 10, 2019, following service upon the New York Secretary of
State, and pursuant to N.Y. Bus. Corp. Law § 307(b)(2), I arranged for a Notice of
Service Pursuant to Bus. Corp. Law § 307, the Summons and Complaint, and Arabic
translations of the Summons and Complaint, as well as the other documents listed in
Footnote 1 (collectively, the "Service Documents"), to be mailed first class registered
mail, return receipt requested, to Defendant FAB.[1] The Service Documents were sent to
the last known street address for FAB's headquarters (FAB Building, Khalifa Business
Park, Al Qurm District, Abu Dhabi, UAE) as well as FAB's last known P.O. Box address
for its headquarters (FAB Building, Khalifa Business Park, Al Qurm District, P.O. Box
6316, Abu Dhabi, UAE). *See* Affidavit of Service by Registered Mail by Ashley S.
Martinez, attached hereto as Exhibit 3.

　　5.　　The official United States Postal Service ("USPS") tracking number for
the package sent to FAB's last known street address is: RE793289048US. The official
USPS tracking number for the package sent to FAB's last known P.O. Box address is:
RE793288997US.

---

[1]　In addition to the documents listed above, the Service Documents included: (1) a
Notice of Electronic Filing; (2) an Arabic translation of the Notice of Electronic
Filing; (3) a copy of the Affidavit of Service on the New York Secretary of State by
Mary M. Bonville; (4) Plaintiff's First Document Request to Defendant FAB; (5) a
copy of Plaintiff's First Document Request to Defendant Samba Financial Group
SJSC; and (6) a Notice of Subsequent Method of Service, Pursuant to New York's
Civil Practice Law and Rules 312-a(e).

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 3

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

6.      Before mailing the Service Documents to the addresses listed in Paragraph 4 of this affidavit, attorneys working under my direction verified that there is no address for FAB "on file in the department of state" in New York. *See* N.Y. Bus. Corp. Law § 307(b)(2). Attorneys at my firm also conducted a search and determined that the United Arab Emirates, where FAB is incorporated, does not have a registry equivalent to the registry maintained by the New York Secretary of State. In our search for FAB's registered address, we identified a license for First Abu Dhabi PJSC listing the same P.O. Box address in Paragraph 4.

7.      On April 30, 2019, the USPS confirmed that the package containing the Service Documents sent to FAB's last known address by registered mail, return receipt requested, was delivered on April 30, 2019. Attached as Exhibit 4 is a print-out of the official USPS tracking information for tracking number "RE793289048US," showing that the package sent to the last known street address of the FAB headquarters was delivered on April 30, 2019.

8.      On April 30, 2019, the USPS also confirmed that the package containing the Service Documents sent to FAB's last known P.O. Box address by registered mail, return receipt requested, was delivered on April 30, 2019. Attached as Exhibit 5 is a print-out of the official USPS tracking information for tracking number "RE793288997US," showing that the Service Documents mailed to the last known P.O. Box of the FAB headquarters was delivered on April 30, 2019.

9.      I now file this Affidavit of Compliance with N.Y. Bus. Corp. Law § 307 within thirty days of receipt of "other official proof of delivery," pursuant to N.Y. Bus. Corp. Law § 307(c)(2).

3

GEOFFREY R. CHEPIGA

Sworn to before me this sixth day of May, 2019

NOTARY PUBLIC

**ASHLEY S. MARTINEZ**
Notary Public, State of New York
No. 01MA6343023
Qualified in Kings County
Certificate Filed in New York County
Commission Expires May 31, 2020

4

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

STATE OF QATAR,

Plaintiff,

-against-

FIRST ABU DHABI BANK PJSC,
SAMBA FINANCIAL GROUP SJSC,
AND JOHN DOE DEFENDANTS 1–20

Defendants.

Index No. 153601/2019

**SUMMONS**

TO THE ABOVE-NAMED DEFENDANTS:

(See attached List of Defendants with Addresses)

YOU ARE HEREBY SUMMONED to serve upon plaintiff's attorneys an answer to the complaint in this action within 20 days after the service of this summons, exclusive of the day of service, or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff designates New York County as the place of trial. The basis of venue is CPLR § 301 and § 302(a)(2).

**FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM**
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

**FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM**
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

Dated: New York, New York
April 8, 2019

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

By: Daniel J Kramer/KF

Daniel J. Kramer
Theodore V. Wells, Jr.
Andrew J. Ehrlich
Geoffrey R. Chepiga
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
dkramer@paulweiss.com
twells@paulweiss.com
aehrlich@paulweiss.com
gchepiga@paulweiss.com

Jonathan L. Hochman
Karen M. Steel
SCHINDLER, COHEN & HOCHMAN LLP
100 Wall Street, 15th Floor
New York, NY 10005
(212) 277-6300
jhochman@schlaw.com
ksteel@schlaw.com

*Attorneys for Plaintiff State of Qatar*

2

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

## DEFENDANTS SERVICE LIST

First Abu Dhabi Bank PJSC
FAB Building, Khalifa Business Park, Al Qurm District, Abu Dhabi, UAE

Samba Financial Group
King Abdul Aziz Rd, Riyadh 12629, Saudi Arabia

3

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/201?

RECEIVED NYSCEF: 05/06/201?

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

STATE OF QATAR,

                                    *Plaintiff,*

            -against-

FIRST ABU DHABI BANK PJSC, SAMBA
FINANCIAL GROUP SJSC, AND JOHN DOE
DEFENDANTS 1–20

                                    *Defendants.*

---

Index No. 153601/2019

**COMPLAINT**

**JURY TRIAL DEMANDED**

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 .PM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 4                                          RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 1                                         RECEIVED NYSCEF: 04/08/2019

## TABLE OF CONTENTS

Page

NATURE OF THE ACTION .................................................................................................... 1

THE PARTIES........................................................................................................................... 3

  A.  PLAINTIFF........................................................................................................................ 3

  B.  DEFENDANTS ................................................................................................................. 4

JURISDICTION AND VENUE ................................................................................................. 5

BACKGROUND ....................................................................................................................... 6

  A.  THE ILLEGAL BLOCKADE OF QATAR ....................................................................... 6

  B.  THE BANQUE HAVILLAND PLAN TO WAGE FINANCIAL WARFARE ON
    QATAR............................................................................................................................ 7

    1.  Banque Havilland's Plan to Wage Financial Warfare ............................................... 8

      (a)  Attacking the Currency .................................................................................. 9

      (b)  Attacking Qatari Bonds............................................................................... 10

      (c)  Attacking Qatar Through the Media ............................................................ 11

      (d)  The Intended Outcome of the Banque Havilland Scheme ............................ 12

  C.  DEFENDANTS ATTACK THE RIYAL AND TRY TO BREAK THE PEG ................ 13

    1.  Defendants Weaponized Bloomberg and Reuters in Their Attack........................... 13

    2.  The Currency Attack Continues Through the Fall of 2017 ..................................... 18

    3.  Defendants' Quotes on Bloomberg and Reuters Were Fraudulent........................... 19

    4.  Defendants' False Quotes Abated When the Banque Havilland Presentation Was
      Exposed.................................................................................................................. 21

    5.  Defendants' Currency Manipulation Caused Harm to Qatar and Investors in New
      York County and Elsewhere ................................................................................... 22

  D.  DEFENDANTS' MANIPULATION OF QATARI BONDS AND CREDIT
    DEFAULT SWAPS........................................................................................................ 24

  E.  ADDITIONAL MANIPULATIVE CONDUCT .............................................................. 27

    1.  Use of the Media to Amplify Harm to Qatar .......................................................... 27

    2.  Efforts to Cause Runs on Qatari Banks .................................................................. 28

  F.  QATAR HAS SUFFERED SUBSTANTIAL HARM AS A RESULT OF
    DEFENDANTS' SCHEME............................................................................................. 28

CLAIMS FOR RELIEF .......................................................................................................... 30

FIRST CLAIM FOR RELIEF ................................................................................................. 30

SECOND CLAIM FOR RELIEF ............................................................................................. 33

THIRD CLAIM FOR RELIEF ................................................................................................. 34

i

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

PRAYER FOR RELIEF ........................................................................................................... 35
JURY TRIAL DEMANDED....................................................................................................... 36

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

Plaintiff State of Qatar ("Qatar"), by and through its attorneys, brings this action against First Abu Dhabi Bank PJSC ("FAB"), Samba Financial Group SJSC ("Samba Bank"), and John Doe Defendants 1–20 (the "John Doe Defendants"), and alleges as follows with knowledge as to its conduct and on information and belief as to the conduct of others:

## NATURE OF THE ACTION

1.      In this lawsuit, Qatar seeks relief from brazen schemes to manipulate the markets for Qatari currency, bonds, and other financial instruments.

2.      The schemes arise out of an illicit blockade of Qatar by the Kingdom of Saudi Arabia ("Saudi Arabia"), the United Arab Emirates ("UAE"), and the Kingdom of Bahrain ("Bahrain"), which seeks to isolate Qatar by land, air, and sea.  As the United Nations High Commission on Refugees has determined, the blockade is unlawful and violates international humanitarian law.  Undeterred by this finding, the blockading countries seek to continue and deepen the unlawful isolation of Qatar.  Indeed, Saudi Arabia has announced its intention to relocate a nuclear waste site to its border with Qatar and to dig a canal along the border, literally turning Qatar into an island.

3.      Not satisfied with Qatar's physical isolation, financial institutions and individuals in league with the blockading countries launched a campaign of financial warfare against Qatar.  Defendants and others engaged in an array of unlawful, manipulative, and fraudulent conduct — including fictitious quoting (or "spoofing") and crossing transactions (or "wash sales") — both in New York County and elsewhere, in an attempt to devalue Qatar's currency (the "Riyal" or "QAR") and cause significant financial harm to Qatar.

4.      Elements of Defendants' schemes are set out in an extraordinary PowerPoint presentation created by Banque Havilland (the "Banque Havilland Presentation" or the "Presentation"), a Luxembourg bank with deep ties to the UAE ruling family.  The Banque

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

Havilland Presentation outlined a strategy for manipulating Qatar's financial instruments, which Defendants FAB, Samba, and the John Doe Defendants executed in New York and elsewhere.

5.      The plan included, among other things, a scheme to devalue Qatar's currency, the Riyal, and "break the peg" — the fixed exchange rate at which the Riyal has traded to the U.S. Dollar for more than a decade. Consistent with the Banque Havilland Presentation, Defendants and others tried to artificially devalue the Riyal by submitting thousands of fictitious and depreciated bid/ask quotes to foreign currency platforms that Thomson Reuters and Bloomberg, L.P. hosted in New York County, and to manipulate key composite foreign exchange rates that Reuters and Bloomberg compiled and published in New York County. Defendant FAB and others made these fictitious quotes a few weeks after the illegal blockade began, during the Eid al-Fitr holidays — one of the holiest periods of the Muslim calendar — when markets in the region traditionally have very little activity and their false quotes were more likely to be included in Bloomberg and Reuters indices.

6.      But the quotes were phony, as FAB, Samba Bank, and others repeatedly refused to transact with counterparties at the prices they were quoting in public.

