UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JAN 1 4 2020

State of Qatar,

          Plaintiff,

    —v—

First Abu Dhabi Bank PJSC, *et al.*,

          Defendants.

19-CV-5567 (AJN)

OPINION & ORDER

**ALISON J. NATHAN, District Judge:**

The State of Qatar filed this action in New York Supreme Court against First Abu Dhabi Bank PJSC, Samba Financial Group SJSC, and twenty unnamed defendants (collectively, the Banks). Qatar alleged several fraud-related claims sounding in New York law. The Banks removed this action to federal court. Qatar now moves to remand. The Banks assert that federal jurisdiction is proper for two reasons. First, they allege that they are "foreign states" within the meaning of the Foreign Sovereign Immunities Act and therefore entitled to removal. Second, they allege that federal-question jurisdiction exists because Qatar's claims raise important federal issues. For the reasons that follow, the Court rejects both arguments. This case is therefore REMANDED to New York Supreme Court, New York County.

## I.    BACKGROUND

In resolving this motion, the Court treats all facts alleged in Qatar's Complaint as true. *See Federal Ins. Co. v. Tyco Int'l Ltd.*, 422 F.Supp.2d 357, 391 (S.D.N.Y. 2006) ("When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff."). The Court also considers documents attached to the parties' memoranda of law regarding this motion.

*See Arseneault v. Congoleum*, 2002 WL 472256, at *6 (S.D.N.Y. 2002) ("The Second Circuit . . . has said that, on jurisdictional issues, federal courts may look outside [the] pleadings to other evidence in the record, and therefore the court will consider material outside of the pleadings submitted on a motion to remand."). The following facts are deemed true for purposes of this motion.

The Kingdom of Saudi Arabia, the United Arab Emirates (UAE), and the Kingdom of Bahrain have cut diplomatic ties with Qatar. Compl ¶ 22. They are now engaged in a multi-faceted campaign to "destabilize" Qatar and its economy. Compl. ¶ 36. The three nations have blockaded Qatar for more than three years by "clos[ing] all land, sea, and air transportations links with Qatar." Compl. ¶ 22. The blockade continues to this day. Compl. ¶ 22. They have also banned travel between the two countries, ejected Qatari citizens from their nations, and ordered their citizens in Qatar to return home. Compl. ¶ 22. And they have "fir[ed] up [their] PR machine[s]" to attack Qatar in the news media. Compl. ¶ 52.

As part of this campaign, financial institutions "in league with the blockading countries" have engaged in fraudulent financial practices to harm Qatar. Compl. ¶ 3. Qatar alleges that Saudi Arabia and the UAE worked with Samba Financial Group and First Abu Dhabi Bank to devalue the Qatari currency, the Riyal. By decree of the Qatari government, the Riyal is pegged to the U.S. dollar at a fixed rate. Compl. ¶ 5, 12. Qatar stands ready to exchange 3.64 Riyal for 1 U.S. dollar for anyone at any time. This peg "provides consistency to foreign investors and is the bedrock of Qatar's monetary policy." Compl. ¶ 12. The Qatari government "has stood behind the Peg" for more than a decade; it has always "been willing and able to exchange Riyals at the pegged rate." Compl. ¶ 12, 40.

The Banks engaged in various fraudulent transactions that aimed to reduce the value of the Riyal. They hoped that investors would rush to exchange their Riyal into dollars, thereby effectively creating a bank run and forcing Qatar into such dire financial straits that it would no longer be able to honor the exchange rate. In other words, this was a scheme to "break the peg." Compl. ¶ 22. "If the conspirators managed to break the Peg and devalue Qatar's currency, Qatar would suffer severe economic consequences. Qatari assets would be depreciated, and foreign investors would question their investments in Qatar." Compl. ¶ 42.

The nations hoped their efforts would cripple Qatar. But that was not the only reason for this campaign. They also hoped that Qatar would be financially unable to hold "the world's most prestigious soccer tournament – the FIFA World Cup" in 2022. Compl. ¶ 54. By blockading Qatar and devaluing its currency, they believed Qatar would be unable to build the infrastructure required for the World Cup. Compl. ¶ 54. That in turn would create an "opening for the blockading countries to make a bid to host the games as a regional event, instead of solely in Qatar . . . bring[ing] [those three nations] attention, tourism, and money." Compl. ¶ 55.

The Banks submitted "fraudulent quotes through their accounts with Bloomberg and Reuters to foreign exchange platforms and data centers located in New York County." Compl. ¶ 19. These phony quotes tanked the actual market value of the Riyal. Despite the Banks' efforts, however, Qatar continued to honor the peg price. Compl. ¶ 44. But doing so came at a cost: Qatar "was forced to liquidate billions of dollars in investments held in accounts . . . and use those proceeds to support the Peg and stabilize Qatar's currency." Compl. ¶ 19.

On April 8, 2019, the State of Qatar filed this action against First Abu Dhabi Bank, Samba Financial Group, and twenty unnamed defendants in New York Supreme Court, New York County. Dkt. No. 2, Ex. A-1 (Complaint). Qatar alleged purely state-law claims: fraud,

conspiracy to commit fraud, and aiding and abetting fraud. Compl. ¶¶ 131-154. The Banks removed this action to federal court. Dkt. Nos. 1 (Samba's notice of removal), 5 (First Abu Dhabi Bank's consent to removal). Qatar now moves to remand. Dkt. No. 25.

A defendant is entitled to remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441. When federal jurisdiction is asserted by a defendant in a removal petition, the defendant has the burden of establishing that removal is proper. *United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994). Any doubts that a case is properly removed to federal court are "resolved against removability out of respect for the limited jurisdiction of the federal courts and the rights of states." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 488 F.3d 112, 124 (2d Cir. 2007).

## II. THE FOREIGN SOVEREIGN IMMUNITIES ACT DOES NOT ENTITLE THE BANKS TO REMOVAL

The Banks first argue that they are entitled to removal under the Foreign Sovereign Immunities Act (FSIA). Because they are not "foreign state[s]" within the meaning of the Act, however, the Court rejects this argument.