7.      The fictitious quotes had Defendants' desired manipulative effect: they altered the Bloomberg and Reuters composite rates to show a devalued price of the Riyal. In response, Qatar liquidated investments, including nearly $3 billion in U.S. Treasury bills and notes held by Qatar in accounts in New York County, incurred losses, and drew down foreign currency reserves, using more than $40 billion to support its currency. This furthered an object of Defendants' conspiracy, which, as described by the Banque Havilland Presentation, was to deplete Qatar's financial reserves so that it would be unable to complete its preparations to host

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

the 2022 FIFA World Cup games, and would be forced to share the games with Saudi Arabia or the UAE.

8. Defendants intended their quotes to signal weakness in the Riyal and, by submitting frequent, coordinated quotes, Defendants' actions had a direct effect on investors in New York County and elsewhere. Not only did the offshore exchange rates Bloomberg and Reuters compiled show that the value of the Riyal had declined significantly, but U.S. Dollar–denominated Qatari bond prices also fell, and the rates on credit default swaps ("CDS"), which rise in value as bond prices fall, more than doubled.

9. Defendants' conduct has been manipulative, deceptive, fraudulent, and unlawful. Manipulative conduct is still ongoing, and the full extent of Defendants' schemes is not yet known.

10. Through this action, Qatar seeks to hold FAB, Samba Bank, and the unknown John Doe Defendants who conspired with them liable for the billions of dollars in damages that they have caused to Qatar, plus punitive damages and statutory interest.

## THE PARTIES

### A. PLAINTIFF

11. Qatar is a foreign sovereign nation. It operates through its agencies and instrumentalities, including the Qatar Central Bank ("QCB"), Ministry of Finance ("MoF"), and the Qatar Investment Authority ("QIA"). The QIA operates a subsidiary in New York County, the Qatar Investment Authority Advisor (USA), Inc.

12. By decree, Qatar's currency—the Riyal—is pegged at an exchange rate of 3.64 Riyal to the U.S. Dollar (the "Peg"). This exchange rate has been stable for more than a decade. It provides consistency and reliability to foreign investors and is the bedrock of Qatar's monetary

3

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

policy. At all relevant times, the QCB has stood behind the Peg, and has been willing and able to exchange Riyals at the pegged rate.

13.     Qatar issues billions of dollars in government bonds that are denominated in U.S. Dollars and trade in the United States, including in New York County. More Qatari sovereign bonds are believed to be held in the United States than in any other country in the world. Large U.S. insurance companies located in New York County, among others, publicly report their holdings of Qatari sovereign bonds.

14.     As a result of Defendants' manipulative conduct, Qatar suffered significant harm when it was forced to liquidate billions of dollars of investments held in New York County and elsewhere in order to provide liquidity to Qatari banks to maintain the Peg.

### B.     DEFENDANTS

15.     FAB, formerly known as National Bank of Abu Dhabi, is a financial institution based in the UAE with branches across the world, including in the United States. FAB has ties to the UAE government, and its largest shareholders include the Abu Dhabi Investment Council and the Mubadala Investment Company, which are sovereign wealth funds. Mubadala Investment Company's parent, the Mubadala Development Company, is partnering with the owners of Banque Havilland in a joint venture, to create the Anglo-Gulf Trade Bank ("AGTB"), one of the world's largest privately owned trade-finance banks.

16.     Samba Bank is a financial institution based in Saudi Arabia with branches across the globe. Samba Bank has ties to the Saudi government. Its largest shareholders include the government of Saudi Arabia and its sovereign wealth funds.

17.     John Doe Defendants 1–20 are individuals or entities whose identities are currently unknown. The John Doe Defendants participated in, conspired with others, or aided and abetted others in performing the unlawful acts alleged herein.

4

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to CPLR 301 and 302(a)(2).

19.     Defendants specifically directed their fraudulent conduct at New York County,
including, among other ways, by submitting fraudulent quotes through their accounts with
Bloomberg and Reuters to foreign exchange platforms and data centers located in New York
County. Defendants directed their fraudulent conduct at New York County: (i) in order to
manipulate indices compiled and published in New York County, which are relied upon by
investors in New York County and elsewhere; (ii) in order to influence financial markets in New
York County, where substantial Qatari assets are held by large New York-based institutional
investors; (iii) in order to influence Qatar itself, which through its agencies and instrumentalities
has offices in New York County and held significant assets in New York County; (iv) with the
effect of damaging Qatari assets in New York County; and (v) with the effect of damaging the
many other significant investors in Qatari securities who are located in New York County. As a
result of Defendants' fraudulent conduct, Qatar and others suffered harm in New York County.
Among other things, Qatar was forced to liquidate billions of dollars in investments held in
accounts, including in New York County, and use those proceeds to support the Peg and stabilize
Qatar's currency.

20.     The John Doe Defendants participated in the scheme, either by submitting
fraudulent quotes themselves, conspiring to commit fraud, or aiding and abetting the commission
of fraud directed at New York County.

21.     Venue is proper in this County pursuant to CPLR 503(a).

5

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

## BACKGROUND

### A.    THE ILLEGAL BLOCKADE OF QATAR

22.    On June 5, 2017, Saudi Arabia, the UAE, and Bahrain cut diplomatic ties with Qatar. These countries closed all land, sea, and air transportation links with Qatar; ordered their citizens to leave Qatar; declared a ban on all travel to and from Qatar; and instructed all Qatari residents and visitors to leave their territories within 14 days.

23.    Qatari citizens who resided in blockading countries were forced to leave those countries, abandoning their families, businesses, and property.

24.    The UAE General Prosecutor announced that anyone from the UAE that "showed any sympathy" for Qatar or its citizens on social media would be imprisoned for 3-15 years and fined over $100,000.

25.    The United Nations High Commission on Refugees has declared that the blockade of Qatar violates international humanitarian law.

26.    The illegal restrictions on the movement of people and goods had an immediate, detrimental impact on the human rights of the citizens of Qatar and the blockading countries. The blockade has destabilized Qatar's economy, impeding the flow of trade and money and increasing the costs of transportation and goods.

27.    To further the aims of the blockading countries, financial institutions and individuals in league with the blockading countries, including FAB, Samba Bank, and the John Doe Defendants, launched a campaign of financial warfare against Qatar in New York County and elsewhere, seeking to cripple Qatar by harming its financial instruments and its foreign investors.

28.    The illegal blockade continues to this day.

6

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

**B.    THE BANQUE HAVILLAND PLAN TO WAGE FINANCIAL WARFARE ON QATAR**

29.    Although the full scope of Defendants' scheme is not yet known, a remarkable PowerPoint presentation — the Banque Havilland Presentation — was published by *The Intercept* on November 9, 2017 (attached hereto as Exhibit A) and subsequently garnered world-wide news coverage. The Banque Havilland Presentation provides a glimpse into the secretive efforts by Defendants and others to wage financial warfare on Qatar.

30.    As reported by the press, the Banque Havilland Presentation was prepared by an analyst at Banque Havilland named Vladimir Bolelyy, and was later discovered in the email inbox of the UAE Ambassador to the United States and disseminated throughout global media.

31.    Banque Havilland, S.A. is a private bank owned and controlled by the Rowland family. Banque Havilland is a successor to failed Kaupthing Bank, several executives of which have been convicted of fraud and sentenced to prison.

32.    Banque Havilland has deep, historic ties to the UAE and its ruling family, as well as business relationships in Saudi Arabia and Bahrain. These connections to the blockading countries supplied the motive, means, and opportunity for Banque Havilland to develop the strategy to wage unlawful financial warfare against Qatar, which Defendants carried out.

33.    The Rowland family has long had business ties to the UAE and enjoys a close relationship with the Crown Prince of Abu Dhabi, Sheikh Mohammed bin Zayed Al Nahyan (also known as "MBZ"). Indeed, the Rowland family recently announced a multi-billion dollar partnership with one of the UAE's sovereign wealth funds, Mubadala Development Company, to create one of the world's largest, privately owned trade-finance banks, AGTB. AGTB, which is expected to have $200 billion or more in assets, is supported by funds from members of the Rowland family, who have personally committed more than $100 million, and MBZ. The

7

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

Rowland family also has connections with financial institutions in Saudi Arabia and Bahrain and with senior officials in those countries.

34.     Further underscoring the deep connections between the UAE, the Rowlands, and Banque Havilland, the analyst who prepared the Presentation — Vladimir Bolelyy — left Banque Havilland in 2017 to work for AGTB.

35.     Newspapers reported that the Banque Havilland Presentation was found in November 2017 in the email inbox of the UAE Ambassador to the United States, Yousef Al-Otaiba.  The Presentation was labelled as "Qatar Opportunity" and stored in the same electronic folder as an "update" on AGTB, again underscoring the connections between Banque Havilland and the UAE regime.  Both documents were filed under a heading:  "Rowland Banque Havilland."

### 1.     Banque Havilland's Plan to Wage Financial Warfare

36.     The Banque Havilland Presentation describes a multi-prong scheme for numerous co-conspirators to destabilize Qatar's economy.  Defendants FAB, Samba Bank, and others put elements of the Banque Havilland Presentation into effect.

37.     The Banque Havilland Presentation has three principal components:  (1) devalue the Qatari Riyal and break the Peg; (2) drive down the prices of Qatari bonds, which would make it more difficult for Qatar to raise capital, and allow the conspirators to make money through the purchase of CDS, which would increase in value as the bonds plunged; and (3) use the media, particularly in New York County and other major financial centers, to launch a public relations assault on Qatar's reputation for financial stability.  Defendants pursued each of these strategies separately, and in conjunction with each other, in their unlawful manipulative scheme to attack Qatar.

8

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

### (a)  Attacking the Currency

38.    For more than fifteen years, Qatar has pegged the value of the Riyal to the U.S. Dollar at a rate of 3.64 Riyals to the U.S. Dollar.

39.    The Peg provides stability and reliability and facilitates foreign — particularly U.S. — investment. Maintaining the stability of the Peg is a bedrock of Qatar's monetary policy.

40.    Qatar has always stood by the Peg, and the QCB has exchanged the Riyal at the rate of 3.64 Riyals to the U.S. Dollar. Prior to Defendants' manipulation, there had been no material or sustained fluctuation in the Riyal-to-U.S. Dollar exchange rate for almost a decade.

41.    Because the Riyal is a pegged currency, it is not typically a heavily traded currency in international markets.

42.    As set forth in the Banque Havilland Presentation, a key part of the conspiracy was to break the Peg. If the conspirators managed to break the Peg and devalue Qatar's currency, Qatar would suffer severe economic consequences. Qatari assets would be depreciated, and foreign investors would question their investments in Qatar. Because the economic consequences of breaking the Peg would be so severe, the Banque Havilland Presentation anticipates that, if the Peg were under attack, Qatar would be forced to liquidate investments, including in New York County, and would draw down its cash reserves to support the Peg.