### A. The Second Circuit's Five-Prong Test for FSIA Removal

FSIA grants "foreign state[s]" immunity from "the jurisdiction of the courts of the United States and of the states," unless a limited set of exceptions applies. 28 U.S.C. § 1604; *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488-89 (1983). It also guarantees foreign states the right to remove any civil action from state court to federal court. "Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(d); *Verlinden*, 461 U.S. at 489.

The term "foreign state" in FSIA "on its face indicates a body politic that governs a particular territory." *Samantar v. Youssuf*, 560 U.S. 305, 314 (2010). But FSIA defines "foreign state" more expansively than just other nation states. "A 'foreign state' . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a). Subsection (b) states:

An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

*Id.* § 1603(b).

The Banks argue that they are "agenc[ies] or instrumentalit[ies]" of Saudi Arabia and the UAE. If the Banks satisfy this definition, FSIA entitles them to remove this case to federal court. There is no dispute that the Banks are "separate legal person[s], corporate or otherwise." As discussed below, both banks are incorporated under the laws of their respective jurisdictions. The Banks therefore satisfy § 1603(b)(1). There is also no dispute that the banks are not American citizens and are created under the laws of Saudi Arabia and the UAE, not any other country. The Banks therefore also satisfy § 1603(b)(3). The Banks' ability to remove thus comes down to § 1603(b)(2). And the Banks do not allege that a "majority of [their] shares or other ownership interest is owned by a foreign state or political subdivision thereof." They must instead prove that they are "organ[s]" of Saudi Arabia and the UAE.

The Second Circuit has "no definitive test to determine whether an entity is a government 'organ.'" *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007). Instead, a multi-factor balancing test, first laid out in *Filler v. Hanvit Bank*, governs this analysis. 378 F.3d 213 (2d Cir. 2004). In *Filler*, the Second Circuit laid out five factors to consider in determining whether an entity is a foreign state's "organ":

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

*Filler*, 378 F.3d at 217 (internal quotation marks omitted).

No single *Filler* factor is dispositive or should be given special weight. "*Filler* invites a balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in favor of, or against, the entity claiming FSIA immunity." *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 86 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010) (internal quotation marks omitted).

**B. The Banks Do Not Satisfy Any of the *Filler* Factors**

The Court thus turns to the *Filler* factors to determine whether First Abu Dhabi Bank and Samba Financial Group are organs of, respectively, Saudi Arabia and the UAE. The Banks have not met their burden to show that any of the five factors are satisfied here. Nor do they even attempt to make this showing. At oral argument, they conceded that *none* of the *Filler* factors is met. Oral Argument Tr., Dkt. No. 47, at 22. The Court reviews all five, however, as they provide context for the Banks' other arguments.

*First*, the "national purpose" factor asks whether the foreign state created the alleged organ for a national purpose. Courts consider whether the entities at issue were "formed by statute" or by "presidential decree." *Filler*, 378 F.3d at 217; *accord Peninsula Asset Mgmt.*, 476 F.3d at 143 (finding that an entity was an organ in part because it was created by a Korean statute). The Court also looks to whether the foreign government has "entrusted" the entity "with the central planning and management of [a national] industry." *Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*, 832 F.3d 92, 116 (2d Cir. 2016) (internal quotation marks and alterations omitted) (Winter, J., concurring). Banks are likely to be organs if they "perform[] functions traditionally performed by the government . . . [such as] protecting depositors and promoting financial stability." *Filler*, 378 F.3d at 217; *accord Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 641 (S.D.N.Y. 2005), *aff'd*, 190 Fed. App'x 43 (2d Cir. 2006) (finding bank to be an organ in part because national government created it to "contribute to the development of the financial industry and the national economy" by having it manage a government fund to increase market liquidity). It is for this reason that the "paradigmatic example of an organ is a central bank." *Scheidemann v. Qatar Football Ass'n*, 2008 WL 144846, at *3 (S.D.N.Y. Jan. 15, 2008).

To start, the Banks were not formed by statute or presidential decrees. The First Abu Dhabi Bank was formed in 2017 following the merger of two other banks and is "licensed as a commercial bank in the United Arab Emirates." Dkt. No. 34-1 (First Abu Dhabi Bank's founding document). It received this license from the Central Bank of the United Arab Emirates. *Id.* Similarly, Samba Financial Group is a "Saudi Joint Stock Company [established] in accordance with" various Saudi corporate laws. Dkt. No. 34-2 (Samba's articles of association). The Banks were also not created to serve a governmental purpose. Nothing suggests that Saudi

Arabia and the UAE have "entrusted [the Banks] with the central planning and management of [their banking] industry." *Corporacion Mexicana De Mantenimiento Integral*, 832 F.3d at 116. They were not "formed to centralize" banking activity in their home countries or "vested with the sole authority" to perform banking services. *In re Terrorist Attacks*, 538 F.3d at 85. Samba's founding document, for example, states that its "objectives . . . shall be to conduct business in accordance with the provisions of the Banking Control Law and the other applicable laws, regulations and rules in force in Saudi Arabia." Dkt. No. 34-2.

The Defendants are also not their home nations' central banks; both Saudi Arabia and the UAE have central banks that are not parties to this action. The UAE's central bank is a distinct entity. *See* Dkt. No. 34-7 (Emirati law creating the Central Bank of the UAE). And Saudi Arabia's central bank is the Saudi Arabian Monetary Agency. *See* Dkt. No. 34-6 (Saudi royal decree establishing the Saudi Arabian Monetary Agency). Those entities, unlike the ones here, were created by government mandate, are run under the auspices of the government, and effectuate state policy. *See* Dkt. No. 34-1, 34-6.

In contrast, the Banks each have shareholders, and it seems they are required to serve the interests of those shareholders. For example, First Abu Dhabi Bank released an "Annual Report" in 2018 addressed to its shareholders. The report detailed the firm's performance over the past year, its plans for growth, and various financial metrics. Dkt. No. 34-5. The Bank's stated focus is "on disciplined, strategic growth," not serving the interests of its home state. *Id.* at 7.