43.    In fact, attacking the Peg is so central to the plan presented in the Presentation that it was prominently featured in its Mission Statement. The Presentation instructs the conspirators that they must work together to manipulate Qatar's currency and financial instruments, noting that "*sanctions do not work unless adhered to by all parties*"; the "*currency peg pressure is only effective when it is exercised by all parties*"; and that "*maintaining the peg requires extensive use of central bank foreign exchange reserves.*"

9

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

44.     Even if the conspirators could not break the Peg, they knew they could inflict billions of dollars of damages on Qatar by forcing Qatar to deplete its reserves and liquidate other investments to defend the Peg, which is indeed what happened. The actions of FAB, Samba Bank and others formed part of the strategy to force Qatar to defend its currency.

### (b)     Attacking Qatari Bonds

45.     The Presentation also calls for an attack on Qatari sovereign bonds.

46.     The Presentation's Mission Statement sets forth the conspirators' aim to manipulate Qatari sovereign bonds and related CDS to drive down the value of Qatar's bonds, putting additional pressure on the country's economy, and making it more difficult for Qatar to raise money going forward. It concludes with the conspirators' goal: *"Control the yield curve, decide the future."* In other words, by increasing the cost of Qatar's bonds and damaging its ability to raise money (*"control the yield curve"*), the conspirators sought to inflict harm on Qatar and its financial prospects (*"decide the future"*).

47.     Stage 1 of the Presentation calls for the conspirators to *"Establish Execution Strategy."* The Presentation proposes the creation of an anonymous offshore investment that would hold Qatari bonds, in order to *"create a sizeable, strong, and standalone entity which can be . . . a smaller counterpart to central bank reserve holdings"* for which *"confidentiality [was] maintained."*

48.     This "standalone entity" would also be used to buy CDS derivative of Qatari bonds, which would increase in value as the value of the underlying bonds declined. Specifically, the Presentation calls on the co-conspirators to *"assess [the] global market conditions for the Qatari Riyal and CDS to establish an execution strategy,"* including *"determining [the] available liquidity, supply, and pricing"* and *"identifying the appropriate instruments such as currency forwards, currency options, and bond CDS."*

10

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

49.     Stage 1 of the Presentation also outlines action by co-conspirators across different geographic regions. Specifically, Stage 1 of the Presentation calls for "ensuring" the existence of "*trade lines*" in "*different time zones*" and the inclusion of "*second-tier banks*" to allow the co-conspirators "*maximum flexibility*" to coordinate their manipulation of Qatar's financial instruments. The Presentation proposes "*mak[ing] targeted use of investment banks' friendship with Qatar to affect loyalty and add confusion to the marketplace.*"

50.     In Stage 2, co-conspirators would "*Gear Up to Control the Yield Curve.*" This would be accomplished by engaging in manipulative trading, such as "*crossing transactions,*" i.e., wash sales, "*whereby . . . affiliated part[ies] sell[] the same bond holdings back to the original seller and thereby create[] additional downward pressure [on bond prices].*" These "*crossing transactions*" would artificially increase transaction volume, drive down prices, "*add to confusion in the marketplace,*" and attract the attention of investors — all with the goal of sowing panic and prompting further sell-offs of Qatari financial instruments. According to the Presentation, this activity would introduce downward pressure on Qatar's currency, while also increasing the value of the CDS owned by the co-conspirators.

51.     Stage 2 calls for the co-conspirators to increase purchases of CDS on Qatari sovereign bonds. The Presentation instructs co-conspirators to seek out "*Qatar-friendly banks who may prove more willing to enter into these trade*s" and to "*increase long CDS positions slowly with large banks, just enough to move the price sufficiently to make it newsworthy.*"

(c)     **Attacking Qatar Through the Media**

52.     In Stage 3 of the Presentation, the co-conspirators would focus on the "*PR Machine & Position Increase.*" The Presentation explains that co-conspirators would increase their positions in CDS and put further downward pressure on Qatari bond prices as well as the Peg by "*fir[ing] up the PR machine to remind people that there is a problem with Qatar.*" Co-

11

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

conspirators planned to coordinate public statements about Qatar's supposedly unstable economy in order to "*refresh the PR message to add more fuel to the fire*."

53.     Finally, the Presentation calls for the co-conspirators to generate news articles and issue "*bold statements from neighboring countries*" that "*focus on the prospect of restricted access to [the] US Dollar and now-doubtful stability of the country*." The Presentation predicts that Qatar would stand behind the Peg and would have to spend significant amounts of its reserves to stabilize its currency.

(d)     **The Intended Outcome of the Banque Havilland Scheme**

54.     According to the Presentation, Qatar's U.S. Dollar reserves would be depleted and its financial prospects would be so compromised that, among other things, Qatar might be unable to host the world's most prestigious soccer tournament — the FIFA World Cup — which Qatar is slated to host in 2022. The Presentation notes that if the co-conspirators forced Qatar to "*spend[] its reserves on protecting the currency and domestic credit markets*," the country would have less money to fund infrastructure spending necessary to build the 2022 World Cup stadiums and other facilities. The Presentation anticipates that the manipulation of Qatar's economy would exacerbate the "*already increased*" construction costs for the 2022 World Cup caused by the blockade, especially since Saudi Arabia and the UAE had been the "*primary suppliers of materials*" to Qatar.

55.     If Qatar did not have the financial ability to host the 2022 World Cup, that would leave an opening for the blockading countries to make a bid to host the games as a regional event, instead of solely in Qatar. That would bring attention, tourism, and money to the blockading countries. Indeed, the UAE has publicly announced that it would be willing to co-host World Cup games.

56.     The Presentation also notes the co-conspirators' intent to *"appeal to FIFA ... to [use] football as a tool to stabilize the region,"* concluding that *"if Qatar rejects the Proposal, [Qatar] will be seen [as] unwilling to work with their [Gulf Cooperation Council] partners."*

## C.     DEFENDANTS ATTACK THE RIYAL AND TRY TO BREAK THE PEG

57.     The Banque Havilland Presentation described a multi-pronged scheme to destroy Qatar's economy. Defendants used the Bloomberg and Reuters foreign exchange platforms — all based in New York County —to put elements of the scheme into action.

### 1.     Defendants Weaponized Bloomberg and Reuters in Their Attack

58.     In carrying out their scheme, Defendants used New York County financial data providers as unwitting tools.

59.     Bloomberg, which is headquartered in and registered to do business in New York County, and Reuters, which has its principal place of business in New York County, are market-leading New York-based data providers that distribute financial information around the world. Bloomberg and Reuters broadcast quotes that are submitted directly by contributors. Bloomberg and Reuters also use contributors' quotes to calculate proprietary exchange rates for currency pairs including the Riyal-to-U.S. Dollar exchange rate used for trading offshore (i.e., not directly with the QCB, which provides the Peg exchange rate), via their data platforms.

60.     The proprietary currency exchange rates compiled by Bloomberg and Reuters are important international rates. The Bloomberg and Reuters exchange rates are closely followed by market participants and relied on as benchmarks by banks and other institutions in New York County and around the world. The values listed by the exchanges are perceived as the product of market forces and indicative of the financial health of the currency issuers.

61.     The Bloomberg and Reuters exchange rates for the Riyal are relied on and broadcast around the world, but they originate in New York County. Bloomberg's Global FX

13

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

business, which manages the Bloomberg foreign exchange platform, is located in New York County, and the electronic servers holding the data Bloomberg distributes around the world are located in New York County. Similarly, Reuters' foreign exchange servers are located in New York County. By submitting false quotes for the Riyal-to-U.S. Dollar exchange rates to Bloomberg and Reuters, Defendants transmitted artificial exchange rates into New York County, through electronic servers located in New York County, and caused Bloomberg and Reuters to transmit, publish, and disseminate artificial Riyal-U.S. Dollar exchange rates from New York County.

62.     Bloomberg calculates two composite exchange rates for the Riyal-U.S. Dollar exchange rate, the Bloomberg Composite Rate ("CMP") and the Bloomberg Generic Price ("BGN"). Bloomberg uses a proprietary algorithm to calculate both exchange rates, but it publicly discloses that its algorithms consider quotes only from "privileged" contributors. Bloomberg determines which contributors are "privileged" based on the "quality and consistency of [their] data, as well as consensus with the market." For the BGN, "each contributor is assigned a quality score based on numerous factors including update frequency and spike frequency." Bloomberg's public explanation makes clear that Bloomberg's proprietary algorithm determines "privileged" contributors based on which contributors: (1) quote more frequently, (2) have stable quotes (i.e., no spikes), and (3) have quotes that are generally in line with those of other contributors.

63.     The illegal blockade started on June 5, 2017. Market evidence shows that Defendants' manipulation of the FX indices began in earnest a few weeks later.

64.     Beginning on or about Friday, June 23, 2017, FAB and others submitted thousands of sham offers to buy and sell the Riyal in significantly increased volumes of quotes,

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

and at substantially devalued rates to the Bloomberg and Reuters foreign exchange platforms in New York County.

65.     The choice of Friday, June 23 was significant. Markets in the region are always closed on Fridays, and currency markets are typically not active on Fridays. Moreover, Friday, June 23 was the weekend leading into the Eid al-Fitr holidays, one of the holiest periods in the Muslim calendar, when regional banks are closed for several days and currency trading activity is historically vastly reduced. This was akin to beginning the manipulation on Christmas Eve.

66.     The volume of quoting of the Riyal during the 2017 Eid al-Fitr holidays was a striking departure from regular market activity, particularly during Eid al-Fitr.

67.     During the Eid al-Fitr holidays the year before, in 2016, FAB did not submit a single quote to the foreign exchange platform hosted by Bloomberg. And, again, during the 2018 Eid al-Fitr holidays, FAB did not submit a single quote for the Riyal to the foreign exchange platform hosted by Bloomberg. By contrast, during Eid al-Fitr in 2017, FAB submitted hundreds of quotes for the Riyal every day during the holidays, all at rates substantially depreciated from the Peg.

68.     Before June 2017, FAB submitted quotes for the Riyal only sporadically to the Bloomberg foreign exchange platform in New York, and these quotes were at or very close to the Peg of 3.64. On June 23, 2017, in contrast, FAB submitted quotes for the Riyal every minute, at depreciated rates as low as 3.72 to 3.82 Riyals to the U.S. Dollar.

69.     Defendants also put pressure on the Riyal's Peg to the U.S. Dollar by submitting fictitious quotes in the market for Riyal currency forwards and non-deliverable forwards ("NDF").

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

70.     During the Eid al-Fitr holidays, FAB quoted in the Riyal currency forwards market in increasing volume and at depreciated rates.  FAB continued to submit thousands of depreciated quotes per day to the Bloomberg currency forwards platform through November 2017.

71.     Defendants submitted those quotes to take advantage of quiet holiday markets in order to more easily manipulate the foreign exchange indices that are compiled by Bloomberg and Reuters in New York County and relied on by Qatar and investors around the world. Defendants intended to game the system that Bloomberg and Reuters set up, outlined above, that "privileged" frequent and consistent quoters.

72.     And, for a time, the scheme worked.  FAB, Samba Bank, and others quoted the Riyal at such frequency and at such consistently depreciated rates that they were "privileged" contributors on Bloomberg.