*Second*, the "supervision" factor looks to whether the foreign states regulate the entity or direct the entity's appointments or official acts. *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007). A foreign state "actively supervises an organ when it appoints the organ's key officials and regulates some of the activities the organ

can undertake." *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 145 (2d Cir. 2014),

*abrogated on other grounds*, 136 S. Ct. 2090 (2016). For example, in *In re Terrorist Attacks on*

*Sept. 11, 2001*, the entity claiming organ status was "actively supervise[d]" by the government of

Saudi Arabia. 538 F.3d at 86. It was also "chaired or presided over by a government official and

conduct[ed] its affairs in accordance with the domestic or foreign policy objectives of" Saudi

Arabia. *Id.* at 86. Moreover, a foreign state can exercise control by appointing the entity's

leadership. *Id.*; *accord Filler*, 378 F.3d at 217 (Korean government appointed defendant's

directors and its president, and oversaw its operations); *Peninsula Asset Mgmt.*, 478 F.3d at 143

(finding entity was an organ in part because a foreign government appointed its governor and

auditor, controlled its actions through an agency, and regulated its fees); *U.S. Fidelity & Guar.*

*Co. v. Braspetro Oil Services Co.*, 1999 WL 307666, *3 (S.D.N.Y. 1999) (concluding that

defendant was an organ because foreign country's president appointed its directors, approved its

charter, and could inspect its financial reports).

There is no evidence that Saudi Arabia or the UAE monitor or supervise the Banks in this

manner. For example, nothing suggests that those nations "can intervene directly in [the Banks']

commercial and operational affairs." *Corporacion Mexicana De Mantenimiento Integral*, 832

F.3d at 116. Nor do the nations appoint the Banks' boards of directors. Indeed, First Abu Dhabi

Bank's charter does not require its board members to be associated with the national

government. Dkt. No. 31-3 at 2-3. And the charter provides for a detailed selection process for

directors and executives. *Cf. Murphy*, 421 F. Supp. At 633 (government exercised "*ex post facto*

control over" election of CEO). The same is true of the Banks' operations. First Abu Dhabi

Bank's board of directors, not the Emirati government, is responsible for "directing the First Abu

Dhabi Bank and its subsidiaries" and tasked with ensuring "the long term success of [the Bank]

and the delivery of sustainable value to shareholders." Dkt. No. 34-3 at 2. The charter also states that "[a]ll other matters, including day to day responsibility for operation of the [Bank] not specifically reserved to the Board or delegated to a committee are delegated to the CEO and the Executive Committee." *Id.* at 4.

*Third*, the Banks do not allege that either Saudi Arabia or the UAE requires them to hire public employees or pays their employees' salaries. For example, in *In re Terrorist Attacks*, the entity claiming organ status "submitted declarations" from an executive "stat[ing] that many [of its] employees are seconded from [Saudi Arabia's] ministries or agencies, which continues paying their salaries." 538 F.3d at 85-86. In other words, "many [of its] workers [were] Kingdom employees who remain[ed] on the Kingdom's payroll." *Id.* at 86. There is no such evidence here. For example, Samba financial statements for 2018 make no suggestion that the Saudi Arabian government pays any of its "[s]alaries and employee related expenses." Dkt. No. 34-4. And there is no evidence that Saudi Arabia or the UAE treat the Banks' employees as public-sector workers. *Cf. Glencore, Ltd. v. Chase Manhattan Bank, N.A.*, 1998 WL 74294, at *3 (S.D.N.Y. 1998) (finding entity to be an organ because home country treated its employees as public employees).

*Fourth*, the Court must consider whether the putative organs possess "exclusive rights to some right in their [home] countr[ies]." *Filler*, 378 F.3d at 217. Other courts examining the "exclusive rights" factor have given it broad meaning. *In re Terrorist Attacks*, 538 F.3d at 86 (alleged organ held an "exclusive right" because it was the "sole authority" to collect and distribute certain charity funds); *Peninsula Asset Mgmt.*, 476 F.3d at 143 (defendant held an "exclusive right" because it was had the sole authority to "receive monthly business reports from the solvent financial institutions it [oversaw]"); *Kelly v. Syria Shell Petroleum Development B.V.*,

213 F.3d 841, 848 (5th Cir. 2000) (defendant had "the exclusive right to explore and develop Syria's identified petroleum reserves, which are the property of the Syrian government."). Here, there is no evidence that the Banks have any exclusive rights in their home countries.

*Fifth*, the Court turns to how foreign law treats the Banks. This Second Circuit found this factor satisfied where the foreign "government informed the State Department and the district court that it treats [the entity] as a government entity." *Peninsula Asset Mgmt.*, 476 F.3d at 143. There is no evidence that Saudi Arabia or the UAE treat the Banks as organs. There is also no evidence that the Banks receive "special privilege[s]" under foreign law, such as immunity from taxation. *See California Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1102 (9th Cir. 2008) (finding this factor probative). The parties do not cite any law of either country that construes the Banks as their organs. There is also no evidence that the Banks have the exclusive rights to use a government fund. *Cf. Miller*, 421 F. Supp. 2d at 644. And there is no evidence that Samba can be sued in "the administrative court of Saudi Arabia," like the state organ in *In re Terrorist Attacks*. 538 F.3d at 86.

The Banks bear the burden of production in this inquiry. And that makes sense; the alleged "instrumentality and its related government frequently possess most of the information needed to establish organ status." *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4211353, at *8 (S.D.N.Y. 2014) (internal quotation marks omitted) (citing cases). Yet here, the Banks provide no evidence that they are organs of their home governments. For example, they submitted no declarations from executives attesting to such facts or internal documents revealing this sort of a government nexus. *Cf. In re Terrorist Attacks*, 538 F.3d at 85 (noting that alleged organ "submitted declarations from" senior executives). If their home countries supervise them,

require the hiring of public employees, grant them exclusive rights, or treat them preferably, the Banks could have produced evidence to this effect. They did not.