73.     The frantic burst of fake quoting activity caused Bloomberg's Riyal-U.S. Dollar exchange rates to drop sharply.  Bloomberg began compiling the quotes from this new, "established" consensus market of banks, and the so-called "offshore" Riyal rates depreciated dramatically.  Of course, an "offshore" market at fluctuating rates makes no sense for a currency like the Riyal, which is pegged at a specific U.S. Dollar exchange rate, guaranteed by the country's central bank, and its significant reserves — unless the market believes the Peg may not be honored, which was indeed the conspirators' aim.

74.     On the first day of the weekend leading into Eid al-Fitr, June 23, 2017, Bloomberg's BGN "offshore" rate for the Riyal depreciated sharply from 3.75 to 3.79. Similarly, on the second day of the Eid al-Fitr holidays, June 24, 2017, the CMP "offshore" rate for the Riyal depreciated from 3.79 to 3.81.

16

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

75.     Defendants' manipulation of these Bloomberg rates broadly affected markets, including in New York County, because the Bloomberg CMP and BGN rates are relied on by banks, investors, and other financial institutions in New York County and elsewhere.

76.     Defendants' coordinated and manipulative activity reinforced a false narrative that Qatar's currency was increasingly volatile and its economy was too unstable for investment.

77.     As Defendants intended, and consistent with the Presentation, this quoting activity was picked up by major international media, which wrote numerous articles about the sudden drop in Riyal-to-U.S. Dollar exchange rates. For example, on June 28, 2017, Reuters published an article titled "*The Qatari Riyal FX Market in Chaos*," and on July 6, 2017, *Bloomberg* published an article with a headline asking, "*What is a Qatari Riyal Worth*?"

78.     Defendants' manipulative scheme caused significant harm to Qatar, as well as to investors and global financial markets.

79.     Qatar and its agents at all relevant times tracked markets for the Riyal, including the Bloomberg and Reuters exchange rates, and closely monitored the market distortions that occurred and were widely reported in the international media.

80.     Unaware that the Bloomberg and Reuters exchange rates for the Riyal had been manipulated, and believing that Defendants' quotes and the manipulated Bloomberg and Reuters exchange rates reflected the legitimate offshore market activity for the Riyal, Qatar took swift action in response. In order to stabilize the currency markets, and as set forth below, Qatar liquidated investments, depleted foreign exchange reserves, and used more than $40 billion to support its currency and maintain the Peg.

81.     Throughout Defendants' manipulation, Qatar stood behind the Peg, and the QCB was willing and able to transact at 3.64.

17

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

### 2. The Currency Attack Continues Through the Fall of 2017

82.     Defendants' manipulative conduct and fictitious quoting continued throughout the summer and fall of 2017 and continued to have a destabilizing effect on the Bloomberg and Reuters "offshore" exchange rates for the Riyal-U.S. Dollar.

83.     Samba Bank submitted quotes to the Riyal-U.S. Dollar Bloomberg foreign exchange platform in increased volumes and at substantially depreciated rates in July 2017. Samba Bank increased its volume of quotes to the Riyal-U.S. Dollar Bloomberg platform as the year progressed, at rates substantially devaluing the Riyal.  Samba Bank quoted a rate as depreciated as 3.95 Riyals to the U.S. Dollar on Bloomberg on November 20, 2017.

84.     Defendants' activity in the Riyal currency forwards market also closely mimicked its manipulative activity in the Riyal-U.S. Dollar foreign exchange markets.  For example, Samba Bank submitted thousands of depreciated quotes per day to the Bloomberg currency forwards platform in July 2017, and continued to quote at high volumes and depreciated prices through November 2017.

85.     FAB likewise increased the numbers of quotes it was submitting in October and November 2017, often submitting quotes to Bloomberg and Reuters every minute, and at rates as low as 3.93.

86.     Due to Defendants' manipulative conduct, the exchange rates Bloomberg and Reuters calculated continued to sharply depreciate the Riyal relative to the U.S. Dollar, and hit an all-time low in November 2017 of 3.94 Riyals to the U.S. Dollar.

18

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4
INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1
INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019



87.    This conduct continued to have a significant impact on Qatar.

88.    Still unaware that the Bloomberg and Reuters exchange rates for the Riyal had been manipulated, and with the Defendants' quotes and the manipulated Bloomberg and Reuters exchange rates apparently reflecting legitimate market activity, Qatar continued to liquidate investments, deplete foreign exchange reserves, and use billions of dollars to support its currency and maintain the Peg.

### 3.    Defendants' Quotes on Bloomberg and Reuters Were Fraudulent

89.    Defendants' conduct was classic "spoofing." Not only were the quotes Defendants submitted to the Bloomberg and Reuters foreign exchanges unusual, they were also bogus, as Defendants were unwilling to transact at the bid/ask prices they quoted to potential counterparties. When traders from other institutions contacted FAB, Samba Bank, and others to transact at the quoted rates, they were told that the rates were "indicative only" or other similar excuses for why no actual trading could occur.

19

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

90.     While FAB, Samba Bank, and others were submitting thousands of quotes to the Bloomberg Riyal-U.S. Dollar foreign exchange platform at depreciated rates, Bloomberg chat messages reveal that they declined to stand behind the rates they quoted.  For example:

   a.   On July 9, 2017, when a bank from a blockading country was quoting rates on Bloomberg as high as 3.76, a trader from that bank was approached via "chat" message about trading Riyals at the bank's quoted rates.  The trader responded that the bank had *"no interest at the mom[ent] in QAR."*  The very next day, a trader from the same bank was approached again about transacting at the bank's quoted rates.  The trader responded that the quotes published on Bloomberg were *"not dealing price[s]."*

   b.   Similarly, on November 1, 2017, a day when FAB's end-of-day quote submitted to Bloomberg was 3.850 Riyals to the U.S. Dollar — well below the Peg — a trader at FAB was approached, via "chat" message on the Bloomberg platform, with a request to complete a transaction at FAB's quoted rates.  The trader responded that the quoted rates were *"indicative levels"* and that he was *"SQR"* (i.e., "square" or unwilling to complete the transaction).

   c.   Again, on November 22, a FAB trader was approached, via "chat" message on the Bloomberg platform, with a request to complete a transaction at FAB's quoted rates.  The trader responded that he had *"nothing to suggest."* despite the fact that FAB traders had submitted over a thousand quotes to Bloomberg that day, with an end-of-day ask quote at the depreciated rate of 3.890 Riyals to the U.S. Dollar.

20

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

      d.  On November 29, 2017, a trader at FAB was approached, via "chat" message on the Bloomberg platform, with a request to complete a transaction at FAB's quoted rates. The trader responded: "*I'm SQR at the moment*" (i.e., "*square*" or unwilling to complete the transaction).

      e.  Also on November 29, 2017, a trader at Samba Bank was approached, via "chat" message on the Bloomberg platform, with a request to complete a transaction at Samba Bank's quoted rates. In response, the Samba Bank trader wrote that he had "*no interest for QAR[] at the mom[ent]*." However, Samba Bank submitted hundreds of quotes that day, and ended the day with an ask quote of 3.730 Riyals to the U.S. Dollar.

91.    Despite refusing to trade Riyals, FAB, Samba Bank, and others continued to submit quotes to Bloomberg and Reuters at rates as depreciated as 3.97 into November 2017.

### 4.   Defendants' False Quotes Abated When the Banque Havilland Presentation Was Exposed

92.    Defendants' false quotes on Bloomberg and Reuters abated towards the end of November 2017, when two events occurred, and the contours of the scheme were revealed to the public: First, Defendants' scheme, as memorialized in the Banque Havilland Presentation, was revealed to the world in *The Intercept*. Second, soon thereafter, the QCB announced that it was beginning an investigation into the market manipulation and had retained U.S. legal counsel to conduct its investigation.

93.    FAB ceased quoting in the Bloomberg QAR/USD spot market as of November 29, 2017, despite submitting over 1,000 intraday quotes in the QAR/USD spot market on Bloomberg on prior days. FAB did not submit any more quotes to Bloomberg at all for the rest of 2017, and for all of 2018 quoted on only one day — and at the pegged rate.

21

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

94.     Samba Bank sharply dropped its rates and returned to quoting around the pegged

rate. After quoting a rate as high as 3.95 on November 20, 2017, Samba Bank's quoted rates fell

precipitously, and its quoted rates were back to near the pegged rate in December 2017.

95.     Although the illegal blockade continues to this day, and other manipulative

conduct is ongoing, Bloomberg and Reuters foreign exchange rates have consistently stayed at or

near the pegged rate since December 2017.

### 5.     Defendants' Currency Manipulation Caused Harm to Qatar and Investors in New York County and Elsewhere

96.     Defendants' scheme to submit false quotes and manipulate the Bloomberg and

Reuters foreign exchange rates for the Riyal caused extensive harm to Qatar and businesses and

individuals who invested in Qatar.

97.     Many investors located in New York County invest in Qatar.

98.     A significant component of that investment is through shares in the Qatari

companies included in the MSCI Emerging Markets Fund ("MSCI EM"), which is an exchange-

traded fund that is headquartered in New York County and allows retail investors and others to

invest in a basket of emerging market economies. The MSCI EM tracks the performance of

firms with a combined market capitalization of approximately $4.9 trillion and is often mimicked

or followed by other investors.

99.     To invest in Qatari companies, investors in funds like the MSCI EM or any other

investors must purchase shares in such companies using Riyals.

100.     Investors in the MSCI EM and other similar funds must therefore convert U.S.

Dollars to Riyals before they buy shares or after they sell them. Banks and other financial

institutions in New York County and throughout the world rely on the Bloomberg and Reuters

"offshore" rates to exchange currency for the purpose of investing in Qatari companies.

22

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

101.   U.S. investors who purchased Qatari stocks, bonds, or other instruments in the period before the manipulation would have purchased those financial instruments at an exchange rate of 3.64 Riyals to the U.S. Dollar. In contrast, if those same investors sold the instruments after the manipulation began, they would have received a depreciated rate — as low as 3.94 Riyals to the U.S. Dollar.

102.   The difference in the Riyal exchange rates before and after Defendants' manipulative conduct caused investors in New York County and elsewhere to suffer significant harm on their investments in Qatar. In fact, complaints were made about this kind of exchange-rate loss by investors, including investors located in New York County.

103.   The problem grew so severe in the fall of 2017 that MSCI EM considered incorporating the unofficial "offshore" rates for the Riyal, compiled by Bloomberg, into its valuations of the Qatari stocks in the MSCI EM, instead of the official pegged rate of 3.64.

104.   On November 21, 2017 — a day when Defendants were submitting thousands of depreciated quotes to Bloomberg at approximately 3.90 Riyals to the U.S. Dollar — Bloomberg reported that MSCI EM was considering switching its index rate to the new "offshore" rates instead of the official pegged rate of 3.64. Had MSCI EM switched to using the offshore Bloomberg composite rate to value Qatari securities in the MSCI EM, investors' holdings would have been even further devalued.

105.   Defendants knew that their manipulative conduct would result in Qatar and investors in New York County and elsewhere redeeming their investments at depreciated rates, and intended exactly such a result.