### C. Even If the Court Looks Past the *Filler* Factors, the Banks Are Not Organs

The Banks urges the Court not to impose a "mechanical" application of the *Filler* factors. Tr. at 22. They instead urge the Court's attention to several facts in the Complaint linking Saudi Arabia and the UAE to the Banks. The Banks are correct that the Court is not constrained to the *Filler* factors. The *Filler* "factors should not be applied mechanically." *Scheidemann*, 2008 WL 144846, \*3 (S.D.N.Y. 2008). For example, the Court in *Murphy* "eschew[ed] a mechanical application of the *Filler* factors" and instead "consider[ed] the . . . record in its entirety." *Murphy*, 421 F. Supp. 2d at 645. The Second Circuit has also characterized the *Filler* factors as "criteria" and has recognized the ability of courts to look at other considerations. *See In re Terrorist Attacks*, 538 F.3d at 85. The *Filler* factors are thus not necessary conditions for an entity to be an organ.

Still, the Court is aware of no case finding an entity to be an organ even though it satisfied *none* of the *Filler* factors. The Banks rely heavily on *Scheidemann*, but the District Court in that case applied the *Filler* factors and found that none was met. It then proceeded to consider the entities' formal legal status under foreign law and "the public function" that they played in their home nations. Both these factors also counseled against organ status, so the Court dismissed for lack of jurisdiction. *Scheidemann*, 2008 WL 144846, \*\*4-6. The Court is thus skeptical that an entity could qualify as an organ even though it does not satisfy *any* of the *Filler* factors. At the very least, with these five factors stacked against them, the Banks face an uphill battle in proving themselves to be organs.

Yet the Banks believe that several allegations in the Complaint are sufficient to overcome that hurdle. Qatar alleged that the Banks' "brazen schemes to manipulate the markets for Qatari

currency, bonds, and other financial instruments . . . [arose] out of an illicit blockade of Qatar by" Saudi Arabia, the UAE, and Bahrain. Compl. ¶¶ 1, 2. And Qatar alleged that the Banks were "in league with [these] blockading countries" to launch "a campaign of financial warfare against Qatar." Compl. ¶ 3. Here's the nub: according to the Banks, the Complaint alleges that they acted against their own financial interests in entering these transactions, and that did so only at the behest of the Saudi and Emirati governments. That is enough, they claim, to be an organ.

Even looking beyond the *Filler* factors, the Banks are incorrect. At core, the Court's task is to interpret the meaning of "organ of a foreign state." 28 U.S.C. § 1603(b). The Court begins, as always, with the statute's text. Merriam-Webster defines "organ" as "a subordinate group or organization that performs specialized functions." As noted, there is no evidence here that the Banks are subordinate to their respective sovereigns. If the Banks did occupy such a position, they bore the burden of production on this issue, and yet they present no evidence along these lines. This result accords with the statute's plain meaning. An entity does not become an organ just by following one discrete command by a foreign nation. Such an interpretation would work a massive expansion of FSIA immunity. To be an organ, a tighter nexus is required. As *Scheidemann* recognized, "an entity should not be viewed as an organ except in rare situations, such as when the foreign state supervises, controls, or is otherwise closely involved with the entity." *Scheidemann*, 2008 WL 144846, *3 n.4 (internal quotation marks omitted). Indeed, the Supreme Court has squarely rejected the notion that "agencies or instrumentalities" under the FSIA can be "any thing or person through which action is accomplished." *Samantar*, 560 U.S. at 315 (internal quotation marks omitted). "[A]ll of the textual clues in [the statutory] definition cut against such a broad construction." *Id.* And "[t]he Act's careful calibration of remedies among the listed types of defendants suggests that Congress did not mean to cover other types of

defendants never mentioned in the text." *Id.* The statute's text, plain meaning, and Supreme Court precedent therefore all foreclose the Banks' argument.

Because the Banks are not "organs," they are not "agencies or instrumentalities," and they are therefore not "foreign state[s]" under FSIA. This result accords with the Second Circuit's repeated admonition that FSIA adopts a "restrictive theory of sovereign immunity," in which "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*)." *Filler*, 378 F.3d at 220 (internal quotation marks omitted). The Banks thus cannot use FSIA's removal provision, 28 U.S.C. § 1441(d), to invoke federal jurisdiction.

## III.   THIS CASE DOES NOT FALL WITHIN THE NARROW WINDOW OF *GRABLE*

The Banks next argue that they are entitled to removal because this case raises important federal issues. *See Grable & Sons MetalProducts, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005). The Banks however have not satisfied three of the four requirements for federal-question jurisdiction under this doctrine. The Court therefore rejects this argument as well.

### A. The *Grable* Doctrine

"Federal courts are courts of limited jurisdiction," possessing "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). Congress has given the federal courts jurisdiction over actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiffs typically invoke federal-question jurisdiction by pleading causes of action created by federal law. *See Gunn v. Minton*, 568 U.S. 251, 257 (2013) ("Most directly, a case arises under federal law when federal law creates the cause of action asserted."); *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). As noted, Qatar pleads only state-law causes of action. Still,

jurisdiction can lie if Qatar's "state-law claims . . . implicate significant federal issues." *Grable*,

545 U.S. at 312, 317. The Supreme Court has made clear that this is an "extremely rare

exception" to the general source of federal-question jurisdiction—federal law—and arises only

in "a special and small category of cases." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547

U.S. 677, 699 (2006); *see also NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1019

(2d Cir. 2014) ("[T]he Supreme Court has been sparing in recognizing state law claims fitting

this criterion.").

In *Grable*, the Supreme Court created a four-part test for this form of federal jurisdiction.

*Gunn*, 568 U.S. at 258. Federal jurisdiction exists over a wholly state-law complaint only if a

federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of

resolution in federal court without disrupting the federal-state balance approved by Congress."

*Id.* If these requirements are met, federal jurisdiction is proper because there is a "serious federal

interest in claiming the advantages thought to be inherent in a federal forum, which can be

vindicated without disrupting Congress's intended division of labor between state and federal

courts." *Grable*, at 313–314. This is not a balancing test—if any one of these four prongs is

absent, there is no federal jurisdiction. *Gunn*, 568 U.S. at 258.