23

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

### D.   DEFENDANTS' MANIPULATION OF QATARI BONDS AND CREDIT DEFAULT SWAPS

106.    Defendants also attacked Qatar's sovereign bonds.  Their goal was to try to depress the value (and accordingly increase the yield) of Qatari bonds, drive away the many investors in New York County who held Qatari bonds (and could purchase more), and convince the world that Qatar was not suitable for investment, while inflating the market in CDS in relation to Qatari bonds.

107.    Qatari bonds are traded over the counter in the United States, and several large financial institutions based in New York County are among the largest holders of Qatari bonds.  At least three financial institutions headquartered in New York County held investments collectively worth more than $300 million in Qatari sovereign bonds as of the end of 2017.  Each of the three was an active purchaser and seller of Qatari sovereign bonds in 2017.

108.    The Banque Havilland Presentation called for co-conspirators to manipulate the price of Qatari bonds by engaging in sham transactions, including wash sales, designed to drive down the price of the bonds.  As the Presentation described, conspirators would "*sell the same bond holdings back to the original seller and thereby create additional downward pressure*" on bond prices.  Conspirators would also seek out "Qatar friendly banks" with which they could trade.  They would also purchase CDS positions on the bonds, which would increase in value as the prices for the bonds fell.

109.    Defendants also used similar manipulative tactics in the bond market as they used in the Riyal-U.S. Dollar foreign exchange platforms — distorting the market with the submission of fictitious, depreciated quotes, and causing depreciation in the price of Qatari bonds.

110.    FAB and others attacked the Qatari bonds in several ways, including:

24

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

a. *First*, by attacking the Riyal-U.S. Dollar exchange rates in order to decrease the value of all Qatari bonds, as participants in the market would be led falsely to believe that the market regarded Qatar with reduced confidence.

b. *Second*, by posting excessive and depreciated (or, in the case of CDS, inflated) quotes via the Bloomberg and Reuters platforms (and via other means of market communication currently unknown to Qatar). For example, with respect to the Qatari U.S. Dollar–denominated bond maturing June 2, 2046, and paying a coupon rate of 4.625%, FAB began quoting depreciated bond prices immediately following the blockade announcement, but then quickly brought its bond quotes back up to pre-blockade levels. FAB then sharply depreciated its quoted bond prices again during the Eid al-Fitr holidays and again in October and November. FAB's quoting followed a similar pattern in the Qatari U.S. Dollar–denominated bond maturing June 2, 2021 and paying a coupon rate of 2.375%, the Qatari U.S. Dollar–denominated bond maturing June 2, 2026 and paying a coupon rate of 3.25%, and the Qatari U.S. Dollar–denominated bond maturing June 15, 2030 and paying a coupon rate of 9.750%.

c. *Third*, by carrying out "crossing transactions" as discussed in the Banque Havilland Presentation (i.e., engaging in transactions whereby the asset is transferred and/or re-transferred at a depreciated notional price, but without any true exchange of value taking place) and publicizing such

25

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

"crossing transactions" to the market so as to create the perception that holders of Qatari bonds were actively selling at depreciated prices.

d. *Fourth*, by purchasing CDS, as described in the Banque Havilland Presentation, so that as the value of Qatari bonds fell, the value of the CDS held by the Defendants would rise.

111. Just as the conspirators had planned, and as predicted by the Banque Havilland Presentation, the drop in bond prices caused an enormous corresponding increase in the prices of CDS. CDS spreads rose from 59.025 bps on June 2, 2017 to their highest level ever on July 7, 2017, at 124.32 bps shortly after the close of the Eid al-Fitr holidays. Those who invested in CDS — as the Banque Havilland Presentation called for the conspirators to do — profited.

112. The press covered the depreciation of the Qatari bond prices as evidence that the blockade — rather than Defendants' intentional market manipulation — made Qatari bonds a credit risk.

113. For example, in the days immediately following the Eid al-Fitr manipulation, *Bloomberg News* reported that Qatar's bond prices had fallen 3% on average since the blockade was announced, and that CDS had surged to their highest level in more than a year on June 29, 2017.

114. Defendants' manipulative scheme in the bond market caused significant harm to Qatar, as well as to investors in New York County elsewhere.

115. Qatar and its agents at all relevant times tracked markets for Qatari bonds, and monitored the market distortions that occurred on Friday, June 23, 2017 and were widely reported in the international media.

26

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

116.   Defendants' manipulative conduct in the bond market contributed to the perceived depreciation of the Riyal and put further pressure on Qatar to support the Peg.  Unaware that the distortions in the bond market had been caused by Defendants' manipulative conduct, and believing Defendants' bond quotes reflected legitimate market activity, in response to the manipulation across markets, Qatar liquidated investments, including investments held in New York County, depleted foreign exchange reserves, and used billions of dollars to support its currency and maintain the Peg.

E.   **ADDITIONAL MANIPULATIVE CONDUCT**

117.   Consistent with the Banque Havilland Presentation, Defendants and others took additional steps to amplify the manipulation and harm Qatar.

1.   **Use of the Media to Amplify Harm to Qatar**

118.   The blockading countries and others coordinated a public relations campaign against Qatar.  As set forth in the Banque Havilland Presentation, the blockading countries hoped press attention — especially in New York County and other financial centers — would amplify the effects of Defendants' manipulative conduct and increase the economic pressure on Qatar.

119.   The Embassy of Saudi Arabia, the Embassy of the UAE, and the Executive Affairs Authority of Abu Dhabi engaged The Harbour Group, a United States public affairs company, to conduct an extensive media campaign against Qatar, targeting numerous United States publications including the *Wall Street Journal*, *Bloomberg*, *Reuters*, and the *New York Times*, which are located in New York County.

120.   The UAE also hired SCL Social Limited, parent of Cambridge Analytica, to engage in a social media campaign targeting Qatar.

121.   As the blockading countries had planned, regional and international media outlets began reporting on the volatility in the financial markets manufactured by Defendants as

27

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

legitimate, intensifying concerns about Qatar's financial instruments and inflicting damage on

Qatar's financial reputation.  For example:

    (a)    On June 28, 2017, *Reuters* published an article titled "The Qatari Riyal FX Market in Chaos."

    (b)    On June 30, 2017, *Reuters* ran another article describing chaos in the foreign exchange markets market titled "Several UK Banks Stop Selling Qatari Riyals."

    (c)    That same day, the *Middle East Eye*, a regional periodical, published an article titled "Qatari Currency Facing Crisis."

    (d)    On July 6, 2017, *Bloomberg* published an article with a headline asking, "What is a Qatari Riyal Worth?"

122.    Similar press coverage continued throughout the summer and fall of 2017.

**2.**    **Efforts to Cause Runs on Qatari Banks**

123.    Around the time of the 2017 Eid al-Fitr holidays, persons and entities from the blockading countries abruptly withdrew more than $8 billion from Qatari banks.

124.    This withdrawal was planned to create a run on Qatari banks, manufacture a liquidity crisis in Qatar, and deplete U.S. Dollar reserves from Qatari banks.  It was intended to coincide with Defendants' other manipulative conduct, and reinforced the false narrative that Qatar's finances were in crisis.  Defendants' goal was to create panic among foreign investors, and exacerbate the downward pressure on the Riyal.

**F.**    **QATAR HAS SUFFERED SUBSTANTIAL HARM AS A RESULT OF DEFENDANTS' SCHEME**

125.    Defendants' manipulative scheme has caused extensive damage to Qatar.

28

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

126.    Qatar and its agents at all relevant times tracked markets for the Riyal and Qatari sovereign bonds, and closely monitored the market distortions that occurred and that were widely reported in the international media.

127.    Qatar was not aware that the Bloomberg and Reuters exchange rates for the Riyal had been manipulated, and relied on the fact that Defendants' bogus quotes and the manipulated Bloomberg and Reuters exchange rates reflected legitimate activity in the offshore foreign exchange markets.

128.    Qatar was not aware that the bond quotes submitted to Bloomberg had been manipulated, and relied on the fact that Defendants' fictitious quotes in the Bloomberg bond markets reflected bona fide transactions in the Qatari U.S. Dollar–denominated bonds.

129.    In response to these market distortions, and in order to support the Peg, Qatar sustained billions of dollars in damages by (i) liquidating investments, including nearly $3 billion in U.S. Treasury bills and notes held in accounts located in New York County as well as other U.S. Dollar–denominated securities earning a high rate of return, in order to provide proceeds to banks in Qatar, and (ii) diverting financial reserves held in New York County and elsewhere to banks in Qatar. This is exactly what the Banque Havilland Presentation predicted Qatar would do, when it wrote that "*maintaining the peg requires extensive use of central bank foreign exchange reserves.*"

130.    In total, Qatar used more than $40 billion to support its currency.

29

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Fraud)**
**(Against All Defendants)**

131.   Qatar incorporates by reference and realleges the preceding allegations as though fully set forth herein.

132.   Defendants made material misrepresentations to Qatar, to Bloomberg, to Reuters, and to investors, including the following misrepresentations, among others:

    a.   that the Riyal quotes they submitted to the foreign exchange platforms hosted by Bloomberg and Reuters in New York County reflected the actual value of the Riyal;

    b.   that the Riyal quotes they submitted to the foreign exchange market platforms hosted by Bloomberg and Reuters in New York County indicated a willingness to enter into arm's-length transactions for the Riyal at the quoted prices; and

    c.   that the quotes they submitted to the foreign exchange market platforms hosted by Bloomberg and Reuters in New York County for Qatari government bonds reflected the actual value of the referenced government bonds.

133.   In addition to making these representations regarding the value of the Riyal and/or the value of Qatari government bonds, each of the Defendants failed to disclose to Qatar, and to Bloomberg, Reuters, and investors, additional facts necessary to make its representations not materially misleading.  Specifically, each of the Defendants failed to disclose that it was manipulating its Riyal-U.S. Dollar quotes and, therefore, manipulating the Riyal composite rates

30

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

calculated by Bloomberg and Reuters; that it was manipulating its Qatari government bond quotes; and that its quotes did not accurately reflect the actual value of the Riyal or Qatari government bonds.

134.    Each of the Defendants knew that its misrepresentations were materially false and misleading when made. In Bloomberg chats between Defendants and counterparties who sought to trade Riyals with Defendants at the depreciated prices Defendants were quoting, Defendants refused to trade and stated that the quoted prices for Riyals were "*wrong*" or "*indicative.*" Nevertheless, Defendants continued to submit thousands of Riyal quotes at depreciated rates at which they were unwilling to transact.

135.    Each of the Defendants' misrepresentations were made intentionally or with reckless disregard for the truth. As set forth in the Banque Havilland Presentation, each of the Defendants knew that Qatar had maintained the value of the Riyal at a pegged rate of 3.64 Riyals to the U.S. Dollar for more than a decade. Nonetheless, each of the Defendants submitted quotes for the Riyal at depreciated values compared to the pegged rate in order to carry out Defendants' scheme to manipulate the markets for Qatari financial instruments around the world, including in New York County.