The Banks argue that all four *Grable* factors are met. If they are correct, then the Court

has jurisdiction over Qatar's state-law claims. The Court addresses each *Grable* factor in turn.

**B. A Federal Issue is Not Necessarily Raised**

The first prong of *Grable* asks whether plaintiff's complaint "necessarily raise[s]" a

federal issue. *Gunn*, 568 U.S. at 251. The Banks point to no federally created obligations,

duties, or rules of liability here. And they cannot, because Qatar's claims do not turn on the

application or interpretation of federal law. Qatar raises classic state-law causes of action—and

they are based exclusively in New York law and allege fraud that occurred in New York.

Compl. ¶¶ 131-154. The Banks instead point to a single federal issue: "Each of the three sovereigns [Qatar, Saudi Arabia, and the UAE] are strategically significant to the United States, which has accordingly sought to abstain from publicly favoring either side in [the] ongoing conflict. Adjudication of this dispute, however, necessarily will force a court in the United States to choose a side." Banks' Br., Dkt. No. 29, at 1. In this case, they argue, it must be a federal court rather than a state court. In support of their theory, the Banks cite multiple reports from the Department of State and the news media demonstrating the United States' policy of neutrality in this dispute. The Banks claim that reaching a final judgment in this suit will violate the United States' policy of neutrality. No matter how a court decides this case, say the Banks, at least one country will "react with . . . displeasure." Banks' Br. at 10.

The Court rejects this argument. The Supreme Court, the Second Circuit, and other federal courts all agree that plaintiffs "necessarily raise" federal issues only if adjudication of their state-law claims require a reviewing court at some point to apply a federal rule of decision. That is not the case here. And as outlined below, the Banks' contrary authority is either inapt or unpersuasive.

*1. There is no federal rule of decision here*

The Supreme Court's cases applying the *Grable* test have involved state-law claims invoking federal rules of decision. In other words, state law in those cases *predicated liability* on the application of federal law. In *Grable* itself, the IRS had seized property from the plaintiff and sold it to satisfy his federal tax delinquency. 545 U.S. at 310-11. Years later, the plaintiff brought a state-law quiet-title action against the third party that purchased the property, alleging that the IRS had failed to comply with various federal notice requirements, rendering the seizure and sale invalid. *Id.* A court deciding the case therefore had to apply the federal notice

requirements, contained in a federal statute, to determine the merits of the plaintiff's state-law claim. Indeed, "[w]hether Grable was given notice within the meaning of the federal statute [was] *an essential element* of its quiet title claim." *Id.* at 315 (emphasis added). So too in *Gunn*. There, the Supreme Court held that the plaintiff's legal-malpractice claim necessarily raised a federal patent question, because "[t]o prevail . . . [the plaintiff] must show that he would have prevailed in his federal patent infringement case if only [his attorneys] had timely made an experimental-use argument on his behalf." *Gunn*, 568 U.S. at 260. In other words, a court resolving his state-law malpractice suit had to apply a federal rule of decision.

The same is true of Second Circuit cases in this area. "A state-law claim 'necessarily' raises federal questions where the claim is affirmatively 'premised' on a violation of federal law." *N.Y. ex rel. Jacobson v. Wells Fargo Nat'l Bank. N.A.*, 824 F.3d 308, 315-16 (2d Cir. 2016) (citation omitted). The Second Circuit in *Jacobson* found federal jurisdiction because the plaintiff's complaint "predicated liability" on a question of federal law. *Id.* at 317. In *NASDAQ*, the Second Circuit again found federal jurisdiction because the plaintiff's claim required a court to determine "whether NASDAQ has violated [a] federally prescribed duty." *NASDAQ*, 770 F.3d at 1021; *accord D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 102 (2d Cir. 2001) (finding federal jurisdiction because plaintiff's "suit is rooted in violations of federal law" and "the gravamen of [plaintiff's] complaint is that [defendant] . . . failed to perform its statutory duty created under federal law, to enforce its members' compliance with those laws").

Other courts of appeal have also adopted this approach. *See Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019) (looking "only to the necessary elements of the [plaintiffs'] causes of action to determine whether they raise federal questions under § 1331" and denying jurisdiction because plaintiffs could "establish all the necessary elements entirely independently

of federal law."); *Gilmore v. Weatherford*, 694 F.3d 1160, 1173 (10th Cir. 2012) (looking to whether plaintiff's complaint raised a federal rule as an "essential element" of her claim); *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1091 (9th Cir. 2009) (explaining that jurisdiction lies under *Grable* only if "a right or immunity created by the Constitution or laws of the United States" is "an element, and an essential one, of the plaintiff's cause of action") (internal quotation marks omitted).

Various District Courts in this Circuit have recognized that *Grable* jurisdiction requires a federal rule of decision. "Courts in this Circuit have made clear that the exercise of federal jurisdiction is inappropriate where no cause of action . . . necessarily stands or falls based on a particular application of federal law." *In re The Reserve Fund Sec. & Deriv. Litig.*, 2009 WL 3634085, at *4 (S.D.N.Y. Nov. 3, 2009) (internal quotation marks omitted) (remanding because plaintiff's claims did not "contain distinct allegations of federal law violations"). The first prong of *Grable* thus comes down to whether "the [federal] issue is an essential element of plaintiff's claim." *PCVST Mezzco 4, LLC v. Wachovia Bank Commercial Mortg. Tr. 2007-C30*, 2015 WL 153048, at *4 (S.D.N.Y. 2015) (internal quotation marks omitted). In *PCVST*, the Court ran through the elements of plaintiffs' state-law claims, found that none raised a federal rule of decision, and therefore denied jurisdiction. *Id.* at **4-8. In other words, "a case only 'arises under' federal law if a plaintiff's 'right to relief under state law requires resolution of a substantial question of federal law.'" *Caggiano v. Pfizer, Inc.*, 384 F. Supp. 2d 689, 690 (S.D.N.Y. 2005) (quoting *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 8–9 (1983)); *see also Belmont v. JetBlue Airways Corp.*, 2019 WL 3804509, at *6 (E.D.N.Y. 2019) (holding that federal issue not necessarily raised because state-law claims did not require "determinations of rights and liabilities" under federal law); *Riseboro Cmty.*