136.    Each of the Defendants knew that Qatar, as well as Bloomberg, Reuters, and investors, through MSCI EM and otherwise, were likely to receive and rely on its misrepresentations. By making these misrepresentations, each of the Defendants intended for Qatar, as well as Bloomberg, Reuters, MSCI EM, and investors, to rely on the misrepresentations and to believe them to be accurate representations of market value.

        a.  Specifically, each of the Defendants submitted false quotes to Bloomberg and Reuters with the intent that Qatar and others would rely on the quotes

31

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

as accurate representations of the purportedly depreciating value of the Riyal, and that, as part of the scheme, Bloomberg and Reuters would rely on the false quotes when calculating composite or index rates reflecting the market value of the Riyal. Each of the Defendants knew that its false quotes would be used in the calculation of the composite or index rates, and each of the Defendants flooded Bloomberg's and Reuters' New York County platforms with false quotes with the intent to manipulate the published composite and index rates. Defendants' intent to cause damage was underscored by their sustained attempts over time to become a "privileged" contributor to the Bloomberg and Reuters composite rate indices to create a critical mass of "privileged" contributors who could more easily depreciate composite rates for Riyal-U.S. Dollar. Each of the Defendants intended for Qatar and others such as MSCI EM to rely on, and take action in response to, the depreciated rates for the Riyal and the manipulated Bloomberg and Reuters foreign exchange rates. As described in the Banque Havilland Presentation, each of the Defendants intended for Qatar to "*spend its reserves on protecting the currency and domestic credit markets*" and to spend significant sums to maintain the Peg.

b. Each of the Defendants employed a similar scheme with respect to Qatari government bonds, and submitted false quotes to Bloomberg and Reuters with the intent that Qatar and others would rely on the quotes as accurate indicators of the depreciating value of Qatari government bonds.

32

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

137.    Qatar reasonably and justifiably relied to its detriment on Defendants' material
misrepresentations and omissions by, among other things, depleting reserves, liquidating
investments, and taking other steps to protect the Riyal and to maintain the Peg.

138.    Each of the Defendants' material misrepresentations and omissions directly and
proximately caused extensive damages in that Qatar depleted reserves, liquidated investments,
including investments held in New York County, and used more than $40 billion to support the
Riyal and maintain the Peg.

139.    Each of the Defendants continues or imminently threatens future manipulative,
fraudulent, and unlawful conduct aimed at attacking Qatar and its finances.

140.    Each of the Defendants' fraudulent acts were willful and wanton, entitling Qatar
to punitive damages.

### SECOND CLAIM FOR RELIEF

#### (Conspiracy to Commit Fraud)
#### (Against All Defendants)

141.    Qatar incorporates by reference and realleges the preceding allegations as though
fully set forth herein.

142.    As described in the preceding allegations, Defendants perpetrated a fraud on
Qatar through, among other things, false and manipulated quotes for the Riyal and Qatari
government bonds.

143.    Defendants formed a conspiracy or corrupt agreement to commit fraud by
manipulating their Riyal-to-U.S. Dollar quotes and, therefore, manipulating the Riyal composite
rates calculated by Bloomberg and Reuters; manipulating their Qatari government bond quotes;
and engaging in a course of material misrepresentations and omissions to conceal their
fraudulent acts.

33

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

144.    As described in the preceding allegations, Defendants intentionally and knowingly committed acts in furtherance of the conspiracy by manipulating their quotes for the Riyal and Qatari government bonds, by making misrepresentations and/or omissions regarding those quotes, and by engaging in a course of material misrepresentations and omissions to conceal their fraudulent acts, and to continue or imminently threaten future manipulation.

145.    Qatar reasonably and justifiably relied to its detriment on Defendants' material misrepresentations and omissions.

146.    Each of the Defendants' material misrepresentations and omissions directly and proximately caused damages in that Qatar depleted reserves, liquidated investments, including investments held in New York County, and used more than $40 billion to support the Riyal and maintain the Peg.

147.    Because Defendants engaged in the conspiracy to commit fraud stated in this Complaint willfully and wantonly, Qatar is entitled to punitive damages.

### THIRD CLAIM FOR RELIEF

#### (Aiding and Abetting Fraud)
#### (Against All Defendants)

148.    Qatar incorporates by reference and realleges the preceding allegations as though fully set forth herein.

149.    Each of the Defendants acted in concert to advance a fraudulent scheme to harm Qatar.

150.    Each of the Defendants was aware of the misrepresentations and omissions made by the other Defendants in furtherance of the conspiracy.  Each of the Defendants also was aware that the misrepresentations and omissions made by the other Defendants in furtherance of the conspiracy were false and/or misleading at the time that they were made.

34

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 1

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

151.    Each of the Defendants provided substantial assistance to other conspirators in making the fraudulent misrepresentations and omissions. Each of the Defendants submitted, or otherwise assisted with the submission of, false quotes to Bloomberg and Reuters in New York County, without any intent to trade at the quoted rates, for the purpose of depreciating foreign exchange rates published by Bloomberg and Reuters in New York County, and with the intent to assist other Defendants in carrying out their fraudulent activities.

152.    The substantial assistance of each Defendant proximately caused the harm suffered by Qatar. The participation of each Defendant, as alleged herein, substantially assisted the conspirators in carrying out the fraudulent scheme. It was foreseeable to Defendants that Qatar would be harmed by the carrying out of their fraudulent scheme. Further, Defendants continue their manipulation or imminently threaten future manipulation.

153.    Each of the Defendants' substantial assistance has caused damages in that Qatar depleted reserves, liquidated investments, including investments held in New York County, and used more than $40 billion to support the Riyal and maintain the Peg.

154.    Each of the Defendants' acts were willful and wanton, entitling Qatar to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Qatar prays for relief as follows:

(a)    That the Court enter judgment awarding Qatar damages against Defendants for all economic, monetary, actual, consequential, and compensatory damages Plaintiff suffered as a result of Defendants' conduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

35

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 1

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

(b)   That the Court enter a permanent injunction ordering Defendants to cease manipulation of the Riyal, Qatari government bonds, Riyal forwards, and other Qatari financial instruments;

(c)   That the Court award Qatar its costs of suit, including reasonable attorney' fees and expenses;

(d)   That the Court award Qatar punitive damages; and

(e)   That the Court award such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Qatar hereby demands a trial by jury on all issues triable by jury.

36

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 4                                        RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 1                                        RECEIVED NYSCEF: 04/08/2019

Dated: New York, New York
April 8, 2019

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

By: /s/ Daniel J. Kramer

Daniel J. Kramer
Theodore V. Wells, Jr.
Andrew J. Ehrlich
Geoffrey R. Chepiga
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
dkramer@paulweiss.com
twells@paulweiss.com
aehrlich@paulweiss.com
gchepiga@paulweiss.com

Jonathan Hochman
Karen Steel
SCHINDLER, COHEN & HOCHMAN LLP
100 Wall Street, 15th Floor
New York, NY 10005
(212) 277-6300
jhochman@schlaw.com
ksteel@schlaw.com

*Attorneys for Plaintiff State of Qatar*

37

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

# Exhibit A

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

**The Intercept_**

# LEAKED DOCUMENTS EXPOSE STUNNING PLAN TO WAGE FINANCIAL WAR ON QATAR — AND STEAL THE WORLD CUP

Ryan Grim, Ben Walsh

November 9 2017, 7:21 a.m.



Photo: Max Faulkner/The Fort Worth Star-Telegram/AP

LEIA EM PORTUGUÊS  →

A plan for the United Arab Emirates to wage financial war against its Gulf rival Qatar was found in the task folder of an email account

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF 7/2018 NO. 2

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

belonging to UAE Ambassador to the United States Yousef al-Otaiba and subsequently obtained by The Intercept.

The economic warfare involved an attack on Qatar's currency using bond and derivatives manipulation. The plan, laid out in a slide deck provided to The Intercept through the group Global Leaks, was aimed at tanking Qatar's economy, according to documents drawn up by a bank outlining the strategy.

The outline, prepared by Banque Havilland, a private Luxembourg-based bank owned by the family of controversial British financier David Rowland, laid out a scheme to drive down the value of Qatar's bonds and increase the cost of insuring them, with the ultimate goal of creating a currency crisis that would drain the country's cash reserves.



A screenshot of Ambassador Yousef al-Otaiba's Outlook Tasks. Photo: Global Leaks

Rowland has long had close relationships with UAE leadership, particularly with Abu Dhabi Crown Prince Mohammed bin Zayed,

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 4                                         RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM          INDEX NO. 153601/2019
NYSCEF DOC. NO. 2    Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup    RECEIVED NYSCEF: 04/08/2019

known as MBZ. The bank is currently in the process of creating a new
financial institution in cooperation with the UAE's sovereign wealth
fund, Mubadala, according to contracts and correspondence obtained by
The Intercept outlining the terms of the deal. That project is separate
from the Qatar operation, but it reflects the close relationship between
the bank and the UAE.

The Qatar debt project would be grandiose in its ambitions. "Control
the yield curve, decide the future," reads the planning document,
referring to a standard financial-industry graph showing a country's
borrowing costs for debt that is due at different dates. The height and
shape of the yield curve is thought to be a reflection of how healthy an
economy is and influences what financing options are available to a
country.

Targeting a nation's economy using financial manipulation would be a
dramatic break from traditional norms of diplomacy and even warfare.

The plan the document presents is far-fetched and appeared to have
been put together by someone with little or no experience trading in
credit and currency markets, two industry veterans who reviewed the
plan for The Intercept said. Both were granted anonymity because
speaking to the press could jeopardize their employment. "I can't
believe they put this on paper," one of the credit veterans added. "They
are talking about colluding to manipulate markets."

There is no conclusive evidence the plan has been initiated, nor that it
will ever be launched — and the current pressure Qatar's currency is
under as a result of an ongoing blockade imposed by the UAE means
those direct, overt steps may be more effective economic sabotage than
anything the slides outline. Additionally, the publication of this story
means the secrecy the plan says it requires no longer exists.

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

The Intercept reached Edmund Rowland, David's son and CEO of the U.K. branch of Banque Havilland, at a mobile phone number listed in internal company documents obtained by The Intercept and asked about the status of the plan to short Qatar on behalf of the UAE, referencing the document. "We've never done anything," Rowland said. Asked for more details, Rowland responded, "I can't make any comment," and hung up.

After the call with Rowland, Herbert Kozlov, a lawyer with the firm Reed Smith, reached out to The Intercept and said on behalf of the bank that it had not traded in Qatari bonds or credit default swaps, the financial products the plan proposed to use. "Banque Havilland does not trade in bonds, securities, CDS, or any other instruments of Qatar and it has no plans to do so," Kozlov said, reading a statement. As for the plan to take down Qatar, he said, "The bank is a prestigious private banking group and will not be drawn into or make comments on what are political storylines."

The metadata of the slide deck obtained by The Intercept indicates Vladimir Bolelyy, an analyst with Banque Havilland, as the creator. A call by The Intercept to Bolelyy's receptionist was rebuffed. "He's been told by Herb Kozlov not to contact this company," said the receptionist, referring to The Intercept. The Intercept had not previously told Kozlov that Bolelyy was listed as the author of the document.