*P'ship Inc. v. SunAmerica Hous. Fund No. 682*, 2019 WL 3753795, at *3 (E.D.N.Y. 2019)

(finding federal jurisdiction because plaintiff's claims required applying various federal statutes);

*In re Standard & Poor's Rating Agency Litig.*, 23 F. Supp. 3d 378, 394–95 (S.D.N.Y. 2014)

(looking to whether an issue is an "essential element" of a plaintiff's claim at *Grable*'s first step);

*New York City Health & Hosps. Corp. v. WellCare of New York, Inc.*, 769 F. Supp. 2d 250, 256

(S.D.N.Y. 2011) (finding federal jurisdiction in part because plaintiff's state claims required

proving a violation of federal law and regulations).

District Courts outside this Circuit have come to the same conclusion in litigation arising

from climate change. Local governments around the country have sued corporations in state

courts for state-law torts arising out of their alleged contributions to climate change. *See Mayor*

*& City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019); *Rhode Island v.*

*Chevron Corp.*, 393 F. Supp. 3d 142 (D.R.I. 2019); *Bd. of Cty. Commissioners of Boulder Cty. v.*

*Suncor Energy (U.S.A.) Inc.*, 2019 WL 4200398 (D. Colo. 2019); *Cty. of San Mateo v. Chevron*

*Corp.*, 294 F. Supp. 3d 934, 938 (N.D. Cal. 2018). These corporate defendants have then

attempted to remove the cases to federal court. They argued that *Grable* conferred jurisdiction

because the litigation required "a court [to] determine for the entire United States, as well as

Canada and other foreign actors, the appropriate balance between the production, sale, and use of

fossil fuels and addressing the risks of climate change." *Boulder Cty.*, 2019 WL 4200398, at *9.

But District Courts have uniformly rejected these arguments, holding that these cases do

not necessarily raise a federal issue and therefore fail *Grable*'s first prong. As one Court

explained, "Defendants have not located 'a right or immunity created by the Constitution or laws

of the United States' that is 'an element and an essential one, of the [State]'s cause[s] of action.'"

*Rhode Island*, 393 F. Supp. 3d at 150-51 (quoting *Gully v. First Nat. Bank in Meridian*, 299 U.S.

109, 112 (1936)). That Court denied jurisdiction because "[t]he rights, duties, and rules of decision implicated by the complaint are all supplied by state law, without reference to anything federal." *Id.* at 151. Another Court noted that "[a] federal question is 'necessarily raised' for purposes of § 1331 only if it is a necessary element of one of the well-pleaded state claims," and then denied jurisdiction because "defendants' generalized references to foreign policy wholly fail to demonstrate that a federal question is "essential to resolving" the City's state law claims." *Baltimore*, 388 F. Supp. 3d at 559 (internal quotation marks omitted). Another Court agreed, finding that although "climate change is certainly a matter of serious national and international concern," plaintiffs did not allege state-law claims having as "an element any aspect of federal law or regulations," did not allege that "any federal regulation or decision is unlawful, or a factor in their claims," and did not ask "the Court to consider whether the government's decisions to permit fossil fuel use and sale are appropriate." *Boulder Cty.*, 2019 WL 4200398, at *11. In short, the "potential for foreign policy implications (resulting from the plaintiffs succeeding on their claims at an unknown future date) does not raise the kind of actually disputed, substantial federal issue necessary for *Grable* jurisdiction." *Cty. of San Mateo*, 294 F. Supp. 3d at 938.

For the same reason, Qatar's complaint does not create federal-question jurisdiction under *Grable*. To recap, Qatar alleges that the Banks committed fraud, conspired to commit fraud, and aided and abetted fraud. Compl. ¶¶ 131-154. None of those state-law torts contains, as an element, a violation of federal law. The Banks' liability is in no way predicated on a violation of federal law. True enough, this litigation may eventually displease Qatar, Saudi Arabia, or the UAE. But the *adjudication* and the *resolution* of Qatar's legal claims will not raise a federal rule of decision. The Banks premise their jurisdictional argument on a *result* of a final judgment in this case. But they cite no case adopting such an expansive approach to the

first *Grable* factor. *See* Oral Arg. Tr. at 31. To the contrary, binding and persuasive precedent squarely reject such a view.

## 2. *The Banks rely on inapt and unpersuasive authority*

The Banks rely heavily on three cases, but none confirms their theory of jurisdiction. In the first case, the Iraqi government sued numerous banks for their alleged conspiracy with then-president Saddam Hussein to "corrupt and plunder an international humanitarian program administered by the United Nations." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 151-52 (2d Cir. 2014). It sued in federal court and alleged claims under two federal statutes and New York common law. *Id.* The Second Circuit dismissed the federal statutory claims for reasons not relevant here. *Id.* The District Court had reached the same conclusion, and then declined to exercise supplemental jurisdiction over the state-law claims. *Id.* at 172. Iraq argued however that the District Court "should have entertained the nonstatutory [state-law] claims as a matter of federal common law." *Id.* at 172. Federal common law preempts state law in "narrow areas" involving "uniquely federal interests," including where the "international nature of the controversy makes it inappropriate for state law to control." *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641-42 (1981) The Second Circuit rejected this argument, holding that Iraq "identifie[d] no uniquely federal interest in the rules of decision to be applied, nor any conflict between a federal policy or interest and the use of state law." *Id.* at 172. The parties quibble over the applicability of this language. But either way, the Second Circuit's decision in *Iraq* has no bearing here, because the Banks do not argue that federal law preempts Qatar's state-law claims. *See* Dkt. No. 29, Def. Memorandum of Law, at 1 (providing two justifications for removal, and not listing complete preemption); *see generally Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005) (noting that "[u]nder the complete-preemption

doctrine, certain federal statutes are construed to have such 'extraordinary' preemptive force that state-law claims coming within the scope of the federal statute are transformed, for jurisdictional purposes, into federal claims—i.e., completely preempted."). The Court will therefore not incorporate the *Iraq* standard here. *Grable* and its progeny—not the jurisprudence surrounding foreign-affairs preemption—govern this case.