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 2

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/09/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

## MISSION STATEMENT

*SANCTIONS DO NOT WORK UNLESS ADHERED TO BY ALL PARTIES*

*CURRENCY PEG PRESSURE IS ONLY EFFECTIVE WHEN IT IS EXERCISED BY ALL PARTIES*

*WHAT MATTERS IS WESTERN PERCEPTION — THE MORE THE WRONGDOING IS CONDEMNED, THE MORE EFFECTIVE SANCTIONS WILL BE*

*MAINTAINING THE PEG REQUIRES EXTENSIVE USE OF CENTRAL BANK FOREIGN EXCHANGE RESERVES*

*CONTROL THE YIELD CURVE, DECIDE THE FUTURE*

Strictly Private and Confidential                                    Page 2

The mission statement of the plan for a UAE economic war on Qatar. Photo: Global Leaks

The new project comes amid — and, if implemented, would escalate — a regional crisis that reached new heights in June, when the UAE and Saudi Arabia led a bloc of Gulf nations in blockading and cutting off diplomatic relations with Qatar. U.S. Secretary of State Rex Tillerson recently faulted the blockading countries for intransigence, but President Donald Trump has largely taken the opposite approach, emboldening Saudi Arabia and the Emirates at the expense of Qatar, which is home to one of the largest overseas U.S. military bases in the world. Tillerson traveled to the region on October 20 in the latest effort to defuse the crisis.

According to a report in the American Conservative, Tillerson previously told people close to him that he believed Trump had undermined him at the behest of Otaiba, the UAE ambassador, working

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

. INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 2

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

through Trump's son-in-law and White House adviser Jared Kushner, to whom Otaiba is close.

Both Kushner and Trump have reason to take sides with Otaiba in the dispute. The president has a Trump-branded golf course in Dubai and bragged at a press conference before his inauguration about a deal he was offered by a billionaire Emirati real estate developer.

The president's attempts to get his hands on Qatari money have been less successful. In 2010, Trump traveled to Qatar with his daughter Ivanka Trump in an attempt to secure two different sources of investment funding. He was unceremoniously rebuffed by both.

More recently, Kushner sought a $500 million bailout from a Qatari royal as part of a plan to redevelop his badly underwater flagship investment in a New York office tower. The money for such bailouts often comes from the Gulf. As The Intercept first reported, the Qatari royal agreed to help bail out the Kushners, contingent on their ability to raise the rest of the funding they needed from other sources. The remainder of the funding, however, fell through, and the Qatari royal pulled out of the deal.

After the deal fell apart, Kushner helped orchestrate an unyielding response to the Saudi- and UAE-led economic blockade of Qatar, which Trump took credit for sparking with a hardline approach at a summit in Riyadh. Former top White House adviser Steve Bannon also credited Trump with stoking the blockade at a recent event in Washington. "I don't think it's just by happenstance that two weeks after that summit, that you saw the blockade by the United Arab Emirates, Bahrain, Egypt, and the Kingdom of Saudi Arabia on Qatar," Bannon said at a think tank. "And I've said from day one, even with the situation in the Pacific, with northwest Korea, I think the single most important situation in the world, that's happening right now, is the situation in Qatar."

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4                                    INDEX NO. 153601/2019
                                                     RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 2    Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup    INDEX NO. 153601/2019
                                                     RECEIVED NYSCEF: 04/08/2019

In late June, Trump waded further into the conflict with remarks aimed at Qatar during a private fundraiser, according to audio obtained by The Intercept. "We're having a dispute with Qatar — we're supposed to say Qatar," Trump said, mocking the pronunciation of the country's name by varying the syllabic emphasis. "It's Qatar, they prefer. I prefer that they don't fund terrorism."

Regional tensions ratcheted up another few notches over the weekend, as Saudi Arabia's Crown Prince Mohammed bin Salman, a close ally of both Otaiba and MBZ, arrested dozens of princes and other top officials in a swift consolidation of power and followed it up with a threat to wage war against Iran.



U.S. dollars to Qatari riyals currency chart. Photo:XE.com

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/201?
RECEIVED NYSCEF: 05/06/201?

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 2        Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

The economic blockade has already directly impacted Qatar's economy, decimating trade, travel, and finance flows in and out of the country. Qatar's sovereign wealth fund recently brought $20 billion back to the country to prop up the country's banking system, and the country's currency is already showing signs of financial stress.

The cost of insuring Qatari debt has risen some 70 percent since May, the stock market is down 24 percent this year, and yields are rising ahead of a bond offering to be made by the end of the year. Ahead of that debt sale, the country abruptly changed how it calculates how much foreign currency reserves it has, a key metric investors use to assess how risky it is to buy a country's debt. The move doubled Qatar's foreign currency reserves and came as a complete surprise to international officials, who normally discuss and review foreign reserve accounting before they are publicly announced. Instead, in this case, Qatar simply released a six-word statement changing its accounting. Despite the unexpected move, the Wall Street Journal noted that "Qatari bond yields are still relatively low for an emerging-market country, reflecting the country's vast oil reserves and attendant wealth."

Banque Havilland is best known for its role in a previous incarnation in the bankruptcy of Iceland, from which it sprung as a new bank out of the Luxembourg branch of the Icelandic bank Kaupthing, and for a willingness to work with controversial clients, such as Nigerian tycoon Kola Aluko.

David Rowland launched Banque Havilland with the help of his friend Prince Andrew. Rowland has been an active ally of the conservative British Tory Party and is said to be close to David Cameron, the former British prime minister. Rowland was said to have paid £20,000 — about $23,000 — for a portrait of Cameron at a Conservative Party fundraiser

and was briefly named treasurer of the Tories in 2010, before
withdrawing amid controversy.

The bank is named after the Rowland's family home on the tax-haven
island of Guernsey, Havilland Hall. Though Edmund Rowland runs the
bank, internal documents show his father David remains involved.
Documents marked "secret and confidential" outlining the plan for the
financial attack against Qatar were being circulated between Banque
Havilland and the Emirati embassy in Washington as recently as late
September.

## PROPOSED STRUCTURE

### STAGE 1 – Establish Execution Strategy

➢ TO PRESERVE INTEGRITY OF EXISTING QATARI BOND HOLDINGS, AN IN-SITU TRANSFER WILL BE
ARRANGED INTO A PROTECTED CELL COMPANY:

  ➢ Create a sizeable, strong, and standalone entity which can be viewed as a smaller counterpart to
  central bank reserve holdings

  ➢ Confidentiality is maintained

  ➢ Separate ownership remains intact

  ➢ Qatari bond holdings serve as collateral

  ➢ Individual holdings can be instantly accessible

➢ ASSESS GLOBAL MARKET CONDITIONS FOR THE QATARI RIYAL AND CDS TO ESTABLISH
EXECUTION STRATEGY WHICH WOULD INCLUDE:

  ➢ Determining available liquidity, supply, and pricing

  ➢ Identifying appropriate instruments such as currency forwards, currency options, and bond CDS

  ➢ Ensuring trade lines are placed in different time zones and include second-tier banks to allow
  maximum flexibility

  ➢ Make targeted use of investment banks' friendship with Qatar to affect loyalty and add confusion to
  the marketplace

Strictly Private and Confidential                                              Page 3

A screenshot from phase one of the plan. Photo: Global Leaks

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

5/17/2018      Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

A private financial institution like Banque Havilland would be very familiar with the first step of the plan as laid out in the outline: creating a new offshore investment fund constructed to obscure its links to the UAE. The fund would hold Qatari bonds already owned by the UAE, as well as additional debt the fund could buy. The fund would also buy credit default swaps, which would rise in value as Qatari debt sank.

The plan then calls for precipitating a run on the debt through a series of sham transactions to drive down the price of Qatar's bonds – a manipulation technique known as "painting the tape," where players swap instruments back and forth to create the false appearance of a high volume of trades. The hope is to get other traders who aren't in on the plan to see the high volume on the "tape" — the market ticker — and think that, since volume is high in a period of political turmoil, something important must be happening, prompting them to sell. The sales, if the technique goes to plan, would drive the price of the bonds down, creating more panic and more selling. According to the plan, the UAE, having bought credit default swaps against the debt, would see the value of that insurance rise as Qatari debt tanked.

The document outlining the scheme puts the bond trading proposal in print: "Establish a crossing transaction arrangement whereby another affiliated party sells the same bond holdings back to the original seller and thereby creates additional downward pressure."

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

## PROPOSED STRUCTURE *(CONT'D)*

### STAGE 2 – Gear Up to Control the Yield Curve

➢ PURCHASE MEDIUM- AND LONG-TERM QATAR PAPER:

   ➢ This would allow to control the yield curve (and thus bond prices) and should favourably affect CDS pricing at a later stage

   ➢ Establish a crossing transaction arrangement whereby another affiliated party sells the same bond holdings back to the original seller and thereby creates additional downward pressure

A screenshot from phase two of the plan. Photo: Global Leaks

The hope is to spark a run by bond investors who think everybody else is selling, so they better get out quickly.

Falling debt prices and rising costs of the default swaps would signal a fresh crisis to the markets, putting pressure on Qatar's currency. The Qatari riyal is pegged to the U.S. dollar, so as its offshore value falls, the country would be forced to spend billions of dollars from its reserves to push it up.

In other words, the UAE plans to short Qatar, then drive it into the ground by manipulating international financial markets, all while gaining diplomatic leverage against its rival.

Speculating about a country's currency and economic future is far from unprecedented in the high-flying world of finance, but the difference in this case is that the plan is not designed for a vulture fund bent on a profit, but a sovereign state looking to undermine a neighboring nation.

The plan is not an obvious winner from a profit perspective, which further suggests its goals to be political rather than financial. As the document notes, at the end of the operation — if it's successful — it

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/2019
RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 2          Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

INDEX NO. 153601/2019
NYSCEF: 04/08/2019

will be difficult for the UAE to unload its Qatari bonds because the attack would have largely weakened Qatar financially.

And that's if the plan even works. "It is very difficult to manipulate a sovereign [country's] yield curve," Frank Partnoy, a finance and law professor at the University of San Diego who formerly structured derivatives at Morgan Stanley, told The Intercept. "This belongs in a James Bond movie but probably wouldn't work very well in practice."

> ➤ **PURCHASE CDS ON QATAR:**
>   > ➤ Start with Qatar-friendly banks who may prove more willing to enter into these trades
>   > ➤ Increase long CDS positons slowly with large banks, just enough to move the price sufficiently to make it newsworthy
>   > ➤ Market depth may be limited and poor pricing on exit expected

A screenshot of the plan dealing with the purchase of credit default swaps on Qatari debt. The CDS instruments rise in value as the bonds fall, allowing the UAE to profit from the collapse of Qatar's currency. Photo:Global Leaks

Rather than outline specifics, the document speaks in a vague, somewhat harebrained tone: It doesn't contain any analysis of Qatari bond, derivative, or currency markets or an estimate of the total economic firepower the UAE can put behind the plan, nor does it address how much of Qatar's $68 billion in outstanding debt the UAE and it allies already own; how to respond when, as is likely to happen relatively quickly in these lightly traded markets, the Qataris see strange trades and apply pressure to markets in the opposite direction by buying their bonds, stabilizing their currency, and selling credit default swaps; or whether a successful attack on a pegged currency in the region will whip back and lead to pressure on the UAE dirham, the Saudi riyal, and the pegged currencies of their allies.