In the second case, the government of the Philippines sued its former president, Ferdinand Marcos, in New York state court to recover property he allegedly stole from the government while in office. *Republic of Philippines v. Marcos*, 806 F.2d 344, 347 (2d Cir. 1986). The Philippine government had issued two executive orders which (1) created a commission charged with recovery of Marcos's "ill-gotten wealth," and (2) froze Marcos's assets in the Philippines and appealed to foreign governments to also freeze them. *Id.* at 353. Marcos removed to federal court. *Id.* at 347. The Second Circuit found that federal jurisdiction was proper under what is now-called the *Grable* doctrine. It held that "federal jurisdiction [was] present . . . because the claim raises, *as a necessary element*, the question whether to honor the request of a foreign government that the American courts enforce the foreign government's directives to freeze property in the United States subject to future process in the foreign state." *Id.* at 354 (emphasis added). The Court explained that "[t]he question whether to honor such a request by a foreign government is *itself a federal question* to be decided with uniformity as *a matter of federal law*." *Id.* (emphasis added). *Marcos* therefore applied the now well-recognized rule that federal courts can exercise jurisdiction over state-law claims under *Grable* only if they predicate liability on a federal rule of decision. Contrary to the Banks' assertions, *Marcos* does not recognize jurisdiction over any claim solely because it may *affect* foreign policy.

The Banks have a better argument under the third decision, but it ultimately does little to advance their case. In *Torres*, former workers sued a Peruvian mining company under Texan tort law, alleging that they were harmed by its chemical emissions while working at its plants. *Torres v. Southern Peru Copper Corp.*, 113 F.3d 540, 541 (5th Cir. 1997). The Peruvian government owned the land on which the mining company operated, owned its minerals, owned the relevant refinery for almost twenty years, and closely regulated the company. "The state of Peru [also] protested the lawsuit by filing a letter with the State Department and by submitting an amicus brief to [the Fifth Circuit]." *Id.* at 542. The Court held that adjudicating the dispute would "strike" at Peru's economic and sovereign interests. *Id.* at 543. The case therefore "raise[ed] substantial questions of federal common law by implicating important foreign policy concerns" and so the Fifth Circuit held that there was federal jurisdiction. *Id.* at 543. But *Torres* is not binding on this Court, predates *Grable* by almost ten years, and contradicts the overwhelming weight of authority in this circuit. And the Supreme Court in *Grable* expressly recognized that federal courts had for decades applied inconsistent standards to determine when plaintiffs could take advantage of this limited road to federal jurisdiction. *Grable*, 545 U.S. at 313 (noting the lack of a "single, precise, all-embracing test for jurisdiction over federal issues embedded in state-law claims between nondiverse parties") (internal quotation marks omitted). The Court in *Grable* "br[ought] some order to this unruly doctrine" by announcing a new four-prong standard to govern this source of federal jurisdiction. *Gunn*, 568 U.S. at 258. The Court is bound to apply that standard to this case, not prior, out-of-circuit caselaw that may no longer be good law.

In short, an issue is necessarily raised if a reviewing court will have to *decide* it in adjudicating the plaintiff's claims. The federal government often has interests in state-court

proceedings, but that is insufficient to confer federal-question jurisdiction. *Grable*'s "first element is not present where all of the plaintiff's claims seek relief under state law and none necessarily raises a federal issue." *Jacobson*, 824 F.3d at 315–16 (2d Cir. 2016) (internal quotation marks omitted). That is the case here, and the Banks therefore do not satisfy the first requirement for *Grable* jurisdiction.

### C. The Federal Issue, Even if Raised, Is Not Disputed

As noted above, each *Grable* factor is a necessary element for federal-question jurisdiction. *Gunn*, 568 U.S. at 258. Because the Banks have not shown that this case necessarily raises a federal issue, federal jurisdiction does not attach here. For the sake of completeness, however, the Court considers the remaining *Grable* factors. The second factor requires the Court to consider whether the federal issue is disputed. Merely raising a federal issue is not enough to confer jurisdiction; instead, *Grable* requires that the case raise a *disputed* federal question. The Banks cannot satisfy this element. Assume that the Court accepts the Banks' theory: by adjudicating this matter, the United States will "take a side" in this international dispute, contrary to its policy of neutrality. If that is true, the Banks have not raised a genuine dispute. Under their theory, one nation or another will be displeased no matter which way the Court rules. Indeed, they admit as much in their briefing. *See* Banks' Br. at 10 ("Granting Qatar the relief it seeks will thus, to say the least, displease Saudi Arabia and the UAE. On the other hand, if a court were to rule against Qatar, that country would be expected to react with similar displeasure."). The Banks' argument is that the Court is faced with a lose-lose scenario—and thus they have not raised a *disputed* federal issue.

### D. If Picking Sides is a Federal Issue, it is a Substantial One

The third factor requires the Court to determine whether the purported federal interest is substantial. The exercise of federal jurisdiction over state law claims demands "not only a

contested federal issue, but a substantial one." *Grable*, 545 U.S. at 313. The "'mere presence' of a federal issue in a state cause of action does not confer jurisdiction." *Veneruso v. Mt. Vernon Neighborhood Health Ctr.*, 933 F. Supp. 2d 613, 622 (S.D.N.Y. 2013) (quoting *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804 813 (1986)). To demonstrate substantiality, "it is not enough that the federal issue be significant to the particular parties in the immediate suit" because "that will always be true when the state claim 'necessarily raise[s]' a disputed federal issue." *Id.* Rather, the "substantiality inquiry . . . looks instead to the importance of the issue to the federal system as a whole." *Id.*; accord *Fracasse v. People's United Bank*, 747 F.3d 141, 144 (2d Cir. 2014). An issue is likely to be substantial if it "present[s] a nearly pure issue of law . . . that could be settled once and for all and would govern numerous . . . other cases." *Empire*, 547 U.S. at 700 (citations omitted); *Fracasse*, 747 F.3d at 144. For example, the Supreme Court in *Grable* found federal jurisdiction because the question of whether the IRS's notice policy violated federal law, and thereby possibly rendered many land transfers invalid, had broad implications for federal law well beyond the particular case. 545 U.S. at 315. In contrast, issues that have "fact-bound and situation-specific effects are not sufficient to establish federal arising under jurisdiction." *Empire*, 547 U.S. at 701.