Case 1:19-cv-05567-AJN Document 2 Filed 06/14/19 Page 127 of 134

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 2          Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

The plan, instead, lays out a conceptual scheme in several phases, the first of which takes a close look at Qatari currency and credit markets to figure out "available liquidity, supply, and pricing."

If all goes according to plan, the next move would be to force Qatar to blow through its cash to prop up its currency. "Maintaining the peg requires extensive use of central bank foreign exchange reserves," reads the outline's mission statement. The idea would be that as the Qatari bond market tanks, so will the country's currency. And as holders of Qatar's currency sell it off and exchange it for dollars, the country's dollar reserves plummet.

The basic premise of the plan — that Qatar is spending billions of dollars to offset the pain inflicted by the blockade and that the country's currency is vulnerable — is largely correct. Just before the blockade against Qatar was enacted, the sheikdom held at least $35 billion in currency reserves. After the embargo, Qatar's reserves plummeted as it spent to prop up its currency and keep its economy afloat. The country now holds just under $24 billion in reserves, though a recent accounting maneuver roughly doubled that number.

Because the country is incredibly rich, Qatar's official reserves understate how much money it has to defend its currency. The government can call on the vast liquid wealth of Qatar-based corporations, its $335 billion sovereign wealth fund, and its citizens to stabilize the currency or support the economy. For instance, the recent repatriation of $20 billion of the sovereign wealth fund's cash from international accounts back to onshore banks effectively bailed out Qatar's financial system, and some government funds are already selling assets.

Qatar may be spending tens of billions of dollars to fight the economic effects of the blockade, but it has hundreds of billions of dollars more.

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/201[

RECEIVED NYSCEF: 05/06/201[

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

And, on the record, Qatar insists that it has sufficient reserves to keep its currency pegged to the dollar.

As a result, the plan would be anything but a sure bet, financially speaking.

Keeping the outline light on details makes sense, said Partnoy, the University of San Diego professor, in the context of the way banks generally operate. "Bankers are always trying to sell complicated products that will make them fee income," he said. "This is an effort to try to sell something that might be a terrible idea."



## PROPOSED STRUCTURE (CONT'D)

### STAGE 3 – PR Machine & Position Increase

➤ FIRE UP THE PR MACHINE TO REMIND PEOPLE THERE IS A PROBLEM WITH QATAR:
  ➤ Reinforce the existing narrative, suggesting the state is feeling some pain from lack of engagement with neighbours and use their own narrative against them
  ➤ Qatar will counter with their own PR but will exhaust the message quickly, especially as market prices will show their weakened position

➤ INCREASE POSITIONS:
  ➤ Simultaneously hit all second-tier bank CDS lines and increase existing positions with larger banks
  ➤ Buying additional CDS leads to falling bond prices, rising rates, and escalation in CDS premia

➤ REFRESH THE PR MESSAGE TO ADD MORE FUEL TO THE FIRE:
  ➤ Focus on the prospect of restricted access to US Dollar and now-doubtful stability of the country
  ➤ The currency peg will not break, although credit markets will not be looking healthy
  ➤ Some bold statements from neighbouring countries may prove useful
  ➤ And... continue to increase positions

➤ CLOSE THE POSITIONS WITH THE QATAR FRIENDLY BANKS FIRST, FOLLOWED BY OTHER LARGER BANKS AND SECOND-TIERS

Strictly Private and Confidential                                          Page 5

The public relations machine ramps up in phase three of the plan. Photo: Global Leaks

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM                    INDEX NO. 153601/2019
NYSCEF DOC. NO. 4                                                   RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM                    INDEX NO. 153601/2019
NYSCEF DOC. NO. 2    Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup    RECEIVED NYSCEF: 04/08/2019

The third stage of the plan would be to ramp up the "PR machine" in order to slam Qatar internationally, pointing to its weakening financial situation. "Focus on the prospect of restricted access to US Dollar and now-doubtful stability of the country," the plan reads. "And ... continue to increase positions." In other words, keep the market cornered and feed fears about falling prices with manufactured bad news.

The public relations effort also calls on other countries for help — presumably UAE allies, like Egypt and Saudi Arabia, which have in recent months teamed up with the Emirates to blockade Qatar. "Some bold statements from neighbouring countries may prove useful," the plan says.

Jacob Frenkel, a former Securities and Exchange Commission enforcement lawyer and federal criminal prosecutor who has served as an expert witness in market manipulation cases, said the proposal raises serious red flags. Because the plan would likely involve trades in U.S. markets and would use U.S. servers and dollars, American regulators and prosecutors would have jurisdiction over it.

Frenkel, now a partner at the law firm Dickinson Wright, said that agreements about timing and pricing of trades are common in manipulation schemes. "The use of entities created for the purpose of engaging in transactions to create the perception of an independent market interest is a characteristic found in market manipulative activities," he said. That alone is a "red flag that would be of interest to a regulator. And anybody in law enforcement would acknowledge what I'm saying."

The documents were provided to The Intercept by an opaque group that calls itself Global Leaks. Over the summer, Global Leaks began distributing emails from Otaiba's inbox to media outlets, including The Intercept. Little is known about the organization, but the Global Leaks

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

operatives use a .ru email account, which suggests they are either Russian or attempting to give that impression. Global Leaks claims it is not connected to the Russian government or any other government.

Global Leaks said it received the documents from sources connected to Banque Havilland, a claim The Intercept investigated and found had merit, though other possibilities — such as a hacking operation — can't definitively be ruled out.

After obtaining the documents, Global Leaks operatives said they asked a source who maintains access to Otaiba's inbox to search for documents related to Rowland or Banque Havilland. That source found the slide deck outlining the scheme in Otaiba's Outlook tasks — a folder designed to serve as a "to-do" list — and provided it to Global Leaks.

Otaiba's use of a Hotmail account for sensitive diplomatic business was itself questionable when it was reported compromised earlier this year — that he continues to do so months later is even more puzzling. Otaiba has not responded to emails from The Intercept, including one requesting comment for this article, but a Washington, D.C. journalist who corresponds with him recently shared an email sent by Otaiba from the same compromised account. Emails to Otaiba's Hotmail account were not responded to but did not bounce back.

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/2019

RECEIVED NYSCEF: 05/06/2019

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

## FIFA OPTION

➤ QATAR HAS COMMITTED TO $200BN OF SPENDING FOR ITS HOSTING OF 2022 WORLD CUP

➤ THE GCC CAN PETITION FIFA TO GRANT THE TOURNAMENT TO THE REGION AS A WHOLE
  ➤ Precedent in the form of Korea/Japan World Cup in 2002
  ➤ European Championship in 2020 to be hosted across the continent in multiple countries

➤ AN APPEAL TO FIFA WILL BE TO DISPLAY FOOTBALL AS A TOOL TO STABILISE THE REGION

➤ IF QATAR REJECTS THE PROPOSAL, THEY WILL BE SEEN UNWILLING TO WORK WITH THEIR GCC PARTNERS

➤ NEGATIVE PUBLICITY CAN RESURFACE AROUND THE ORIGINAL AWARD OF THE TOURNAMENT, BRIBERY ALLEGATIONS, CONDITIONS OF CONSTRUCTION PERSONNEL AND OTHER ISSUES

➤ THE MOVE DRAWS PUBLIC ATTENTION TO QATAR'S DUBIOUS ABILITY TO HOST THE WORLD CUP ON THEIR OWN
  ➤ Primary suppliers of materials were Saudi Arabia and the UAE – costs have already increased
  ➤ Importing talent from abroad has become more difficult given the no-fly zones – ability of fans to travel to the region has already diminished
  ➤ If Qatar now spends its reserves on protecting the currency and domestic credit markets, there is less dry powder to fund the infrastructure spending

Strictly Private and Confidential                                                                    Page 6

A screenshot from the public relations stage of the plan. Photo: Global Leaks

While the scheme itself would be an ambitious undertaking, the goal is ultimately petty: It's about soccer.

One of the plan's stated aims is forcing Qatar to share soccer's 2022 World Cup, according to the outline. The strategy laid out in the document calls for using a public relations campaign to point the international soccer body FIFA to Qatar's dwindling cash reserves, making a case that the small Persian Gulf monarchy can't afford to build the necessary infrastructure.

The blockade is already raising prices for infrastructure supplies and recruiting top officials to work in Qatar has been difficult, the slides point out. The outline concludes with the hope that the economic war will make it harder for Qatar to continue building stadiums and other

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM
NYSCEF DOC. NO. 4

INDEX NO. 153601/201!
RECEIVED NYSCEF: 05/06/201!

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM
NYSCEF DOC. NO. 2

INDEX NO. 153601/2019
RECEIVED NYSCEF: 04/08/2019

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

assets needed to host the games: "If Qatar now spends its reserves on protecting the currency and domestic credit markets, there is less dry powder to fund the infrastructure spending."

The UAE, according to the document, hopes to make a push for the Gulf Cooperation Council — a group of Arab monarchies that includes Qatar — to host the premiere global sports event across the member nations, rather than in Qatar alone.

On October 20, several weeks after The Intercept first obtained the document outlining the plan, a well-funded Twitter campaign launched with the goal of taking the World Cup from Qatar, complete with a slickly produced video.



 **Kick Qatar Out**
@KickQatarOut

Don't be a spectator to Qatar's human rights abuses. It's more than a game. Stop the abuse.
4:14 PM - Oct 23, 2017

928    823 people are talking about this

"An appeal to FIFA will be to display football as a tool to stabilise the region," the document reads. "The GCC can petition FIFA to grant the tournament to the region as a whole." If Qatar rejects the idea, the plan

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

contends, "they will be seen unwilling to work with their GCC

partners" — one of which would have just launched a surreptitious

financial attack against the country.

Top photo: Yousef al-Otaiba, UAE ambassador to the United States, talks during a news conference on Thursday, Feb. 2, 2012, in Grapevine, Texas.

We depend on the support of readers like you to help keep our

nonprofit newsroom strong and independent. Join Us →

**RELATED**

**The Sordid Double Life of Washington's Most Powerful Ambas**

**At Neocon Think Tank, Steve Bannon Bashes Qatar and Praise**

**Hacked Emails Show Top UAE Diplomat Coordinating With Prc**

**Saudi Arabia's Government Purge — And How Washington Cou**

FILED: NEW YORK COUNTY CLERK 05/06/2019 07:36 PM

NYSCEF DOC. NO. 4

INDEX NO. 153601/201

RECEIVED NYSCEF: 05/06/201

FILED: NEW YORK COUNTY CLERK 04/08/2019 08:35 AM

NYSCEF DOC. NO. 2

Leaked Documents Expose Stunning Plan to Wage Financial War on Qatar — and Steal the World Cup

INDEX NO. 153601/2019

RECEIVED NYSCEF: 04/08/2019

## ADDITIONAL CREDITS:



Research: Sheelagh McNeill.