The alleged federal interest here—the United States picking a side in an international conflict—is not a question of law. It is unlikely to have controlling effect in other cases. But the interest is a substantial one because it implicates sensitive questions of American foreign policy. The Second Circuit has made clear that "substantiality must be determined based on a careful, case-by-case judgment." *NASDAQ*, 770 F.3d at 1028. The Banks have provided evidence indicating that the United States has a position of neutrality in this dispute, and a judicial

decision in this case could be perceived as a departure from that policy. In short, although this federal interest is neither necessarily raised by this case nor in dispute, it is substantial.

### E. The Exercise of Federal Jurisdiction Would Disrupt Congress' Carefully Drawn Scheme

The Court turns finally to the fourth *Grable* factor: whether exercise of federal jurisdiction would disrupt the federal-state balance. "Because arising-under jurisdiction to hear a state-law claim always raises the possibility of upsetting the state-federal line drawn (or at least assumed) by Congress, the presence of a disputed federal issue and the ostensible importance of a federal forum are never necessarily dispositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction." *Grable*, 545 US at 314. In other words, courts have federal jurisdiction under *Grable* only if exercising "jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts." *Id.* at 313. The Second Circuit has looked to "express congressional preference[s]" in making this determination. *Jacobson*, 824 F.3d at 316.

Federal courts are courts of limited jurisdiction. They can exercise subject-matter jurisdiction in few circumstances, the rules of which are carefully circumscribed by Congress. In enacting the Federal Sovereign Immunities Act, Congress expanded the scope of federal jurisdiction. It gave federal courts the ability to hear state-law claims *if* they involved a small set of defendants: foreign states, and their agencies and instrumentalities. Congress then carefully delineated the scope of that jurisdiction by defining the sorts of entities that could invoke it, imposing procedural requirements, and creating a slew of exceptions. 28 U.S.C. §§ 1603 (definitions), 1605 (exceptions), 1608 (procedures).

Entities like the Banks often find themselves falling *just outside* the scope of federal jurisdiction under FSIA. Perhaps they are working "in league with" a foreign state, but are not

quite that state's organ.  Under Congress' carefully drawn scheme, that is not good enough to invoke federal jurisdiction and subsequent immunity under FSIA.  Yet the Banks now ask the Court to use the *Grable* doctrine to create a *backdoor* to the federal courthouse—and to sovereign immunity—in these sorts of cases.  Under their theory, cases implicating foreign relations, but not involving "foreign state[s]," could invoke federal jurisdiction.  But they offer no limiting principle.  Cases on FSIA's outer borders often raise foreign-policy implications, and on the Banks' theory they could come into federal court even if they do not satisfy FSIA's strictures.  The Banks' position would thus dramatically expand federal jurisdiction and nullify Congress's line drawing, upending the careful federal-state balance in this sensitive area.  This "threatening structural consequence[]" gives "good reason to shirk from federal jurisdiction." *Grable*, 545 U.S. at 319-20.  The fourth factor of *Grable*, therefore, also cuts against the Banks.

\* \* \* \* \*

In sum, there is no federal-question jurisdiction here because the Banks cannot satisfy three of *Grable*'s requirements.

## IV.  QATAR'S REQUEST FOR FEES IS DENIED

An order remanding a case may, in a court's discretion, "require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  28 U.S.C. § 1447(c).  "[C]ourts may award attorney's fees under section § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.  Conversely, when an objectively reasonable basis exists, fees should be denied."  *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005).  The Second Circuit has approved awards of attorneys' fees related to motions to remand where arguments for federal jurisdiction were based on federal defenses, *see Savino v. Savino*, 590 Fed. App'x 80, 81 (2d Cir. 2015) (summary order), or on claims raised in a third-party complaint, *see Calabro v. Aniqa Halal Live Poultry Corp.*, 650 F.3d 163, 166 (2d Cir.

2011). Courts will deny fee motions if a defendant had "at least a colorable basis for removal" and there is no evidence that removal was "merely an attempt to abuse or harass" the plaintiff or to force it to incur unnecessary expenses. *Koninklijke Philips Elecs. v. Digital Works, Inc.*, 358 F. Supp. 2d 328, 335 (S.D.N.Y. 2005) (internal quotations and citations omitted).

Although the Banks' arguments for removal are ultimately unsuccessful, they were colorable. In other words, "it cannot be said that Defendants' position is so wholly frivolous or unreasonable as to warrant an award of costs of fees." *PCVST*, 2015 WL 153048, *9. The Banks have also not acted in bad faith, and Qatar introduces no evidence that their motion rises to the level of abuse or harassment. True enough, the Banks originally claimed federal jurisdiction under an affirmative defense (the act-of-state doctrine). *See* Dkt. No. 1 (notice of removal) at 3-4. The well-pleaded complaint rule bars the Court from premising federal jurisdiction on an affirmative defense. *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) ("Federal jurisdiction cannot be predicated on an actual or anticipated defense.") But the Banks dropped their reliance on that untenable argument as a basis for removal. Banks Br. at 7. The Banks are therefore not required to bear Qatar's attorney's fees.

## V.     CONCLUSION

The Banks have not satisfied their burden to demonstrate that the Court has subject-matter jurisdiction to hear this case. The Defendants' Motion to Remand is thus GRANTED. This resolves Dkt. No. 25. The Clerk of Court is directed to REMAND this case to the New York Supreme Court, New York County and close the case.


SO ORDERED.

Dated: January 14, 2020
       New York, New York

ALISON J. NATHAN
United States District Judge